# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

JOSE TRINIDAD LOZA,

      Petitioner,

                         Case No. 1:98-cv-287
  v.                      JUDGE EDMUND A. SARGUS, JR.
                         Magistrate Judge Terence P. Kemp

BETTY MITCHELL, Warden,

      Respondent.

## OPINION AND ORDER

Petitioner, a prisoner sentenced to death by the State of Ohio, has filed a habeas corpus action pursuant to 28 U.S.C. § 2254. Petitioner filed his original habeas corpus petition (Doc. # 6), to which Respondent responded with a Return of Writ (Doc. # 11). Thereafter, this Court issued a *Opinion and Order* dismissing the following claims as procedurally defaulted: seven, nineteen, twenty (paragraph 252), twenty-six, and thirty-three.

The Court permitted some factual development in this case. By prior order, this Court issued a decision granting Petitioner leave to conduct discovery on the following claims for relief: five and seventeen (as to the selective prosecution component). Petitioner proceeded to conduct numerous depositions and to collect certain documents. Thereafter, the Magistrate Judge issued an *Opinion and Order* expanding the record before this Court to include certain deposition transcripts. (Doc. # 57.) Still to be resolved by the Court are Petitioner's request for an evidentiary hearing (Doc. # 68-1), Respondent's response (Doc. # 72), and Petitioner's reply (Doc. # 73.) In addition, An amicus brief was filed on Petitioner's behalf by counsel for the United Mexican States. (Doc. # 71.)

This case is now ripe for a final decision on the merits of those claims that are properly before the Court: grounds one, two, three, four, five, six, eight, nine, ten, eleven, twelve, thirteen, fourteen, fifteen, sixteen, seventeen, eighteen, twenty (except paragraph 252), twenty-one, twenty-two, twenty-three, twenty-four, twenty-five, twenty-seven, twenty-eight, twenty-nine, thirty, thirty-one, thirty-two, and thirty-four.

## I. Factual and Procedural History

The facts and procedural history of this case were set forth by the Ohio Supreme Court in *State v. Loza*, 71 Ohio St. 3d 61 (1994):

> On January 16, 1991, defendant-appellant, Jose Trinidad Loza, shot four members of the family of his girlfriend, Dorothy Jackson. The victims were shot in the head at close range while they slept in their home in Middletown, Ohio. Loza shot Jackson's mother, Georgia Davis; her brother, Gary Mullins; and her two sisters, Cheryl (Mullins) Senteno and Jerri Luanna Jackson. Mullins died almost immediately from his wound; Davis and Senteno survived several hours before dying. Jerri Jackson, six months pregnant at the time of the shooting, died on January 31, 1991.

> On the afternoon of January 16, 1991, Gary Hoertt observed an individual in a white Mazda pick-up truck with California plates loading trash into his dumpster at his shop in Middletown. Having had previous problems with the unauthorized use of his dumpster, Hoertt searched the dumpster for something with which to identify the individual. Hoertt found a letter in the dumpster signed by Loza with a return address in Butler County. Hoertt read the letter, the contents of which indicated that Loza was involved in a drive-by shooting in Los Angeles and that he came to Ohio to avoid apprehension by the Los Angeles police.

> After reading the letter, Hoert called the Warren County Sheriff's Department to report his discovery. Hoertt was informed that it would take some time before a deputy could respond. During that time, Hoertt was informed by an employee that the individual, later identified as Loza, and a female companion were seen in the vicinity of the nearby Greyhound bus station. Hoertt then called Middletown police detective Roger Knable.

After Knable arrived at Hoertt's shop and read the letter, Knable and Hoertt went to the dumpster, where they retrieved other items that Loza had discarded, which included: a knife; an empty box for a .25 caliber Raven automatic handgun; a receipt signed by a Judy A. Smith for the purchase of the handgun on January 15, 1991; a woman's purse; a blank check on the account of Georgia L. Davis; a general money order made payable to Jose Loza; clothing; and some other personal items.

As Hoertt and Knable were going through the items in Hoertt's office, Hoertt saw Loza approach the dumpster. Knable went to his cruiser and requested his dispatcher to notify Warren County deputies that the individual had returned and that he was going to speak to him. Knable identified himself as a police officer, approached Loza with his gun in his hand, and instructed Loza to place his hands on the front of the car. Knable searched Loza and asked his name. At this time, Loza identified himself as "Jose Rodriguez." Knable told Loza the reason he was being stopped was because of what he put in the dumpster. Loza responded "yes." Knable said the letter indicated that Loza may have been involved in a drive-by shooting in Los Angeles. Loza again responded "yes." Knable then informed Loza that he was going to handcuff him and hold him until Warren County deputies arrived. Knable then went to locate the woman who had been seen with Loza earlier. Loza said that the woman's name was Cynthia Rodriguez, that she was his wife, and that they were headed to California.

Knable then went inside the bus station and approached Dorothy Jackson. He asked her name and she responded "Dorothy Jackson." When asked, Jackson stated that Loza's name was "Jose Rodriguez," and that they were not married. Within a short time after Knable's initial contact with Loza, Warren County deputies arrived. The deputies determined Jackson was under age and that she planned to travel to California with Loza. When asked, Jackson gave her mother's telephone number to the deputies. Knable was unsuccessful in reaching Davis, Jackson's mother, by phone. Detectives Knable and George Jeffery then went to Davis's home at 1408 Fairmont, but did not receive any response when they knocked at the door. A neighbor approached the detectives and said that she had been trying unsuccessfully all day to get someone from the house to respond.

Because the police were unable to determine if Jackson had permission to travel out of state, she was arrested for being an unruly minor and was taken to the Warren County Juvenile Detention Center. Loza was arrested for contributing to the delinquency or unruliness of a minor and was taken to the Warren County Justice Center.

When the detectives began questioning Jackson at the juvenile detention center, she did not initially tell them of the murders. Shortly into the questioning, she began crying. She said she did not want to go to jail, and that Loza had killed her family. Jackson told the detectives what she knew about the murders.

Based upon Jackson's statement, Detective Knable obtained a search warrant for the house at 1408 Fairmont. When the police entered the house, they discovered the victims.

Knable and Jeffery then returned to the Warren County Justice Center and began questioning Loza. The detectives' interview with Loza was videotaped. At the beginning of the interview, Loza waived his *Miranda* rights. Initially, Loza said that he and Jackson were traveling to California with her mother's permission. The detectives told Loza they knew what had happened, and that it would be in his, Jackson's and the unborn baby's best interest if he just told the truth. About one hour into the interview, Loza confessed to the murders. Loza detailed the murders, including the order in which he shot the victims. Loza stated that Jackson was not in the house at the time of the murders, and that she did not know that he was going to kill her family members.

The detectives asked Loza when he began thinking about murdering Jackson's family members. Loza responded that he had been thinking about it since he had obtained the gun and particularly after Davis had threatened to have him arrested if he tried to leave the state with Jackson. Loza explained that he shot Davis because of her threats. When asked why he shot the others, he responded: "Knowing I had to do one, I had to do all. * * * Because if I only done one, they would have – they would have known it was me. If I would have done all of them, nobody would have found out."

Loza was indicted on four counts of aggravated murder, with three death penalty specifications and a gun specification added to each murder charge. Death specification number one alleged murder to escape detection and arrest, R.C. 2929.04(A)(3); death specification number two alleged "course of conduct" murders, R.C. 2929.04(A)(5); and death penalty specification number three alleged murder during an aggravated robbery, R.C. 2929.04(A)(7). Appellant pleaded not guilty to all the charges.

Appellant waived his right to a jury trial and proceeded to trial before a three-judge panel. During cross-examination of the state's final witness, the defense moved for a mistrial on the basis that the stated had failed to disclose certain exculpatory evidence during discovery. Over the state's objection, the court granted a mistrial without prejudice. The trial court denied appellant's subsequent motion to bar his retrial on double jeopardy grounds.

After the court denied appellant's pretrial motion to suppress all statements and evidence seized in this matter, a trial by jury commenced on October 21, 1991.

Prior to submitting the case to the jury, the court dismissed the aggravated-robbery specification with respect to the aggravated murder of Jerri Jackson. The jury found appellant guilty on all four counts of aggravated murder. The jury also found appellant guilty of all remaining specifications except for the R.C. 2929.04(A)(3) specification with respect to the aggravated murders of Senteno and Jerri Jackson.

At the conclusion of the penalty phase, the court merged the R.C. 2929.04(A)(3) and 2929.04(A)(5) specifications with respect to the aggravated murders of Davis and Mullins. The jury recommended the death sentence for the aggravated murders of Mullins, Senteno, and Jerri Jackson and thirty years to life imprisonment for the aggravated murder of Davis. The court accepted the recommendation and sentenced appellant to death for the aggravated murders of Senteno, Mullins, and Jerri Jackson. The court also sentenced appellant to thirty years to life imprisonment for the aggravated murder of Davis and imposed a three-year term of actual incarceration for the firearm specification. The court ordered the life and three-year firearm sentences to be served consecutively to appellant's death sentences.

(*Loza*, 71 Ohio St. 3d at 61-64; App. Vol. III, at 1232-34.)

Represented by two new attorneys from the Ohio Public Defender's Office, as he would be throughout the remainder of his state court proceedings, Petitioner appealed first to the Court of Appeals for the Twelfth Appellate District. Counsel for Petitioner raised twenty-nine assignments of error. On April 19, 1993, the appellate court issued an opinion affirming Petitioner's convictions and sentences, and further finding that the aggravating circumstances outweighed the mitigating factors and that Petitioner's death sentences were not disproportionate. (*State v. Loza*, Case No. CA91-11-198 (Ohio App. 12 Dist.); App. Vol. I, at 556.)

Represented again by the Ohio Public Defender's Office, Petitioner pursued his second appeal of right to the Ohio Supreme Court. Counsel for Petitioner raised thirty-three

propositions of law. On November 30, 1994, the Ohio Supreme Court affirmed Petitioner's convictions and sentences, and further concluded that the death sentences were appropriate and proportionate. (*State v. Loza*, 71 Ohio St. 3d 61 (1994); App. Vol. III, at 1223.) On December 28, 1994, the Ohio Supreme Court summarily denied Petitioner's motion for reconsideration. (App. Vol. III, at 1263.)

On November 27, 1995, Petitioner filed a postconviction action to vacate or set aside the judgment or sentence pursuant to R.C. § 2953.21 He raised thirteen claims for relief. On September 24, 1996, the trial court issued findings of fact and conclusions of law denying Petitioner's postconviction action. (App. Vol. III, at 1604.) Petitioner appealed to the Court of Appeals for the Twelfth Appellate District. On October 13, 1997, the appellate court issued an opinion affirming the trial court's judgment denying Petitioner's postconviction action. (*State v. Loza*, Case No. CA96-10-214 (Ohio App. 12 Dist. Oct. 13, 1997); App. Vol. IV, at 1990-2012.) Petitioner sought discretionary review by the Supreme Court of Ohio and filed his memorandum in support of jurisdiction on November 26, 1997. On January 28, 1998, the Ohio Supreme Court issued an entry summarily declining to accept jurisdiction over Petitioner's appeal. (*State v. Loza*, Case No. 97-2470 (Jan. 28, 1998); App. Vol. IV, Exh. KK, at 2199.)

## II. Standards for Habeas Review

The provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which became effective prior to the filing of the instant petition, apply to this case. *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997). Under the AEDPA, a federal court shall not issue a writ of habeas corpus on a claim that the state courts adjudicated on the merits unless the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application

6

of, clearly established Federal law, as determined by the Supreme Court of the United States," 28

U.S.C. § 2254(d)(1), or was based on "an unreasonable determination of the facts in light of the

evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2). Section 2254(d)(1)

circumscribes a federal court's review of claimed legal errors, while § 2254(d)(2) places

restrictions on a federal court's review of claimed factual errors.

Under § 2254(d)(1), a state court decision is "contrary to" Supreme Court precedent

"when the state court confronts facts that are materially indistinguishable from a decision of the

Supreme Court and nevertheless arrives at a result different from its precedent[]" or "when the

state court 'applies a rule that contradicts the governing law set forth in' Supreme Court cases."

*Williams v. Coyle*, 260 F.3d 684, 699 (6th Cir. 2001) (quoting *Williams v. Taylor*, 529 U.S. 362,

406-07 (2000)). A state court decision involves an unreasonable application of Supreme Court

precedent if the state court identifies the correct legal principle from the decisions of the Supreme

Court but unreasonably applies that principle to the facts of the Petitioner's case. *Coyle*, 260

F.3d at 699. A federal habeas court may not find a state adjudication to be "unreasonable"

simply because the court concludes in its independent judgment that the relevant state court

decision applied clearly established federal law erroneously or incorrectly. *Id.* Rather, a state

court's application of federal law is unreasonable "only if reasonable jurists would find it so

arbitrary, unsupported or offensive to existing precedent as to fall outside the realm of plausible

credible outcomes." *Barker v. Yukins*, 199 F.3d 867, 872 (6th Cir. 1999).

Further, § 2254(d)(2) prohibits a federal court from granting an application for habeas

relief on a claim that the state courts adjudicated on the merits unless the state court adjudication

of the claim "resulted in a decision that was based on an unreasonable determination of the facts

7

in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). In this regard, § 2254(e)(1) provides that the findings of fact of a state court are presumed to be correct and that a petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence.

### III. Petitioner's Claims

This case is ripe for review of the merits of all but the following claims for relief: seven, nineteen, twenty (paragraph 252), twenty-six, and thirty-three.

**First Ground for Relief: The trial court erroneously deprived Petitioner of his rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution when it prohibited the introduction to the jury of defense evidence regarding the reliability and credibility of Loza's confession.**

In the First Ground for Relief, Petitioner alleges that the trial court violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights by preventing him from introducing expert testimony regarding the credibility and reliability of his confession. (Petition, Doc. # 6, at ¶¶ 1-9; Memorandum in Support, Doc. # 62, at 4-11; Reply, Doc. # 70, at 1-9.)

On January 17, 1991, Petitioner was interviewed by Detective Knabel and Sergeant Jeffrey of the Middletown Police Department. The interview began at 12:21 a.m. and concluded one hour and ten minutes later. As soon as the interview began, the officers read to Petitioner his *Miranda* rights, which Petitioner indicated both orally and in writing that he understood.

The undersigned initially notes that he has watched the videotape of the statements and has reviewed the written transcript of the questioning. The Court notes that the questioning began in a low key, somewhat casual, albeit professional, manner. The interrogation room was small, but not particularly restrictive. In general, the questioning began by covering preliminary

8

matters. After approximately thirteen minutes, the officer began asking pointed questions. At no time did either officer raise his voice or otherwise appear menacing.

The officers did tell Petitioner that "Luanna is alive," which was true. (App. Vol. VII, at 3654.) Although she never regained consciousness and died two weeks later, the officers told Petitioner that Luanna had given them a statement inculpating him. (App. Vol. VII, at 3658.)

Thirty-seven minutes into the questioning, the following exchange took place between Petitioner and Knabel:

> Q. Do you know what Luanna was – Do you know what Luanna was wearing this morning?
>
> A. No. I didn't see her --
>
> Q. How about a black t-shirt that come down just below her butt, a pair of white panties.
>
> A. I've never seen her. After I went to work, she was outside. Last time I seen her it was on the street which was walking with Dorothy.
>
> Q. Jose, we've talked to her.
>
> A. Well, what can I say?
>
> Q. You can say the truth.
>
> A. Well, that's what I am trying to tell you.
>
> Q. No. That's not the case. What you're trying to do is put yourself in an electric chair or a gas chamber right along with Dorothy, and this child is going to go off into never, never land and never be seen again.

(App. Vol. VII, at 3648.)

In addition, Petitioner stated in multiple answers that his only fear was what was going to happen to Dorothy and their unborn child. (App. Vol. VII, at 3670, 3701, 3711, 3713, 3968.)

9

Knabel also told Petitioner:

Q.      Dorothy stands to do the same thing you do, man. Dorothy stands not only
to lose her child, she's 16 years old. She could lose the next 60 years.

(App. Vol. VII, at 3667.)

The officers also discussed with Petitioner what they could do for him if he cooperated.

They told him that they did not "have the authority to make that deal." (App. Vol. VII, at 3666.)

When Petitioner asked Knabel how long Petitioner could spend in prison, Knabel told him, "I

don't know. That's the judge's decision, Jose." (App. Vol. VII, at 3666.) Jeffrey also told

Petitioner:

Q.      Jose, we can't make you any promises, okay. You know that. We can't
make any promises.

A.      I'm not asking for none.

Q.      I didn't say you asked us for any. Okay. But we can't make you any
promises. But there's one thing we can do. We can explain to the court what
happened and why it happened. Okay. And surely you have some – some
remorse over all of this. Okay. Surely it bothers you in here a little bit, I would
think, because I think you got a heart.

(App. Vol. VII, at 3658-59.)

Approximately one hour and three minutes into the interview, Petitioner confessed to the

killings. At the time he began the confession, Petitioner appeared to be calm.

In the first phase of the trial, Petitioner's counsel sought to introduce the testimony of Dr.

Roger Fisher, a clinical psychologist. The following exchange occurred outside of the presence

of the jury:

THE COURT:      We will allow counsel to state what he would expect the
doctor to testify to if permitted to do so.

10

MR. SHANKS: We would expect that he would have testified if permitted to do so that he was a qualified psychologist, that he reviewed the taped confession, taped statement, of Jose Loza which was introduced into evidence by the State of Ohio in this case and that he reviewed other personal records of the Defendant in regard to his school records, juvenile records, employment records and summaries of interviews from Mr. Casey Cone in the State of California.

I believe he also testified that he reviewed the psychological history of Mr. Jose Loza present in the file from the Center for Forensic Psychology of Butler County Court System and that based upon his training, skill and experience and the documents reviewed and his review of the videotaped statement of Mr. Loza, that the videotaped statement specifically in reference to Mr. Loza's acknowledgment of his participation in the offense and his desire to take full responsibility would have been product of psychological coercion and duress brought upon by the statements of the police officer that his girlfriend would be placed in the electric chair and his child would be sent to never-never land and that the letters and repeated affirmations of that statement would have been consistent with Mr. Loza's coerced desire to protect his girlfriend and unborn child.

THE COURT: The Court, of course, has already ruled on motions to suppress in this case and found the confession has already been admitted as being a voluntary, knowing confession on the part of the Defendant.

The expert's opinion as to duress at this time is not appropriate at this time.

The Court has already been advised, as counsel has already been advised, the Court will exclude that testimony in this phase of the case.

(App. Vol. VI, at 3176-78.)

Petitioner contends that he was deprived of his right to present testimony as to the

"physical and psychological environment that yielded the confession." *Crane v. Kentucky*, 476

U.S. 683, 689 (1986.) Petitioner asserts that Dr. Fisher should have been allowed to explain to

the jury Petitioner's psychological make-up and unique characteristics which rendered his

confession unreliable.

The Ohio Supreme Court made the following determination in rejecting Petitioner's

claim on direct appeal:

11

In his first proposition of law, appellant asserts that psychological testimony concerning the voluntariness of his confession should have been admitted during the guilt phase of his trial.

The trial court did not permit the jury to hear testimony of Dr. Roger Fisher, a clinical psychologist, who would have testified that appellant's confession resulted from police coercion and duress caused by statements made by the police officers during the interrogation. Dr. Fisher would have testified that, in his opinion, appellant confessed because his background, psychological makeup, and his personal code of conduct required that he not "snitch" and that he "protect Dorothy." Dr. Fisher would have testified that because Loza had a difficult childhood he was compelled to confess to protect his girlfriend and unborn child. The trial court concluded that since it had made a pretrial determination that Loza's confession was voluntary, Dr. Fisher's testimony was not appropriate during the guilt phase.

Appellant argues that *Crane v. Kentucky* (1986), 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636, requires the admission of Dr. Fisher's testimony. In *Crane*, a sixteen-year-old defendant sought to introduce testimony regarding the psychological impact of the length of his interrogation and the manner in which it was conducted. FN1 The United States Supreme Court held that the exclusion of the testimony about the circumstances of the defendant's confession deprived him of his fundamental constitutional right to a fair opportunity to present a defense. The court recognized that while the issue of whether a confession is voluntary is a question of law for the court, the jury was entitled to hear the excluded testimony in order to make a factual determination of whether the manner in which the confession was obtained cast doubts on its credibility. *Id.* at 689, 106 S.Ct. at 2146, 90 L.Ed.2d at 644.

> FN1. The defendant in Crane testified that he had been detained in a windowless room for a protracted period of time, that he had been surrounded by as many as six police officers during the interrogation, that he had repeatedly requested and been denied permission to telephone his mother, and that he had been badgered into making a confession.

The testimony of Dr. Fisher is clearly outside the holding of *Crane*. The testimony of the witnesses in *Crane* related to how the physical and psychological environment of the interrogation could have impacted the voluntariness and credibility of the confession. Dr. Fisher's proffered testimony relates to how Loza's individual, psychological makeup, independent of the circumstances surrounding the interrogation, could have impacted the voluntariness and credibility of the confession. Consequently, *Crane* does not require the admission

of Dr. Fisher's testimony.

        The jury was able to accurately consider the credibility and weight of the confession by watching it on videotape. They could see and hear the tone and manner of the interrogation, the number of officers present, the physical characteristics of the room, and the length of the interrogation. The jury had the opportunity to evaluate the credibility of the appellant and to give the confession its appropriate probative weight. See *State v. Jamison* (1990), 49 Ohio St.3d 182, 191, 552 N.E.2d 180, 189 (the weight to be given evidence and the credibility of witnesses are jury issues). Because the trial court already had ruled on the voluntariness of the confession and the jury had the opportunity to evaluate the credibility of the confession, the trial court did not abuse its discretion by excluding the testimony of Dr. Fisher during the guilt phase of the trial.

        This proposition of law is overruled.

(*Loza*, 71 Ohio St. 3d at 65-66; App. Vol. III, at 1234-35.)

        This Court must determine whether the decision of the Ohio Supreme Court contravened or unreasonably applied clearly established Supreme Court precedent or involved an unreasonable determination of the facts based on the evidence presented. Petitioner relies primarily upon *Crane v. Kentucky*, *supra* to support his contention that the Constitution required that he be permitted to offer evidence regarding the circumstances surrounding his confession. Petitioner argues that 28 U.S.C. § 2254(d)(1) does not preclude habeas corpus relief because the Ohio Supreme Court's decision was contrary to the language of *Crane* and an unreasonable application of the principles underlying *Crane*. In *Crane*, the trial judge made a preliminary, evidentiary ruling that the confession was admissible. *Crane*, 476 U.S. at 685. During the trial, the trial court excluded any testimony regarding the methods used to obtain the confession. *Crane*, 476 U.S. at 686. These circumstances included the fact that Crane, then age 16, was questioned by six police officers over an extended period of time. *Crane*, 476 U.S. at 685. Crane repeatedly asked to see his mother, and was denied his request. None of those facts were

13

presented to the jury. *Crane* did not offer expert testimony and the Supreme Court did not address the admissibility of such offered evidence.

In contrast, the jury in this case watched the entire encounter between Petitioner and the interrogating officers. All of the circumstances surrounding Petitioner's confession, including the *Miranda* warning, were observed by the jury. To this extent, *Crane* is inapposite.

What Petitioner essentially challenges is the trial court's exclusion of Dr. Fisher's opinions that the confession was "the product of psychological coercion and duress." (App. Vol. VI, 3177.) The Ohio Supreme Court found that the jury had the ability to observe the entirety of circumstances leading to the confession. The question of whether an expert in psychology may opine on the voluntariness of a confession is a matter of state law and not subject to review in this habeas corpus proceeding, unless a state evidentiary rule, by itself or in concert with other state rules, "undermine[s] fundamental elements of the defendant's defense." *United States v. Scheffer*, 523 U.S. 303, 315 (1998).

Although not mentioned in its decision in this case, the Ohio Supreme Court has held that expert witnesses may not, under the Ohio Rules of Evidence, offer opinions as to the truthfulness of a witness's statement. *State v. Boston*, 46 Ohio St. 3d 108 (1989). The Ohio Supreme Court held that the veracity of an alleged victim of child abuse was "the key issue in the case" and that expert testimony on the issue "infringed upon the role of the fact finder, who is charged with making determinations of veracity and credibility." *Boston*, 46 Ohio St.3d at 129, 130 (citing *State of Ohio v. Eastham,* 39 Ohio St.3d 307, 312 (1988)). Further, as the United States Supreme Court explained in *Montana v. Egelhoff*:

14

In the absence of any valid state justification, exclusion of this kind of exculpatory evidence deprives a defendant of the basic right to have the prosecutor's case encounter and survive the crucible of meaningful adversarial testing. Our holding that the exclusion of certain evidence in that case violated the defendant's constitutional rights rested not on a theory that all "competent, reliable evidence" must be admitted, but rather on the ground that the Supreme Court of Kentucky's sole rationale for the exclusion (that the evidence "did not relate to the credibility of the confession") was wrong. *Crane* does nothing to undermine the principle that the introduction of relevant evidence can be limited by the State for a "valid" reason, as it has been by Montana.

*Montana v. Egelhoff,* 518 U.S. 37, 53 (1996) (quoting *Crane,* 476 U.S., at 687, 690-691; *Crane*

*v. Commonwealth*, 690 S.W.2d 753, 755 (1985)) (quotation marks omitted).

This Court cannot say that state law-authorized limitations placed upon experts opining

on truthfulness "undermines fundamental elements of the . . . defense." *Scheffer*, 523 U.S. at

315. This is particularly so when the jury has the opportunity to view a videorecording of the

entire interview which culminated in the confession. This Court concludes that the Ohio

Supreme Court's decision rejecting Petitioner's claim did not violate the rule established in

*Crane v. Kentucky.* Petitioner's constitutional rights were not violated by the exclusion of the

testimony of Dr. Fisher. Accordingly, Petitioner's first ground for relief is **DENIED.**

> **Second Ground for Relief: The admission of a coerced and involuntary statement at his capital trial denied Petitioner of his rights as guaranteed by the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.**
>
> **A. Loza's Statement [Was] The Result of Coercion**
>
>> **1. Coercive Police Tactics**
>> **2. Improper Inducements**
>> **3. Trickery**
>> **4. The Personal Characteristics of the Suspect**
>> **5. Conclusion**

**B. The trial court erred by denying Petitioner's motion to suppress using an erroneous legal standard in deprivation of Petitioner's rights as guaranteed by the Fourth, Eighth and Fourteenth Amendments to the United States Constitution.**

**C. The trial court failed to explain the suppression denial.**

Petitioner contends that his confession was coerced and involuntary in violation of his

rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments. Petitioner asserts that

he confessed only after police threatened his pregnant girlfriend. Petitioner also notes that he had

not slept in twenty-four hours and was only eighteen years old. Petitioner further contends that

the interrogating officers lied to and made certain promises to Petitioner in order to obtain his

confession. (Petition, Doc. # 6, at ¶¶ 10-49; Doc. # 62, at 11-18; Doc. # 70, at 9-13.)

The Ohio Supreme Court rejected Petitioner's claim as follows:

Appellant contends in his second and fifth propositions of law that his confession was involuntary because of psychological coercion, trickery, and deception by the police.

Appellant's pretrial motion to suppress was based upon what he contended was an illegal arrest at the Greyhound station. Although he did not raise the issue of voluntariness in the motion to suppress, we will address the issue here.

A confession is involuntary and violative of the United States and Ohio Constitutions if it is the product of "coercive police activity." *Colorado v. Connelly* (1986), 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473, 484. "In deciding whether a defendant's confession is involuntarily induced, the court should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *State v. Edwards* (1976), 49 Ohio St.2d 31, 3 O.O.3d 18, 358 N.E.2d 1051, paragraph two of the syllabus, vacated in part on other grounds (1978) 438 U.S. 911, 98 S.Ct. 3147, 57 L.Ed.2d 1155.

Appellant contends that his confession was involuntary because detectives Knable and Jeffery were psychologically abusive during the interrogation. Appellant asserts that the detectives were aware of his deep feelings for Jackson

16

and his unborn child and they played upon those feelings in order to coerce appellant into confessing. Additionally, appellant asserts the detectives offered a plethora of promises, including lenient treatment from the court, a visit with Jackson, and a promise to release Jackson if he could just "tell * * * the truth."

Admonitions to tell the truth are considered to be neither threats nor promises and are permissible. *State v. Cooey* (1989), 46 Ohio St.3d 20, 28, 544 N.E.2d 895, 908; *State v. Wiles* (1991), 59 Ohio St.3d 71, 81, 571 N.E.2d 97, 112. The detectives did no more than urge the appellant to tell the truth.

The detectives' references to Jackson were made in response to appellant's repeated inquiries about what would happen to her. No threats were made concerning Jackson or what would happen if appellant did not confess. The detectives merely informed appellant of the possible consequences of his actions. By the time the detectives were questioning appellant, Jackson had already told the police about appellant's involvement in the murders. Appellant sought the release of Jackson and he initiated the bargaining for her release. Under these circumstances, the statements made to the detectives were voluntary beyond doubt. See *State v. Melchior* (1978), 56 Ohio St.2d 15, 25-26, 10 O.O.3d 8, 14-15, 381 N.E.2d 195, 201-202.

The detectives made no promises regarding the treatment appellant would receive from the court. They did say that they would be willing to testify that appellant was cooperative. Promises that a defendant's cooperation would be considered in the disposition of the case, or that a confession would be helpful, does not invalidate an otherwise legal confession. *Edwards, supra,* 49 Ohio St.2d at 40-41, 3 O.O.3d at 23-24, 358 N.E.2d at 1058-1059.

The detectives made no promises regarding a visit with Jackson; the detectives did say that they would try to make arrangements for appellant and Jackson to visit "after all of this [was] done." Contrary to the interpretation proffered by the defense, taken in the proper context of the entire confession the detectives' statements could not be viewed as a coercive tactic used by the police to elicit the confession.

Appellant also contends that the police used trickery to induce his confession. Knable told appellant that Jerri [Luanna] Jackson was alive. He also stated that she had identified her assailant, which was not the case. However, all the other circumstances surrounding the confession indicate that it was made voluntarily, and the confession is admissible even though the police misled appellant by suggesting that they received certain information from the victim of the crime. See *Wiles, supra,* 59 Ohio St.3d at 81, 571 N.E.2d at 112.

Applying the test of voluntariness set forth in *State v. Edwards, supra*, and in carefully reviewing the totality of the circumstances in this case, we concur in the trial court's finding that the appellant's statements were voluntarily made and that the appellant's will to resist was not overborne by threats or improper inducements. Appellant was of majority age and was in command of his faculties at the time he confessed. He was not interrogated for an unreasonable length of time, and was not subjected to physical abuse or harsh conditions. We note that before the interrogation began, appellant waived his *Miranda* rights. Upon completion of the interrogation, when the detectives asked if he felt threatened by them or if they had made any promises to him, appellant responded that "no," they had not threatened him, and agreed they had not made any promises to him. Through these affirmations, appellant has confirmed that his confession was voluntarily made.

Thus, we reject appellant's propositions of law two and five.

(*Loza*, 71 Ohio St. 3d at 66-68; App. Vol. III, at 1235-36.)

Petitioner is entitled to habeas corpus relief only if this Court determines that the Ohio Supreme Court's decision was contrary to or involved an unreasonable application of clearly established federal law or involved an unreasonable determination of the facts. This Court is not persuaded that is the case.

The Court first addresses the circumstances of the confession. As noted above, the entire interview was tape recorded. The videotape does not demonstrate that Petitioner was reacting to a loss of sleep or that, at age eighteen, he was vulnerable or unsophisticated.

Petitioner claims that he confessed only after officers threatened his pregnant girlfriend, Dorothy Jackson, and their unborn child. On the videotape, Petitioner expressed concern for the welfare of Jackson and the unborn child. As Petitioner became evasive, Detective Knabel told him:

No. That's not the case. What you're trying to do is put yourself in an electric chair or gas chamber right along with Dorothy, and this child is going to go off into never, never land and never be seen again.

18

(App. Vol VII, at 3648.) Although only Knabel knew the true intent of this statement, the literal words suggested that Jackson could be a codefendant with Petitioner and both could face capital charges. As to the child "going to go off into never, never land and never be seen again," this implicates that the child would enter foster care and adoption, if both mother and father were convicted of murder. From this statement alone, Petitioner might have inferred that direct harm would come to the child. Prior to the confession, however, Knabel explained:

> Dorothy stands to do the same thing you do, man. Dorothy stands to lose not only her child, she's 16 years old. She could lose the next 60 years.

(App. Vol. VII, at 3667.)

Petitioner was arrested as he was in the company of Dorothy Jackson. They were at a bus station preparing to leave town. Jackson lived in the same house where the murders occurred. Knabel had good reason in the early stages of the investigation to question the extent of Jackson's involvement. Knabel's questions to Petitioner, although no doubt pointed, probed the involvement of Petitioner's pregnant girlfriend. Taken as a whole, prior to the confession, and contrary to Petitioner's claim, the officers did not threaten that the child would be executed.

Petitioner also contends that the officers made unkept promises to him in order to induce a confession. After reviewing the entire videotape, the Court is of a different view. The officers made it clear that they could only advise a judge of Petitioner's level of cooperation; they told Petitioner quite explicitly that they could not make other promises.

Finally, Petitioner contends that the officers lied to him by telling Petitioner that Luanna Jackson was alive and had told them what happened. Although Luanna Jackson was alive at that time, she was unconscious and had made no statement.

19

Even though a defendant is *Mirandized*, a confession may be unconstitutionally compelled if the same was the product of coercive state action. The Supreme Court noted in *Colorado v. Connelly*:

> Thus the cases considered by this Court over the 50 years since *Brown v. Mississippi* have focused upon the crucial element of police overreaching. While each confession case has turned on its own set of factors justifying the conclusion that police conduct was oppressive, all have contained a substantial element of coercive police conduct. Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law.

*Colorado v. Connelly*, 479 U.S. 157, 164-65 (1986) (footnote omitted).

As to Petitioner's claim that the officers lied to him, thereby inducing an involuntary confession, the case of *Frazier v. Cupp*, 394 U.S. 731 (1969) is instructive. Frazier was told by police officers that his cousin had already confessed to the crime. This statement was false. The Supreme Court held that, "[t]he fact that the police misrepresented the statements that Rawls had made is, while relevant, insufficient in our view to make this otherwise voluntary confession inadmissible. These cases must be decided by viewing the 'totality of the circumstances,'" 394 U.S. 731 (1969) (citing *Clewis v. Texas*, 386 U.S. 707, 708 (1967)).

The Sixth Circuit has acknowledged that psychological coercion may render a confession involuntary. *Ledbetter v. Edwards*, 35 F.3d 1062 (1994). The Sixth Circuit described a number of relevant factors, including (1) the recitation of Constitutional rights; (2) the age, education and intelligence of the defendant; (3) the length of questioning; and (4) any deprivation of food or sleep. Also, the Sixth Circuit considered the impact of misrepresentations made by law enforcement in reviewing the totality of the circumstances.

20

Petitioner contends that *Spano v. New York*, 360 U.S. 315 (1959), is analogous to his case. In *Spano*, a pre-*Miranda* case, the defendant was questioned for over eight hours, during which Spano asked for and was denied an attorney. During the interrogation, a police officer who was a close friend of Spano told the defendant that he (the police officer) would be fired if Spano did not cooperate. The Court does not find the facts in this case similar to those in *Spano*. Petitioner was *Mirandized* and never asked for counsel. The interrogation lasted only one hour, was videotaped, and did not reveal other forms of coercion.

The Court concludes that the Ohio Supreme Court's decision rejecting Petitioner's claim did not contravene or unreasonably apply controlling United States Supreme Court precedent and did not involve an unreasonable determination of the facts. That being so, Petitioner's second ground for relief must be **DENIED**.

> **Third Ground for Relief: The State of Ohio ignored its international treaty obligations thereby depriving Petitioner of his rights as guaranteed by the Supremacy Clause, and the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

Petitioner's third ground for relief asserts that his rights under Article 36 of the Vienna Convention on Consular Relations were violated when local law enforcement officers not only failed to notify him without delay that, as a Mexican national, Petitioner had an absolute right to communicate with the Mexican consulate, but also failed to notify the Mexican consulate without delay that Petitioner had been arrested. (Petition, Doc. # 6, at ¶¶ 50-71.) In fact, according to Petitioner, to this day neither he nor the Mexican government have received formal notification. Arguing that the Supremacy Clause of the United States Constitution confers upon treaties the same force and effect as the Bill of Rights and other federal laws, Petitioner argues that the

violation of his Vienna Convention rights warrants federal habeas corpus relief. Specifically, Petitioner argues that the violation of his Vienna Convention rights mandates the same sort of remedy as would a violation of his *Miranda* rights – namely the exclusion of Petitioner's inculpatory statements. In the absence of those inculpatory statements, Petitioner argues, the capital convictions against him cannot stand. In this regard, Petitioner points out that there was no scientific evidence or eyewitnesses that linked him to the homicides and that for a host of reasons, Dorothy Jackson's self-serving statements implicating Petitioner are not reliable.

Petitioner argues that although he need not demonstrate prejudice, he was in fact prejudiced by the violation of his rights under the Convention. Petitioner asserts that the Mexican consulate *would* have advised him of his rights, *would* have provided him with Spanish-speaking attorneys, *would* have assisted Petitioner's counsel with the investigation of Petitioner's background, *would* have attended Petitioner's trial to ensure that the proceedings were full and regular, and *would* have assisted Petitioner in demonstrating that his confession was the result of police coercion – threats directed at Petitioner's girlfriend and unborn child – to which Petitioner was particularly susceptible because of his cultural background.

In sum, Petitioner argues that by failing to honor a treaty into which the United States entered, local law enforcement not only violated the Supremacy Clause, but in doing so implicated Petitioner's due process rights and additionally violated Petitioner's Fifth Amendment right to remain silent.

Petitioner expands upon these arguments in his memorandum in support of his habeas corpus petition. (Doc. # 62, at 18-35.) Petitioner turns his focus first on the import of the

International Court of Justice's *LaGrand Case* decision.[1]  That decision, according to Petitioner,

defined the scope of rights guaranteed by Article 36 of the Vienna Convention, is authoritative,

and must be followed by this Court.  Petitioner asserts that the International Court of Justice

("ICJ") set out five principle holdings:

> First, "Article 36 ... creates **individual** rights" for a detained foreign national to be
> informed, following his detention and prior to trial, that he is entitled to receive
> assistance from his nation's consul if he so chooses.  La Grand ¶ 77 (emphasis
> added).  Second, this right is separate and distinct from, and not cumulative of,
> rights accorded under the laws of a state or the U.S. Constitution.  Id. ¶ 91.  Third,
> a showing of prejudice is not necessary to establish a violation of Article 36.  Id. ¶
> 74.  Fourth, a state that denies a defendant his Article 36 rights cannot invoke
> waiver as a defense to a challenge based on that violation.  Id. ¶ 60.  Finally,
> neither the United States, nor any of its constituent states, including Ohio, may
> apply its procedural default rules to deprive a foreign national of the opportunity
> to challenge his conviction and death sentence on the ground that he was deprived
> of his rights under Article 36 to seek and obtain consular assistance from his own
> government without delay.  Id. ¶¶ 90-91.

(Doc. # 62, at 22.)  Petitioner argues that Ohio is bound by the Supremacy Clause to follow the

Convention and that the ICJ's *LaGrand* decision prescribes the rule of law for this Court

regarding Article 36 rights.

Petitioner argues that there are additional reasons why *LaGrand* is binding on this Court,

to wit: because the United States recognized when it signed and ratified the Vienna Convention

that the ICJ's interpretations and applications of the Convention would be binding and under the

United Nations charter that it would undertake to comply with any decision by the ICJ to which

the United States was a party; because the principles of *stare decisis* should apply to give the

ICJ's decision binding effect on similarly situated detainees; because the related doctrines of

"issue preclusion" and "offensive collateral estoppel" prohibit the United States from

---

[1]     *LaGrand Case, (Germany v. U.S.)*, 2001 I.C.J. 104 (June 27).

23

disregarding the rulings on a case to which the United States agreed to be a party; because the "paramount international law rule of *pacta sunt servanda*" mandates that treaties must be observed; because disregarding *La Grand* would result in German and non-German detainees being treated differently – (the detainees in the *La Grand* case were German nationals and Petitioner is a Mexican national) – and because " '[t]reaties that lay down rules to be enforced by the parties [to the treaty] through their internal courts or administrative agencies should be construed so as to achieve uniformity of result despite differences between national legal systems.' " (Doc. # 62, at 26 (quoting Restatement (Third) of Foreign Relations of Law of the United States Restatement at Section 325 cmt. d (1987)).)

Petitioner also points out that the ICJ's *La Grand* decision reinforces his argument that he need not show prejudice from the violation of his Article 36 rights in order to obtain relief. Asserting that the denial of Article 36 rights affects the entire proceeding, Petitioner reiterates his arguments that relief does not require a showing of prejudice and cannot be denied through the application of harmless error review. In any event, Petitioner argues as he did in his petition that he in fact suffered "overwhelming prejudice" from the denial of his Article 36 rights. (Doc. # 62, at 30.) Specifically, Petitioner argues that the Mexican consulate would have found Petitioner different counsel familiar with the critical cultural issues implicated in both the culpability and sentencing phases of Petitioner's trial and that the involvement of the consulate would have provided invaluable resources and inhibited the racism that Butler County law enforcement officers displayed toward Petitioner.

Respondent argues that Petitioner is not entitled to relief on his third ground for relief because his rights under a treaty are not constitutional in dimension. (Doc. # 67, at 39.)

24

Respondent argues that the state trial court and court of appeals were correct in rejecting Petitioner's claim in postconviction on the basis that Petitioner's claim did not constitute a substantive ground entitling him to postconviction relief. Respondent argues that Petitioner is incorrect in his assumption that a breach of international law automatically constitutes a ground upon which federal habeas corpus relief can be granted and that Petitioner's reliance on the *La Grand* decision in making that assumption is misplaced. Respondent additionally asserts that the Eleventh Amendment forecloses habeas relief on Petitioner's claim. Respondent concludes that the state courts' rejection of Petitioner's claim did not contravene or unreasonably apply federal law and did not involve an unreasonable determination of the facts.

Petitioner presents three primary arguments in his reply brief. First, Petitioner argues that the determination by the state courts in postconviction that his argument did not state a claim upon which postconviction relief could be granted was *not* a ruling on the merits. Accordingly, Petitioner argues, this Court must review his claim *de novo* rather than merely determine whether the state courts' decision contravened or unreasonably applied controlling federal law. (Doc. # 70, at 13-14.) Second, Petitioner presents multiple arguments disputing "Respondent's sole contention" that "a violation of the Vienna Convention does not constitute a violation of the constitution." (*Id.* at 14.) Citing 28 U.S.C. § 2241(c)(3) and § 2254(a), Petitioner argues that Congress expressly empowered federal district courts to grant habeas relief on a violation of a treaty. Petitioner argues that the United States Supreme Court recognized as much in *Breard v. Green*, 523 U.S. 371, 376 (1998). Regarding Respondent's argument that the Eleventh Amendment forecloses relief on this claim, Petitioner argues simply that his claim does not implicate the Eleventh Amendment because Petitioner is not suing the State of Ohio.

25

Finally, after reiterating his arguments in support of relief, Petitioner for the first time and in the alternative "requests an evidentiary hearing to present evidence that he has been prejudiced by Ohio's failure to comply with the Convention." (Doc. # 70, at 18-19.) Respondent opposes Petitioner's request. (Doc. # 72.)

The evolving state of law on this issue resulted in the parties filing numerous supplemental pleadings. Petitioner filed a notice on April 16, 2004 stating that the International Court of Justice ruled on March 31, 2004 that the United States had violated the Vienna Convention on Consular Relations in securing the convictions and death sentences of Mexican nationals. (Doc. # 74.) The ICJ made four specific findings as to Petitioner's case: (1) that Petitioner's rights were violated when Ohio did not provide Petitioner information regarding his right to consular access; (2) that Petitioner's rights were violated when Ohio did not notify the Mexican consulate without delay of Petitioner's arrest; (3) that Petitioner was denied his rights to communicate with, receive visits from, and have access to the consulate; and (4) that Petitioner was denied his rights to have the consulate arrange for legal counsel. (*Id.* at 1-2.) Petitioner attached a copy of the ICJ's decision ("*Avena* decision").

On December 7, 2004, Petitioner filed notice of additional authority in support of his third and fourth grounds for relief – his claims that his rights under the Vienna Convention were violated and that his defense counsel were ineffective in their representation of a foreign national. (Doc. # 75.) Petitioner argues specifically that ABA Guideline 10.6 concerning the obligations of counsel representing a foreign national and the decision of *Hamblin v. Mitchell*, 354 F.3d 482 (6th Cir. 2003), where the Sixth Circuit recognized the applicability of the ABA Guidelines in determining the prevailing professional norms by which counsel's performance is to be judged

26

bolster his third and fourth grounds for relief.

On April 20, 2005, Petitioner filed notice of relevant proceedings, explaining that in

*Medellin v. Dretke*, Case No. 04-5928, the United States Supreme Court had accepted the

following questions for review:

> 1. In a case brought by a Mexican national whose rights were adjudicated in the
> *Avena* Judgment, must a court in the United States apply as the rule of decision,
> notwithstanding any inconsistent United States precedent, the *Avena* holding that
> the United States courts must review and reconsider the national's conviction and
> sentence, without resort to procedural default doctrines?
>
> 2. In a case brought by a foreign national of a State party to the Vienna
> Convention, should a court in the United States give effect to the *LaGrand* and
> *Avena* Judgments as a matter of international judicial comity and in the interest of
> uniform treaty interpretation?

(Doc. # 77, at 1.)

On July 21, 2006, Petitioner filed notice of additional authority, to wit: *Sanchez-Llamas*

*v. Oregon*, 548 U.S. __ , 2006 LEXIS 5177 (June 28, 2006). In *Sanchez-Llama*, according to

Petitioner, the Supreme Court considered whether the exclusionary rule was an appropriate

remedy for a Vienna Convention claim and whether procedural default is applicable to such

claims. (Doc. # 82, at 1.) Petitioner argues that the decision lends support to his second, third,

and fourth grounds for relief by, among other things, endorsing Petitioner's claim that the

Supremacy Clause requires Ohio to comply with the Vienna Convention and assuming without

deciding that the Vienna Convention grants individuals enforceable rights.

On March 27, 2008, Respondent filed notice of additional authority – namely, the

Supreme Court's decision in *Medellin v. Texas*, __ U.S. __ (2008). In *Medellin*, according to

Respondent, the Supreme Court held that the ICJ's *Avena* decision is not enforceable in domestic

27

courts and accordingly does not provide the basis for a viable claim in federal habeas corpus. (Doc. # 86.) Respondent argues that the petitioner in *Medellin*, like Petitioner herein, was specifically named in the ICJ's *Avena* decision and that the Supreme Court decided as to the petitioner in *Medellin* that *Avena* was not enforceable in United States courts because the Vienna Convention was not a self-executing treaty and constituted only an obligation of the political branches.

Disagreeing with Respondent's interpretation, Petitioner filed a response on April 3, 2008 setting forth his own interpretation of the *Medellin* decision. (Doc. # 87.) In short, according to Petitioner, *Medellin* does not impact this Court's review of arguments that Petitioner has made showing how he was prejudiced by the denial of his Article 36 rights. Petitioner argues in the first instance that because *Medellin* concerned procedurally defaulted claims and Petitioner's claim is properly before the Court on the merits, *Medellin* has no application. Petitioner insists that "[t]he heart of the challenge rejected in *Medellin* was the Mexican National's attempt to overcome state procedural bars that prevented the consideration of his successive habeas petition by citing the ICJ's ruling that procedural bars could not be invoked to prevent merits review of Article 36 violations." (*Id.* at 3.) Petitioner's second argument is that because *Medellin* did not go so far as to bar any domestic remedy for the denial of Article 36 rights, *Medellin* did not foreclose the availability of habeas corpus relief. Petitioner concludes by reiterating his argument that his claim is meritorious – that his Article 36 rights were violated and that he suffered overwhelming prejudice as a result.

Petitioner presented a bare-bones version of this claim to the state courts in postconviction, obviously without the legal and factual arguments that recent decisions by the

ICJ and United States Supreme Court gave rise to. Petitioner argued in his first claim for relief

that his trial attorneys were ineffective for failing to utilize the services of a cultural expert and in

his fourth claim for relief that Ohio's death penalty violated international laws and the

Supremacy Clause of the United States Constitution. (App. Vol. III, at 1412.) Subsequently

Petitioner supplemented those claims with the argument that his right of consular access under

Article 36 of the Vienna Convention was violated. (*Id.* at 1607-08.) The trial court rejected his

argument, finding among other things that Article 36's right to consular access "does not equate

to a fundamental right, such as the right to an attorney;" that the trial court was aware "of no law,

treaty, or judicial precedent which imposes on law enforcement officials an affirmative duty to

inform an alien detainee of a right to contact consul;" that Petitioner "fail[ed] to demonstrate how

the failure to contact the Mexican consul prejudiced his defense;" and that "[t]he Vienna

Convention does not establish any basis for vacation of petitioner's sentence." (*Id.* at 1608-09,

1611.)

Petitioner expanded upon his Vienna Convention argument on appeal from the trial

court's decision, presenting more succinctly the claim that he presents herein. (App. Vol. IV, at

1643-49.) The state appellate court rejected Petitioner's claim as follows:

> In his first assignment of error, Loza contends that he is entitled to
> postconviction relief because his rights under the Vienna Convention on Consular
> Relations were violated. The Vienna Convention requires an arresting
> government to notify a foreign national who has been arrested, imprisoned or
> taken into custody or detention of his right to contact his consul. Vienna
> Convention on Consular Relations, April 24, 1963, TIAS 6820, 21 U.S.T. 77.
> Loza, a citizen of Mexico, argues that he is entitled to postconviction relief
> because the police never informed him that he had a right to contact the Mexican
> consul.

Pursuant to R.C. 2953.21(A)(1), postconviction relief is dependent upon a showing that "there was such a denial or infringement of the person's rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States." Thus, a petitioner is not entitled to postconviction relief unless he shows a violation of rights that are constitutional in dimension, which occurred at the time that he was tried and convicted. State v. Powell (1993), 90 Ohio App.3d 260.

Pursuant to the Supremacy Clause of the United States Constitution, federal statutes and treaties are the supreme law of the land. Thus, a treaty has been deemed to be the substantial equivalent of a federal statute. See, e.g., Boos v. Barry (1988), 485 U.S. 312, 108 S.Ct. 1157; Reid v. Covert (1957), 345 U.S. 1, 17-18, 77 S.Ct. 1222, 1230-31. However, rights under a treaty and rights under a federal statute are not the equivalent of constitutional rights. Id.; see, also, Waldron v. I.N.S. (C.A.2, 1993), 17 F.3d 511, 518 (holding that rights under Vienna Convention are not the equivalent of fundamental rights, such as the right to counsel). Therefore, we agree with the following reasoning of the United States Court of Appeals for the Fourth Circuit:

> Even if the Vienna Convention on Consular Relations could be said to create individual rights (as opposed to setting out the rights and obligations of signatory nations), it certainly does not create constitutional rights. Although states may have an obligation under the Supremacy Clause to comply with the provisions of the Vienna Convention, the Supremacy Clause does not convert violations of treaty provisions (regardless of whether those provisions can be said to create individual rights) into violations of constitutional rights. Just as a state does not violate a constitutional right merely by violating a federal statute, it does not violate a constitutional right merely by violating a treaty.

Murphy v. Netherland (C.A.4, 1997), 116 F.3d 97, 100.

Although the police should have complied with the Vienna Convention and informed Loza that he had the right to contact the Mexican Consul, Loza's rights under the treaty are not constitutional in dimension. Accordingly, the trial court properly found that Loza's claim did not constitute a substantive ground that entitled him to postconviction relief, and Loza's first assignment of error is overruled.

(App. Vol. IV, at 1993-95.) Because the Ohio Supreme Court declined to exercise jurisdiction

over Petitioner's discretionary appeal, the state appellate court's decision constitutes the last

reasoned state decision addressing Petitioner's claim.

Before addressing the merits of Petitioner's claim, the Court must determine as a threshold matter which standard of review to employ. By way of reminder, under the AEDPA, a federal court shall not issue a writ of habeas corpus on a claim that the state courts adjudicated on the merits unless the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2). Moreover, under § 2254(d)(1), a state court decision is "contrary to" Supreme Court precedent "when the state court confronts facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from its precedent[]" or "when the state court 'applies a rule that contradicts the governing law set forth in' Supreme Court cases." *Williams v. Coyle*, 260 F.3d 684, 699 (6th Cir. 2001) (quoting *Williams v. Taylor*, 529 U.S. 362, 406-07 (2000)). Similarly, a federal habeas court may not find a state adjudication to be "unreasonable" simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. *Id*. Rather, a state court's application of federal law is unreasonable "only if reasonable jurists would find it so arbitrary, unsupported or offensive to existing precedent as to fall outside the realm of plausible credible outcomes." *Barker v. Yukins*, 199 F.3d 867, 872 (6th Cir. 1999).

The limitations on federal habeas review set forth in § 2254(d) apply only to state court decisions that constitute "adjudications on the merits." Petitioner argues that the state appellate

court, by rejecting his Vienna Convention claim as not constituting a substantive ground upon which postconviction relief could be granted, did not adjudicate his claim on the merits. Accordingly, Petitioner argues, this Court must undertake a *de novo*, rather than deferential, review of his claim. (Doc. # 70, at 13.) Petitioner's argument is unpersuasive for two reasons. First, in the Sixth Circuit, even in the absence of a decision by the state courts addressing the substance of a properly raised federal claim, federal habeas courts are required to "conduct an independent review of federal law to determine if the state court either contravened or unreasonably applied clearly established federal law...." *Schoenberger v. Russell*, 290 F.3d 831, 835 (6th Cir. 2002) (citing *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000)). *See also Doan v. Brigano*, 237 F.3d 722, 730-31 (6th Cir. 2001).

Second, the Court is of the view in any event that the state appellate court's decision in the instant case was an adjudication on the merits. State court decisions that federal habeas courts have declined to characterize as "adjudications on the merits" typically are those that produce no results or amount to no ruling at all. *See McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003) (where state appellate court addressed admissibility of evidence but not sufficiency of evidence, state appellate court produced "no results, let alone reasoning, to which this court can defer.") For example, federal courts outside of the Sixth Circuit have held that a state court that rejects an otherwise properly raised federal claim with a summary order or rejects a claim without addressing the *federal* component of the claim has failed to adjudicate the claim on the merits sufficient to trigger the applicability of § 2254(d)'s deferential review. *See Schoenberger*, 290 F.3d at 838-40 (Keith, J., concurring). In the instant case, after considerable discussion about the scope of postconviction relief under Ohio law, the provisions of Article 36, and case

law governing the force and effect of treaties, the state appellate court decided that Petitioner's claim did not constitute a substantive ground entitling him to postconviction relief. The Court is not persuaded that the state appellate court's decision can be characterized as one that produced no results or amounted to no ruling at all. Accordingly, the scope of this Court's review of Petitioner's Vienna Convention claim will be limited to a determination of whether the state appellate court's decision rejecting that claim contravened or unreasonably applied clearly established federal law.

The Court begins its analysis, accordingly, by identifying the clearly established federal law that governs review of Petitioner's claim. There does not appear to be any clearly established federal controlling Petitioner's claim, which all but forecloses habeas relief on Petitioner's claim. Put succinctly, the United States Supreme Court has never addressed directly whether Article 36 of the Vienna Convention grants to individuals judicially enforceable rights. Absent clearly established federal law in that regard, it is not possible for Petitioner to demonstrate that the Ohio courts' decision rejecting his claim contravened or unreasonably applied clearly established federal law as determined by the Supreme Court.

The first time that the Supreme Court addressed a Vienna Convention claim in the context of a criminal proceeding, *Breard v. Greene*, 523 U.S. 371 (1998), the Supreme Court held only that the petitioner's failure to raise an Article 36 claim resulted in procedural default of that claim in federal habeas corpus. *Id.* at 377. At no point did the Supreme Court hold that Article 36 created individual, judicially enforceable rights. The most that the Supreme Court stated in that regard was that the Vienna Convention "arguably confers on an individual the right to consular assistance following arrest." *Id.*

33

In *Sanchez-Llamas v. Oregon*, 548 U.S. 331 (2006), the Supreme Court stated even more

clearly that it was not resolving the issue of whether Article 36 creates individual, enforceable

rights. After holding that suppression is not an appropriate remedy for an Article 36 violation

and that Article 36 claims are not immune from enforcement of procedural default in federal

habeas corpus, the Supreme Court stated:

> Because we conclude that Sanchez-Llamas and Bustillo are not in any event
> entitled to relief on their claims, we find it unnecessary to resolve the question
> whether the Vienna Convention grants individuals enforceable rights. Therefore,
> for purposes of addressing petitioners' claims, we assume, without deciding, that
> Article 36 does grant Bustillo and Sanchez-Llamas such rights.

*Id.* at 343.

Most recently, in *Medellin v. Texas*, 128 S.Ct. 1346 (2008), the Supreme Court again

stopped short of directly addressing whether Article 36 creates individual rights enforceable in

domestic courts. Petitioner Medellin had been one of the fifty-one named Mexican nationals

whose Article 36 rights, in the view of the ICJ's *Avena* decision, had been violated by the failure

of local law enforcement officers to notify those individuals upon their arrest of their right to

consular access. Following the *Avena* decision, President Bush issued a Memorandum on

February 28, 2005 stating that respective state courts should review the judgments against the

fifty-one named individuals in light of *Avena*. In response to the ICJ's *Avena* decision and

President Bush's Memorandum, Medellin filed a successive state habeas action, which action the

Texas courts dismissed on state abuse of the writ grounds. Medellin subsequently challenged the

Texas courts' dismissal, arguing that the ICJ's *Avena* decision and the President's Memorandum

granted him individual rights that were enforceable as domestic law in the state courts

irrespective of state procedural rules. The United States Supreme Court disagreed, stating, "[w]e

conclude that neither *Avena* nor the President's Memorandum constitutes directly enforceable

federal law that preempts state limitations on the filing of successive habeas petitions." *Id*. at

1353. Because the holding was limited to stating that none of the named *Avena* individuals had

Article 36 rights that pre-empted state procedural rules, the Supreme Court cautioned that:

> As in *Sanchez-Llamas*, 548 U.S., at 342-343, 126 S.Ct. 2669, we thus assume,
> without deciding, that Article 36 grants foreign nationals "an individually
> enforceable right to request that their consular officers be notified of their
> detention, and an accompanying right to be informed by authorities of the
> availability of consular notification."

*Id*. at 1357 n.4.

This Court is of the view that because the Supreme Court has declined to directly address

the issue of whether Article 36 creates individual rights enforceable as domestic law, there is not

clearly established federal law *as determined by the Supreme Court* entitling Petitioner herein to

habeas relief on his claim that local law enforcement violated his Article 36 rights when they

failed to notify him of his right to consult with the Mexican consulate and the Mexican consulate

of the fact that Petitioner had been detained on quadruple murder charges. Several federal courts

that have addressed the issue have agreed. In *Leal Garcia v. Quarterman*, 573 F.3d 214 (5th Cir.

2009), where the petitioner therein had argued not that his right to consular access had been

denied but that the ICJ's *Avena* decision required the state courts to at least reconsider his case,

the Fifth Circuit stated, "[t]he Supreme Court has never answered whether the Convention

creates rights enforceable by individual residents of the signatory nations." *Leal Garcia*, 573

F.3d at 218 n.19. *See also Celebisoy v. Brunson*, No. CO8-5739 FDB, 2009 WL 2473479, at * 9

(W.D. Wash. Aug. 10, 2009) ("The United States Supreme Court has not directly addressed the

issue of whether Article 36 gives individuals enforceable rights."); *Ayala v. Wong*, No.

35

01cv1322-IEG (PCL), 2009 WL 1357416, at * 8 (S.D. Cal. May 13, 2009) ("even when given numerous opportunities to establish that the Vienna Convention created individually enforceable rights, the United States Supreme Court ha[s] repeatedly and expressly declined to reach a conclusion on the issue."); *Claudio v. United States*, Nos. 8:03-cr-254-T-17TGW, 8:07-cv-1504-T-17TGW, 2008 WL 2116928, at * 5 (M.D. Fla. May 19, 2008) ("the United States Supreme Court has never ruled on the issue of whether the Vienna Convention conveys a judicially enforceable judicial right.").[2]

In the absence of clearly established federal law on this issue, state court decisions rejecting claimed Article 36 violations cannot be said to have contravened or unreasonably applied clearly established federal law. *Carty v. Quarterman*, No. 08-70049, 2009 WL 2708112, at * 5 (5th Cir. Aug. 28, 2009) ("There can be no debate among jurists of reason that the purported individual right is not at this time clearly established by Supreme Court precedent."); *Celebisoy*, 2009 WL 2473479, at * 9 ("If no Supreme Court precedent creates clearly established federal law relating to the legal issue the habeas petitioner raised in state court, the state court's decision cannot be contrary to or an unreasonable application of clearly established federal law."); *Ayala*, 2009 WL 1357416, at * 9 (holding that habeas corpus relief on claimed Vienna Convention violation "is not currently dictated by the Constitution, and was certainly not compelled by existing precedent at the time his conviction became final.").

---

[2]        This Court is mindful that there are other courts that appear to have recognized judicially enforceable rights under Article 36 of the Vienna Convention. *See Osagiede v. United States*, 543 F.3d 399, 409-19 n. 6 (7th Cir. 2008) (collecting cases); *see also Jogi v. Voges*, 480 F.3d 822, 834 (7th Cir. 2007). Those courts appear, however, to be in the minority. *See Claudio*, 2008 WL 2116928, at * 5 ("The Court notes that the Seventh Circuit case cited by Claudio is not the prevailing view, and that the United States Supreme Court has never ruled on the issue of whether the Vienna Convention conveys a judicially enforceable judicial right.").

36

In addition to the weight of authority set forth above, decisions by the Sixth Circuit, as well as district courts within the Sixth Circuit, primarily pre-dating *Medellin*, also stand against Petitioner on his Vienna Convention claim. *See United States v. Garcia-Perez*, 190 Fed. Appx. 461, 464 (6th Cir. 2006) ("Under this Court's interpretation, the Vienna Convention does not create enforceable individual rights") (citing *United States v. Emuegbunam*, 268 F.3d 377, 394 (6th Cir. 2001)); *United States v. Emuegbunam*, 268 F.3d at 394 ("we hold that the Vienna Convention does not create a right for a detained foreign national to consult with the diplomatic representatives of his nation that the federal courts can enforce"); *United States v. Page*, 232 F.3d 536, 540 (6th Cir. 2000) (declining to decide issue of whether Article 36 creates individual rights and stating, "we join our colleagues in the First, Ninth, and Eleventh Circuits in concluding that although some judicial remedies may exist, there is no right in a criminal prosecution to have evidence excluded or an indictment dismissed due to a violation of Article 36") (citations omitted)); *United States v. Barrena*, No. 1:07-cr-66, 2008 WL 2705229, at * 5 (E.D. Tenn. Jul. 8, 2008) (holding that Supreme Court's March 25, 2008 decision in *Medellin* foreclosed relief on the petitioner's motion to suppress statements based on claimed violation of Article 36 rights); *United States v. Barrena*, No. 1:07-CR-66, 2007 WL 5312565, at * 13 (E.D. Tenn. Dec. 28, 2007) (holding prior to *Medellin* decision that "the Sixth Circuit has already addressed this issue holding that *even if* Article 36 conveys rights to individuals, it still does not require suppression of evidence or dismissal of an indictment for failure to give consular notification...."); *Foti v. Bobby*, No. 1:05 CV 1019, 2007 WL 1577785, at * 3 (N.D. Ohio May 31, 2007) (noting that despite a conflict among the circuits and the fact that the Supreme Court had not directly addressed the issue, "the Sixth Circuit, in full recognition of these circumstances, has recently

37

explicitly stated that its decision in *Emuegbunam*–that the Vienna Convention does not create any individual rights subject to enforcement in federal court–'remains the controlling law of this Court.' " (quoting *Garciz-Perez*, 190 F.App'x at 466)); *Acosta v. Younger*, No. Civ.A. 05-243-HRW, 2006 WL 27212 , at * 1 (E.D. Ky. Jan 4, 2006) (noting that in addition to other reasons for dismissing a *Bivens* complain, "the Sixth Circuit has held that the Vienna Convention does not grant a detained foreign national an enforceable right to consult with the diplomatic representatives of his nation."). *But see Deitz v. Money*, 391 F.3d 804 (6th Cir. 2004) (remanding case to district court to consider whether the petitioner received ineffective assistance of counsel for the failure to raise a Vienna Convention claim), *called into question by Garcia-Perez*, 190 F.App'x at 467.

Put simply, Petitioner's Vienna Convention claim finds no support in the law by which this Court is bound.[3] Whatever the United States Supreme decisions on the issue may have assumed or suggested as to whether Article 36 confers individually enforceable rights, Petitioner cannot evade the reality that the Supreme Court has *never* held that Article 36 creates individual rights enforceable as federal law in domestic courts sufficient for this Court to find that the state courts' rejection of Petitioner's Vienna Convention claim contravened or unreasonably applied clearly established federal law as determined by the Supreme Court. This fact precludes this Court from granting relief on the Vienna Convention claim set forth in Petitioner's third ground for relief. Further, regardless of Petitioner's attempt to distinguish his case by alleging that he suffered prejudice as a result of the fact that local law enforcement did not provide Article 36

---

[3]     The Court is mindful that Petitioner did not have the benefit of many of the decisions discussed and cited herein when he made his substantive arguments in support of relief on his Vienna Convention claim.

notifications, the fact that Petitioner was named in the ICR's *Avena* decision, and the fact that there is no allegation of procedural default against his claim, to the extent that Petitioner seeks suppression of his statements (and the resulting reversal of his convictions and death sentences), that relief is squarely foreclosed by the Supreme Court's *Sanchez-Llamas* decision, as well as by the Sixth Circuit's *Garcia-Perez* decision. Finally, the Court concludes that because it does not appear that Petitioner can demonstrate, as a matter of law, that the state court decisions rejecting his Vienna Convention claim contravened or unreasonably applied clearly established federal law, Petitioner has not demonstrated that an evidentiary hearing on this claim is warranted.

For the foregoing reasons, Petitioner's third ground for relief, and request for an evidentiary hearing on his third ground for relief (Doc. # 70, at 18-19), are **DENIED**.

> **Fourth Ground for Relief: Petitioner was deprived of the right to the effective assistance of counsel as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**
>
> > **A. Trial counsel are ineffective when they fail to investigate and present available cultural evidence.**
> >
> > **B. Trial counsel are ineffective when they fail to investigate and present available mitigating evidence.**

Petitioner argues in his fourth ground for relief that his trial attorneys performed unreasonably and to his prejudice when they failed to obtain the services of a cultural expert for both phases of Petitioner's trial. (Doc. # 6, at ¶¶ 72-78.) A cultural expert, Petitioner argues, could have assisted in demonstrating why Petitioner's Hispanic culture influenced him to protect his unborn child and the child's mother, why Petitioner's confession should have been suppressed as involuntary and coerced or in the alternative seen by the jury as unreliable, and how Petitioner's Mexican heritage, the immigrant experience, and the realities of gang

39

involvement all shaped Petitioner's actions in this instance. Petitioner argues that counsel's failure was not a strategic decision informed by reasonable investigation and that Petitioner was prejudiced by counsel's deficient performance insofar as expert testimony undermining Petitioner's "confession" might have provided a basis for suppressing Petitioner's confession or in the alternative tipped the jury's decision in favor of acquittal or a sentence less than death. Petitioner similarly argues that trial counsel were ineffective for failing to present available mitigation evidence from Petitioner's family not only to provide a complete picture of Petitioner's life and background but also to complement the cultural evidence that, according to Petitioner, counsel also should have developed and provided.

Petitioner expands upon these arguments in his memorandum in support, setting forth in detail the facts surrounding Petitioner's upbringing, beginning with his father's abandonment of the family in Mexico, resulting in the illegal immigration to the United States first of Petitioner's mother and then four years later of Petitioner and his siblings, and culminating in the family's impoverished residency in violent and gang-ridden Los Angeles. (Doc. # 62, at 35-41.) According to Petitioner, a cultural expert would have assisted trial counsel in investigating, developing, and presenting these facts during the culpability and penalty phases of his trial so that the jury might have a more complete understanding of Petitioner and the cultural influences that informed his actions. Specifically, according to Petitioner, it was his status as a Mexican male, as well as his desire to be the father that his own father never was, that caused him to claim more culpability than he was responsible for in an effort to protect his unborn child and the child's mother. Petitioner emphasizes that his trial counsel failed in this regard not as a strategic decision but, by their own admission, as an oversight owing to the fact that they had never

40

represented a Mexican national and therefore did not appreciate the need for exploring his cultural background or have an awareness of his right to consular access. Petitioner also reiterates his argument that his trial attorneys were ineffective for failing to present more detailed testimony from more of Petitioner's relatives concerning his disadvantaged immigrant background.

Respondent argues that Petitioner's claim "is untenable when examined." (Doc. # 67, at 44.) Specifically, Respondent argues that counsel did request a mitigation expert (Susan Shore), did travel to Los Angeles to investigate Petitioner's background, and did present evidence during both phases of the trial that Petitioner had confessed to the killings in order to "protect" Dorothy Jackson and their unborn child. Respondent argues that during the mitigation phase, trial counsel presented cultural evidence through the testimony of Dr. Fisher and evidence concerning Petitioner's upbringing through the testimony of his mother and two of his sisters. Thus, according to Respondent, counsel essentially did what Petitioner assails them for failing to have done and cannot be said to have been ineffective simply because their efforts did not result in acquittal or a sentence less than death.

Petitioner begins his reply to Respondent's arguments by taking issue in two respects with Respondent's interpretation of the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), for evaluating ineffective assistance claims. (Doc. # 70, at 19-33.) First, Petitioner disputes Respondent's assertion that strategic decisions are "virtually unchallengeable," insisting that strategic decisions are reasonable only to the extent that they were based on reasonable investigation. Second, Petitioner also disputes Respondent's reliance on *Lockhart v. Fretwell*, 506 U.S. 364 (1993), to support the proposition that proving prejudice

41

requires the petitioner to prove that counsel's deficient performance rendered the trial and its result as fundamentally unfair.

Regarding Respondent's argument that trial counsel did in fact present cultural evidence through Dr. Fisher's testimony at the mitigation phase, Petitioner argues first that counsel's presentation of evidence at the mitigation phase does not excuse or speak to their failure to develop the evidence in time to present it during the culpability phase. Petitioner also argues that Respondent mischaracterizes Dr. Fisher's testimony as cultural testimony when it was actually psychological testimony, per Dr. Fisher's training. Petitioner reiterates that counsel conceded their failure to develop cultural evidence and attributed that failure to the fact that they had never represented a Mexican national. Petitioner also argues that Respondent failed to respond to Petitioner's argument that trial counsel failed to present Dr. Fisher's testimony, as well as the testimony of a cultural expert, as a basis to suppress Petitioner's confession.

Turning to his arguments of ineffective assistance during the mitigation phase, Petitioner again disputes any argument by Respondent that Petitioner cannot demonstrate prejudice by virtue of the fact that trial counsel *did* present cultural evidence via Dr. Fisher's testimony. Petitioner also attacks any argument that trial counsel, by taking some steps to investigate and present mitigating evidence, did enough in the way of investigation and preparation to prevent Petitioner from satisfying the deficient-performance component of *Strickland*. Petitioner reasons that "[t]he issue under *Strickland* is not what was presented, but what with reasonable effort could have been presented." (Doc. # 70, at 26.) Petitioner argues that trial counsel failed to present available mitigating evidence from cultural experts and additional family members and to more fully develop the testimony that was provided by family members. Petitioner dismisses

42

Respondent's argument that any testimony provided by additional family members would have been cumulative to information already presented through the testimony of Dr. Fisher, Petitioner's mother, and Petitioner's two sisters. Petitioner argues that had trial counsel presented the testimony of Petitioner's grandmother Emma Rodas, who had been his primary caregiver for most of his life, Ms. Rodas could have testified about the medical problems that Petitioner suffered as child, the extent of the abuse suffered by Petitioner at the hands of his mother's boyfriend, Petitioner's lack of involvement in gangs despite other testimony to the contrary, Petitioner's taking blame for the theft of a stereo in order to avoid betraying his friends, and Petitioner's statements to Ms. Rodas that he took blame for the killings to protect Dorothy and the baby from the police. Petitioner also argues that despite the testimony that his mother and sisters provided about his background, they could have provided far more information, such as abuse that Petitioner had suffered in Mexico and when he first came to the United States, had trial counsel met with Petitioner's family members more than once and better prepared them to testify.

Finally, Petitioner requests in the alternative an evidentiary hearing to present evidence that his trial counsel performed unreasonably and to his prejudice (Doc. # 70, at 32-33), which motion Respondent opposes (Doc. # 72).

Petitioner presented the essence of these ineffective assistance claims to the state courts in postconviction. In his first claim for postconviction relief, Petitioner argued that his convictions and/or sentences were void or voidable because his trial attorneys were deficient in failing to obtain the services of a cultural expert to testify at both the guilt and penalty phases of his trial. (App. Vol. III, at 1414-16.) He argued in his third claim for postconviction relief that

43

his convictions and/or sentences were void or voidable because his trial attorneys were deficient in their presentation of mitigation witnesses from the Loza family, specifically by neglecting to call Petitioner's grandmother, sister, and brother. (*Id.* at 1417-19.) Petitioner supported these claims with the affidavits of anthropologist Dr. Susan Keefe, Petitioner's mother Beatriz Ventura, Petitioner's maternal grandmother Emma Rodas, Petitioner's sister Viviana Loza, Petitioner's sister Beatriz Loza, Petitioner's brother Jesus Loza, Petitioner's trial attorneys Michael D. Hanks and Gregory Howard, clinical psychologist Dr. Julia Hawgood, and Edna Marlow – Dorothy Jackson's foster mother who recovered and turned over to trial counsel letters that Petitioner had sent to Dorothy from prison. The trial court appears to have rejected Petitioner's claims as being barred by *res judicata*, as being without merit, and as being supported by only cumulative evidence. (App. Vol. III, at 1605-09, 1610.)

The last state court to issue a reasoned decision addressing these arguments, the state appellate court, rejected Petitioner's claim as follows:

> Loza also argues that his trial counsel was ineffective for failing to present cultural evidence. Loza claims that a cultural expert would have provided evidence as to why Loza's Hispanic culture influenced him to "protect" his unborn child and Jackson by confessing to the murders. In support of this claim, Loza submitted an affidavit from Susan Keefe, a professor of anthropology, in which she stated that "it would be consistent with Mr. Loza's Mexican values to tr and protect Dorothy and the baby after his arrest by confessing to the crimes."
>
> The record contains evidence that Loza's trial counsel offered evidence that Loza confessed to "protect" Jackson and his unborn child during the guilt and mitigation phases of Loza's trial. During the guilt phase of the trial, Loza's trial counsel sought to introduce the testimony of Dr. Roger Fisher, a clinical psychologist. The proffered testimony was that Loza confessed because "his background, psychological makeup, and his personal code of conduct required that he not snitch and that he protect Dorothy." Loza, 71 Ohio St.3d at 65-66. The trial court excluded this testimony during the guilt phase of the trial and the Ohio Supreme Court upheld this ruling on direct appeal. Id. However, Dr.

44

Fisher's testimony was allowed during the mitigation phase of the trial. Since Keefe's "cultural evidence" is merely cumulative of or alternative to Dr. Fisher's testimony, Loza has failed to establish ineffective assistance of counsel. See Lawson, 103 Ohio App.3d at 315; State v. Combs (1994), 100 Ohio App.3d 90, 105.

Finally, Loza argues that his trial counsel was ineffective for failing to present mitigating evidence from Loza's family. In support of this argument, Loza submitted affidavits from his grandmother, sister, and brother. However, the record reveals that Loza's mother and two of his other sisters testified about Loza's family history and general character during the mitigation phase of his trial. Since the affidavits submitted by Loza are merely cumulative to the evidence presented at trial, he has failed to establish ineffective assistance of counsel. See Lawson at 315; Combs at 105. Accordingly, Loza's claims of ineffective assistance of counsel are without merit, and his second assignment of error is overruled.

(App. Vol. IV, at 1998-2000.)

Regarding the state courts' decisions, Petitioner argues in his reply that because Respondent did not argue that the AEDPA was applicable to Petitioner's claim, Respondent waived the AEDPA's applicability to this claim. Petitioner argues in the alternative that the AEDPA does not preclude this Court from granting relief on his claim because the state appellate court, in rejecting this claim in postconviction on the basis that Dr. Fisher *had* provided cultural evidence, unreasonably applied *Strickland*. Petitioner also argues that the state courts made factual findings not supported by the record in violation of 28 U.S.C. § 2254(d)(2) by failing to consider not only defense counsel's admissions that they had failed to develop cultural evidence because they had never represented a Mexican national, but also Dr. Hawgood's affidavit concerning cultural evidence that defense counsel failed to develop. Regarding the argument that defense counsel failed to present cultural evidence as a basis for suppressing his confession, Petitioner argues that he is entitled to *de novo* review of that argument because the state appellate

45

court improperly applied a procedural bar against the claim instead of addressing it on the merits. Petitioner also argues that the state appellate courts flew in the face of § 2254(d)(2) when they concluded, regarding Petitioner's mitigation-phase ineffective assistance arguments, that Dr. Keefe's affidavit was cumulative to Dr. Fisher's testimony and that information by family members who did not testify was cumulative to information provided by the family members who did testify.

Turning to governing case law, the right to counsel guaranteed by the Sixth Amendment is the right to the effective assistance of counsel. *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970). The standard for demonstrating a claim of ineffective assistance of counsel is composed of two parts:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984). Scrutiny of defense counsel's performance must be "highly deferential." *Id*. at 689.

With respect to the first prong of the *Strickland* test, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. To establish the second prong of the *Strickland* test, prejudice, a Petitioner must demonstrate that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. *Id*. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the

outcome." *Id.* Because Petitioner must satisfy both prongs of the *Strickland* test to demonstrate

ineffective assistance of counsel, should the court determine that Petitioner has failed to satisfy

one prong, it need not consider the other. *Id.* at 697.

Petitioner's claim, at its core, is a claim challenging the adequacy of counsel's

investigation, preparation, and presentation of available evidence both at the culpability and

mitigation phases of Petitioner's trial. It is well settled that "[c]ounsel has a duty to make

reasonable investigations or to make a reasonable decision that makes particular investigations

unnecessary." *Strickland*, 466 U.S. at 691; *see also Carter v. Bell*, 218 F.3d 581, 600 (6th Cir.

2000). The importance of competent representation during the penalty phase of a capital trial

cannot be understated, especially with respect to the duty to investigate, because, as a practical

matter, all that stands between a defendant who has been convicted of capital murder and a death

sentence is whatever mitigation evidence he can muster. *Mapes v. Coyle*, 171 F.3d 408 (6th Cir.

1999).

> Under the Ohio statute, a capital defendant found guilty of a death specification
> has to present some mitigating evidence in order to avoid the death penalty. If a
> jury has nothing to weigh against the aggravating circumstance, it almost certainly
> must find that the aggravating circumstance outweighs the (nonexistent)
> mitigating circumstances, and recommend death.

*Id.* at 426. *See also Rompilla v. Beard*, 545 U.S. 374, 387 n.7 (2005) (incorporating the 2003

American Bar Association ("ABA") Guidelines regarding competent representation in capital

cases); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (discussing the duty to investigate mitigating

evidence and incorporating the 1989 ABA Guidelines regarding competent representation in

capital cases). Thus, the Sixth Circuit has not hesitated to hold that "failure to investigate

possible mitigating factors and failure to present mitigating evidence at sentencing *can* constitute

47

ineffective assistance of counsel under the Sixth Amendment." *See, e.g., Martin v. Mitchell*, 280

F.3d 594, 612 (6th Cir. 2002) (citing *Carter v. Bell, supra*, 218 F.3d at 600, and *Skaggs v. Parker*,

235 F.3d 261, 271 (6th Cir. 2000)).

In the Sixth Circuit, the scope of a court's review of a claim of ineffective assistance of

counsel during mitigation is shaped by the degree of counsel's alleged inadequacies. As the

Sixth Circuit recently explained, "[o]ur circuit's precedent has distinguished between counsel's

*complete* failure to conduct a mitigation investigation, where we are likely to find deficient

performance, and counsel's failure to conduct an *adequate* investigation, where the presumption

of reasonable performance is more difficult to overcome." *Beuke v. Houk*, 537 F.3d 618, 643 (6th

Cir. 2008) (citing *Campbell v. Coyle*, 260 F.3d 531, 552 (6th Cir. 2001), and *Moore v. Parker*,

425 F.3d 250, 255 (6th Cir. 2005)). In *Beuke*, the Sixth Circuit went on to explain:

> In the present case, defense counsel did not *completely fail* to conduct an
> investigation for mitigating evidence. Counsel spoke with Beuke's parents prior
> to [the] penalty phase of trial (although there is some question as to how much
> time counsel spent preparing Beuke's parents to testify), and presented his
> parents' testimony at the sentencing hearing. Defense counsel also asked the
> probation department to conduct a presentence investigation and a psychiatric
> evaluation. While these investigative efforts fall far short of an exhaustive search,
> they do not qualify as a complete failure to investigate. *See Martin v. Mitchell*,
> 280 F.3d 594, 613 (6th Cir. 2002) (finding that defense counsel did not completely
> fail to investigate where there was "limited contact between defense counsel and
> family members," "counsel requested a presentence report," and counsel "elicited
> the testimony of [petitioner's] mother and grandmother"). Because Beuke's
> attorneys did not entirely abdicate their duty to investigate for mitigating
> evidence, we must closely evaluate whether they exhibited specific deficiencies
> that were unreasonable under prevailing professional standards. *See Dickerson v.
> Bagley*, 453 F.3d 690, 701 (6th Cir. 2006).

*Beuke*, 537 F.3d at 643.

In the instant case, Petitioner will not be heard to suggest that his counsel completely failed to investigate or present evidence in mitigation. The record contains evidence that trial counsel sought funds for mitigation experts at an early stage during the pretrial proceedings and traveled to Los Angeles to interview Petitioner's family members and investigate his background. At the mitigation hearing, trial counsel delivered an opening statement urging the jury to consider Petitioner's difficult background, the testimony that trial counsel anticipated presenting, Petitioner's lack of a significant criminal history, Petitioner's concern for the well-being of Dorothy Jackson and their unborn child, the absence of a nexus between the robberies and killings of the victims, and Petitioner's acceptance of responsibility. (Tr. Vol. VI, at 3384-88.) Trial counsel went on to call clinical psychologist Dr. Roger Fisher, who provided testimony explaining among other things how abandonment by Petitioner's father, difficult upbringing and violent surroundings, and concern for the well-being of his unborn child and its mother would prompt Petitioner to repeatedly and emphatically take responsibility for the murders to protect Dorothy and their unborn child. Trial counsel also presented testimony by Petitioner's youngest sister Samantha Ceja, oldest sister Viviana Loza, and mother Beatriz–all of whom provided information generally about Petitioner's background, upbringing, positive attributes as a brother and son, and relationship with Dorothy Jackson and her family. The foregoing precludes any argument that trial counsel *completely* failed to investigate or present mitigation. Accordingly, this Court will "closely evaluate" whether Petitioner's attorneys "exhibited specific deficiencies that were unreasonable under prevailing professional standards." *Beuke*, 537 F.3d at 643.

49

### A. Counsel's Failure To Obtain A Cultural Expert.

Viewed within this framework, Petitioner's first argument is that his attorneys performed unreasonably and to his prejudice by failing to utilize the services of a cultural expert to provide assistance and testimony at both the culpability and penalty phases of Petitioner's trial. As noted above, Petitioner argues that a cultural expert could have provided testimony during the culpability phase explaining how Petitioner's experience as a Hispanic, immigrant male drove him to accept responsibility for the murders in order to protect his unborn child and its mother from the police. Petitioner also argues that the services of a cultural expert in this regard would have at a minimum provided a basis for suppressing Petitioner's confession prior to trial as involuntary and coerced. Petitioner asserts in the alternative that such testimony would have provided a basis for the jury to question the reliability of Petitioner's confession. Finally, Petitioner argues that the services of a cultural expert as detailed above also would have assisted counsel during the penalty phase in explaining that Petitioner's experience as Hispanic, immigrant male, motivated him to accept responsibility for the murders in order to protect Dorothy Jackson and their unborn child and accordingly made him deserving of a sentence less than death.

Quoting from and adopting the 1989 ABA Guidelines as defining the scope of counsel's mitigation-phase duties, the Supreme Court stated in *Wiggins v. Smith*, that, "among the topics counsel should consider presenting are medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences." 123 S.Ct. at 2537. The Sixth Circuit has not addressed in detail the issue of whether or to what extent counsel provides ineffective assistance by failing to

recognize the need for and obtain the services of a cultural expert. In *Durr v. Mitchell*, 487 U.S. 423, 438 (6th Cir. 2007), the Sixth Circuit rejected the petitioner's claim of ineffective assistance for the failure to obtain a cultural expert to testify about cross-cultural issues and explain why the petitioner was drawn to Caucasian women. *Durr* is not particularly instructive, however, because there, the Sixth Circuit rejected the claim primarily on the basis of the petitioner's failure to demonstrate prejudice stemming from the fact that the expert's affidavit was couched in phrases such as "in my opinion" and "it is doubtful." *Id*. (quoting *Strickland*, 466 U.S. at 693 ("It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding").) The Sixth Circuit also noted that given the absence of available mitigation evidence, counsel's decision not to present such an expert was a sound one because of a probability that the expert would have done more harm than good. *See also Fears v. Bagley*, No. 1:-cv-183, 2008 WL 2782888, at *90 (S.D. Ohio Jul. 15, 2008) (finding no ineffective assistance for the failure to present expert on southern culture of violence because even assuming the expert testimony would have passed muster as reliable under *Daubert*, such testimony presented an alternative theory of mitigation, which does not establish ineffective assistance, and would have contradicted culpability phase trial theory).

Conceptually, this Court does not doubt that the failure to obtain a cultural expert *can* constitute ineffective assistance. *See e.g., Siripongs v. Calderon*, 35 F.3d 1308, 1316 (9th Cir. 1994); *see also Caro v. Calderon*, 165 F.3d 1223, 1226 (9th Cir. 1999) ("this Court has recognized that the failure to present evidence necessary to bridge a cultural gap may constitute ineffective assistance of counsel."). But the Court is not persuaded that Petitioner's counsel were ineffective in this case for failing to obtain a cultural expert. In *Syriani v. Polk*, 118 Fed. App'x

51

706 (4th Cir. 2004), the petitioner was convicted of capital murder in the killing of his wife. The petitioner, who was a native of Jordan, raised a claim of ineffective assistance for counsel's failure to obtain a cultural expert to testify as to the effect that the Petitioner's "Arabic heritage might have had upon his actions during the marriage and on the night he inflicted the fatal wounds upon his wife." *Syriani*, 118 F.App'x at 716. The Fourth Circuit found no ineffective assistance, explaining:

> It is clear that Syriani's counsel understood and adequately presented the cultural aspects of the case, and successfully highlighted their mitigation value. In particular, Mr. Plumides demonstrated that he fully understood Syriani's marriage arrangement and the cultural differences between his life in Jordan and his life in the United States. Counsel presented information about Syriani's unique cultural background to the jury, through the testimony of Syriani and [his sister] Odeet. And, counsel referred to the differences between Arabic and American culture during his closing argument to the jury, including reminding the jury of Syriani's unique difficulty in coping with his wife's adoption of more American behaviors, such as driving, working outside the home, and wearing makeup and a more americanized wardrobe.

> In sum, we cannot say that the trial counsel's failure to travel to Jordan to interview family members and friends of Syriani from years before, or failure to retain a "cultural expert" to testify as to the effect his Arabic heritage might have had upon his actions during the marriage and on the night he inflicted the fatal wounds upon his wife, constituted ineffective assistance of counsel. Counsel interviewed Syriani and his sister living in the United States, as well as a sibling who visited from Jordan, and presented a great deal of evidence of Syriani's background to the jury. * * **

*Id.* The Fourth Circuit went on to conclude that even assuming counsel should have done more in investigating this aspect of the case by obtaining a cultural expert, the petitioner had failed to demonstrate prejudice. The Court reasoned that, even after counsel presented evidence about the petitioner's background, cultural influences, and the effect that all of that had on his actions during the marriage and on the evening of the murder, "[c]learly, the jurors knew and understood

the cultural issues involved in this case, and weighed them, but concluded that this did not outweigh the aggravating nature of the attack." *Id.* at 717.

Like the Fourth Circuit in *Syriani*, this Court is of the view that Petitioner's trial counsel did not render ineffective assistance by failing to obtain a cultural expert. As the Court will explain more fully below, the Court concludes that counsel obviously demonstrated an understanding of the cultural influences on Petitioner and that counsel's failure to go further by obtaining a cultural expert did not constitute deficient or prejudice performance at either the culpability or mitigation phases. Counsel attempted to present evidence during the culpability phase to call into question the reliability of Petitioner's confession and did present some evidence during mitigation not only to undermine the reliability of Petitioner's confession but also to bridge any cultural gap.

To the extent Petitioner argues that his trial counsel were ineffective for failing to present the testimony of a cultural expert during the culpability phase of the trial, Petitioner's argument must fail. Trial counsel sought to call psychologist Dr. Roger Fisher to testify during the culpability phase of the trial that Petitioner's confession was the product of psychological coercion and duress because of statements that police had made suggesting that Dorothy Jackson could end up in the electric chair and that their unborn child could end up in "never never land," and that letters that Petitioner sent from prison were a deliberate attempt on his part to reinforce his coerced desire to protect Dorothy and the baby. (Tr. Vol. VI, at 3175-77.) The trial court excluded the testimony, explaining that because it had already admitted Petitioner's confession as voluntary and knowing, it would be inappropriate to allow expert testimony suggesting that Petitioner's confession was the product of coercion or duress. (*Id.* at 3177.) A cultural expert

presumably would have testified essentially along those same lines during the culpability phase or in support of a motion to suppress Petitioner's confession prior to trial. Thus, Petitioner falls short of demonstrating deficient performance or prejudice from counsel's failure to take an action that counsel essentially tried to take: present expert testimony suggesting that Petitioner's confession was the product of coercion or duress, particularly in a case in which the jury was able to view a videotape of the confession.

As for counsel's failure to obtain a cultural expert during the mitigation phase, Respondent is correct that trial counsel did essentially present what Petitioner faults them herein for failing to present–namely the theory that Petitioner, by virtue of his upbringing, experiences, and influences, admitted responsibility for the murders not necessarily because he had committed those murders, but because he sought above all else to protect Dorothy Jackson and his unborn child from the police. Dr. Fisher testified emphatically and repeatedly that Petitioner would have done anything, including lie and give up his life, to protect Dorothy and their unborn child. (*Id.* at 3415-16, 3416, 3418, 3419.) Petitioner appears to be arguing that had trial counsel obtained the services of a cultural expert to add a cultural dimension to the theory–*i.e.*, that Petitioner, by virtue of the influence of his Mexican immigrant heritage, was that much more compelled to confess to the murders and was that much more susceptible to threats by the police of what would become of Dorothy and the baby if Petitioner did not accept full responsibility–there is a reasonable probability that the jury either would have acquitted him of capital murder or at least recommended a sentence less than death. Petitioner's argument is unpersuasive.

First, as noted above, trial counsel did manage to present *some* cultural evidence during the mitigation phase to bridge the cultural gap. Dr. Fisher explained that the abandonment of the

54

family by Petitioner's father had a particularly devastating impact on Petitioner because Petitioner was at an age during which young males in a Hispanic culture look to their fathers for security, stability, and well-being within the family, and as role models for how to be a man, husband, and father. (Tr. Vol. VI, at 3401.) Dr. Fisher also testified about the difficulties that Petitioner experienced when he and his siblings relocated to Los Angeles because Petitioner struggled to learn English and adapt to a new culture. (*Id*. at 3403-04.) Dr. Fisher went on to explain how Petitioner's urgent desire to become part of the family he had never had and to give his surname worth again after his father's abandonment—desires informed by his Mexican heritage—resulted in Dorothy Jackson becoming the most important thing in his life. (*Id*. at 3409-10, 3417.)

Of course, Petitioner is also correct in his assertion that trial counsel did not present all of the cultural evidence that Petitioner argues was available and warranted—namely, the testimony of an expert on Mexican American culture who could have provided more extensive information about the extent and force of the cultural dimension underlying Petitioner's motivation to confess to the murders not only as a basis for suppressing Petitioner's confession before trial, but also during the culpability and penalty phases to persuade the jury that Petitioner's admissions were unreliable and should be given little if any weight. Petitioner submitted in support of his state postconviction action an affidavit dated November 9, 1995, by Dr. Susan Keefe, a Professor of Anthropology at Appalachian State University who specialized in Mexican American culture. (App. Vol. III, at 1435-1443.) Dr. Keefe explained that she was trained in the analysis of "cultural systems," defined as "the learned pattern of of ideas, values, and rules governing behavior in a social group." (*Id*. at 1436, ¶ 8.) Dr. Keefe stated that she reviewed numerous

55

materials and documents from Petitioner's trial and detailing his background, in addition to reviewing the affidavits of immediate family members, friends, a teacher, and a probation officer, and also consulted with defense counsel, the mitigation specialist, the clinical psychologist, and Petitioner himself. (*Id*. at ¶¶ 10-12.)

Based on the foregoing, Dr. Keefe made numerous observations not only generally about the Mexican American immigrant experience, but also specifically about the stresses that Petitioner and his family experienced. Dr. Keefe stated for instance that once relocated in Los Angeles, Petitioner and his family coped with their social isolation through loyalty to family and other traditional Mexican cultural supports such as the church. (*Id*. at 1439, ¶ 29.) Dr. Keefe discussed generally the oppressive poverty in which many Mexican American immigrants lived and how they often turned to alternative forms of family, such as gangs, in order to survive on the streets. (*Id*. at ¶¶ 30-31.) Dr. Keefe also explained how mother-centered households often turn out the most gang members, as "the gang often provides the first opportunity to have male role models among peers facing similar difficulties in sex role identification." (*Id*. at 1440, ¶ 33.) Dr. Keefe opined that Petitioner encountered the most difficulties when he entered high school and began drinking, getting into more fights, and tattooing himself consistent with gang membership; and yet, according to Dr. Keefe, "[Petitioner] was probably a peripheral gang member rather than a hard-core member." (*Id*. at 1440-41, ¶¶ 36-37.) Dr. Keefe also explained that "Chicano gangs have a subculture which is consistent in significant ways with Mexican culture, especially with regard to ideal masculinity or machismo." (*Id*. at 1441, ¶ 38.) After describing in detail the "complex cultural concept of Mexican manliness," Dr. Keefe went on to explain the depth and extent of Petitioner's "concern with manliness." (*Id*. at ¶ 40.) After discussing Petitioner's

obsession with having his own family, as a product of cultural influences and his own father's abandonment, Dr. Keefe went on to describe Petitioner's relationship with Dorothy Jackson, their desire to get married and have a family, and the increasing disdain that Dorothy's family exhibited toward Petitioner and Dorothy herself. (*Id.* at 1442, ¶¶ 42-45.) Dr. Keefe explained that abortion and even adoption would be abhorrent to most Mexican Americans as inconsistent with the tenets of the Catholic church and with the Mexican cultural value of family that emphasizes blood kin. (*Id.* at 1443, ¶ 47.) Dr. Keefe concluded as follows:

> It would be consistent with Mr. Loza's Mexican values to try to protect Dorothy and the baby after his arrest by confessing to the crimes. His concerns on the videotaped confession are entirely focused on the outcome for Dorothy and the baby after the police say that he and Dorothy will be electrocuted and the baby will go to "Never-Never Land." After this statement, Mr. Loza says that Dorothy had nothing to do with it. "I'm taking all responsibility for this," he says. He wonders if Dorothy can get the money back from the unused bus tickets (presumably in order to travel to Los Angeles). He wonders if she could be released to live with his mother. He wonders if she has the baby in prison would the baby be taken away. He wonders if his mother could adopt the baby. He ends by saying he would do it again if Dorothy's family still said the same things: that they would give the baby up for adoption and that the baby should not be given Mr. Loza's last name. In the end, Mr. Loza explains his situation by saying "I'm only trying to be the man my father never was." A real Mexican man would respond to threats against his family, protect his family at all costs, and stand his ground in the most difficult circumstances."

(*Id.* at ¶ 48.) The state courts found that "[Dr.] Keefe's 'cultural evidence' is merely cumulative of or alternative to Dr. Fisher's testimony."[4] (App. Vol. IV, at 1999.) The most that Petitioner

---

[4]     The Court also reviewed the October 30, 1995, affidavit of clinical psychologist Dr. Julia Hawgood. (App. Vol. III, at 1498-1512.) Petitioner took the state appellate court to task for failing to consider Dr. Hawgood's affidavit in rejecting his claim, but the Court is unclear why Dr. Hawgood's opinions should be given any more credence than those of Dr. Fisher's as they relate to this claim. Dr. Hawgood, according to her own affidavit, is a clinical psychologist. Beyond claiming to have developed a familiarity with the type of preparation required for capital cases and perhaps having been provided with more background information than Dr. Fisher was, Dr. Hawgood does not appear to stand on any different ground than Dr.

has shown is that counsel *could* have done more, which will almost always be the case. What Petitioner has not shown is that counsel *should* have done more as a matter of prevailing professional norms. Petitioner makes much of the fact that counsel admitted in affidavits that their failure to obtain a cultural expert was the result not of a strategic decision but of oversight stemming from the fact that they had never represented a Hispanic defendant and did not recognize the need to obtain a cultural expert. But given the fact that counsel obviously demonstrated an understanding of the cultural influences on Petitioner, attempted to present evidence during the culpability phase to call into question the reliability of Petitioner's confession, and did present some evidence during mitigation to call into question the reliability and bridge any cultural gap, this Court cannot find that counsel's admitted failure to recognize the need for an obtain a cultural expert amounted to deficient performance falling outside prevailing professional norms.

Petitioner also has not shown that but for counsel's alleged errors, there is a reasonable probability that the outcome of his trial or sentencing hearing would have been different. First, although the likelihood that a trial court will refuse to admit certain evidence does not obviate counsel's duty to attempt to offer the evidence if it appears that the evidence is relevant and competent, Petitioner still cannot demonstrate prejudice from counsel's failure to offer a cultural expert in the instant case. As noted above, the fact that the trial court would not permit Dr. Fisher to testify during the culpability phase of the trial that Petitioner's confession was the result

---

Fisher regarding the capacity to present "cultural testimony." It bears reminding that one of Petitioner's arguments against finding that trial counsel managed to provide cultural evidence through Dr. Fisher's mitigation testimony is that "Dr. Fisher rendered his opinion as per his qualifications – on a psychological basis." (Doc. # 70, at 22.) That said, this Court has fully reviewed and considered Dr. Hawgood's affidavit.

of coercion or duress militates strongly in favor of finding that Petitioner was not prejudiced during the culpability phase due to counsel's failure to obtain a cultural expert to testify about the degree to which Petitioner's Mexican heritage motivated him to confess to the murders.

In addition, the fact remains that trial counsel *essentially* presented to the jury during mitigation the theory that Petitioner had confessed to killing Dorothy's four family members not necessarily because he had actually done so, but because he was motivated above all else to protect Dorothy and their unborn child from the police. (Tr. Vol. VI, at 3387-88, 3393-3430.) Petitioner has not demonstrated and the Court is not otherwise persuaded that had counsel simply presented more evidence in support of that theory—namely in the form of expanded testimony by an expert in Mexican American culture—there is a reasonable probability that the jury would have reached a different verdict at either the culpability phase or the penalty phase. Petitioner dismisses any argument that trial counsel presented the essence of this cultural evidence through the mitigation testimony of Dr. Fisher, emphasizing that Dr. Fisher provided only psychological testimony, not cultural testimony. But having reviewed Dr. Susan Keefe's affidavit, the Court simply finds unpersuasive any argument that had the jury heard more extensive testimony from a cultural expert such as Dr. Keefe rather than or in addition to the testimony that Dr. Fisher provided, there is a reasonable probability that the jury would have reached a different sentencing result. In considering the value of Dr. Fisher's testimony relative to the value of testimony by a cultural expert, the Court recognizes that Dr. Fisher's testimony about the lengths to which Petitioner would have gone to protect Dorothy and her baby included killing her family and feeling that that was justified, while Petitioner has consistently argued that a cultural expert would have helped explain how Petitioner's cultural influences motivated him to protect Dorothy

not by committing the murders but by confessing to the murders. (*Id*. at 3414, 3420-21.)

Nonetheless, considering all of the evidence, as well as the cultural evidence that Petitioner

argues should have been presented, the Court simply is not persuaded that there is a reasonable

probability that the testimony of a cultural expert, even if confined to a theory that Petitioner

confessed to but did not commit the murders, would have resulted in a different sentencing

verdict. *See, e.g., Beuke*, 537 F.3d at 644 ("Thus, 'we reweigh the evidence in aggravation

against the totality of available mitigating evidence,' which includes the mitigation evidence that

was omitted because of counsel's alleged deficiencies.") (quoting *Harries v. Bell*, 417 F.3d 631,

639 (6th Cir. 2005).) In so holding, the Court is mindful that "[t]he petitioner 'need only show

that one juror would have reached a different result to establish prejudice.' " *Beuke*, 537 F.3d at

644-45 (quoting *Gillard v. Mitchell*, 445 F.3d 883, 896 (6th Cir. 2006).)

### B. Counsel's Failure To Present Additional Family Members During Mitigation.

Petitioner also argues that trial counsel performed deficiently and to his prejudice by

failing during the mitigation hearing to call additional family members to testify and to better

prepare the family members who did testify. Petitioner argues that his trial counsel performed

deficiently and to his prejudice by failing to call not only his maternal grandmother, who had

raised him for much of his life, but also his sister Beatrix and his brother Jesus. (Petition, Doc. #

6, at ¶ 78.) Petitioner asserts that calling those additional family members would have provided

the jury with a complete picture of Petitioner's life and background. Petitioner also asserts that

the testimony would have provided evidence of the full effect of Petitioner's father's

abandonment of the family when the children were so young and of Petitioner's mother then

being forced to leave her children. (Doc. # 62, at 41.) Petitioner also argues that the omitted

60

testimony, in conjunction with the testimony of a cultural expert, not only would have provided the jury with a more complete understanding of life in Los Angeles for illegal Mexican immigrants, but also would have provided a basis for the proposition that Petitioner had confessed falsely in order to protect his unborn child. Citing *Eslaminia v. White*, 136 F.3d 1235 (9th Cir. 1998), Petitioner asserts that testimony from various family members cannot be cumulative because first-person views and opinions constitute unique and unduplicated evidence. (Doc. # 62, at 41.) Petitioner asserts that he was prejudiced by the omissions because the fact that the jury returned a life verdict on the first aggravated murder count demonstrates a reasonable probability that but for counsel's deficient performance in failing to call additional family members, the jury would have returned life verdicts on each of the victims.

Responding to Petitioner's arguments in her Return of Writ, Respondent characterizes Petitioner's claim as one assailing trial counsel for failing to present cumulative mitigating evidence. (Doc. # 67, at 45.) Respondent asserts that defense counsel presented substantial mitigating evidence from Petitioner's family and that Petitioner's mother and two sisters provided testimony about Petitioner's family history and character. Respondent goes on to argue that Dr. Fisher testified as to all of the information that Petitioner's grandmother's affidavit purports to reveal and to all of the details about Petitioner's ROTC and work experiences that Petitioner's sisters' affidavits purport to reveal. Respondent further asserts that Petitioner's sister Viviana Loza also testified about Petitioner's family background and ROTC involvement. Respondent also maintains that Petitioner's mother testified about Petitioner's father's abandonment of the family, Petitioner's traumatic childhood experiences, and Petitioner's "light criminal past." (*Id.*) Finally, Respondent asserts that Petitioner's brother Jesus's affidavit

offered nothing mitigating on behalf of Petitioner–only criticism of Dorothy Jackson. Respondent concludes by arguing that additional family testimony would only have been cumulative.

In his reply brief, Petitioner essentially disputes Respondent's argument that testimony by family members who did not testify would have been cumulative or otherwise not relevant mitigating evidence. (Doc. # 70, at 26-32.) Petitioner argues that testimony by his maternal grandmother Emma Rodas would not have been cumulative to anything that was presented, and argues specifically that Dr. Fisher could not have described any of the information set forth in Rodas's affidavit. Petitioner asserts that his grandmother, as the person who raised him for much of his life, could have testified about medical problems and conditions that Petitioner experienced as a child; the extent of abuse that Petitioner suffered at the hands of his mother's boyfriend; Petitioner's lack of involvement in gangs; the fact that Petitioner once took the blame for stealing stereos solely in order to protect his friends; and Petitioner's statement to her that regardless of guilt, he took the blame for the murders solely in order to protect Dorothy and his child.

Petitioner does not dispute Respondent's assertion that Petitioner's sister Viviana provided some background information regarding Petitioner. Petitioner argues, however, that the information that she provided was incomplete, due to the fact that she met with counsel only once prior to testifying. Petitioner argues that Viviana could have provided the following additional information, to wit: that Petitioner was physically abused by teachers at public schools in Mexico; that Petitioner was developmentally delayed in that he did not learn to speak at an appropriate age; that bullies beat up Petitioner nearly every day when he first came to the United

62

States; and that Dorothy's family left Los Angeles as the result of being victims of a drive-by shooting.

Similarly, Petitioner argues that although his mother Beatriz provided some background information concerning Petitioner, his mother could have provided more complete information, had she met with counsel more than once before testifying. For instance, according to Petitioner, his mother could have testified that teachers and classmates in public school in Mexico physically abused Petitioner; that Petitioner was a sickly child; that gang members beat Petitioner because he refused to join their gang; that Dorothy, following a physical altercation, miscarried the first child that she and Petitioner had conceived; and that Dorothy's family left Los Angeles as a result of being the victims of a drive-by shooting.

With respect to Respondent's argument that Petitioner's brother Jesus's affidavit offered nothing mitigating on behalf of Petitioner and only criticism of Dorothy Jackson, Petitioner argues that Respondent mischaracterizes Jesus's affidavit. Petitioner argues that Jesus could have testified that gang members once beat Petitioner because he refused to join their gang and that Petitioner eventually joined a gang that did not engage in violent acts and that Petitioner joined only to be with his friends. Petitioner argues that such testimony would have been invaluable corroborating evidence that Petitioner was not a serious gang member, contrary to other improper gang evidence that was introduced throughout Petitioner's trial.

Petitioner concludes by arguing that the omitted information set forth above was not cumulative to information that defense counsel did provide during his sentencing hearing. Petitioner argues, accordingly, that any factual finding made by the state courts in postconviction that the information was merely cumulative is unreasonable based on the evidence presented and

63

therefore deserves no deference as set forth in 28 U.S.C. §§ 2254(d)(2) and (e)(1). Petitioner argues in the alternative that he is entitled to an evidentiary hearing to develop the facts set forth above and prove that those facts establish a claim of ineffective assistance of trial counsel. (Doc. # 70, at 32-33; Doc. # 73.)

As noted above, Petitioner presented this component of his ineffective assistance claim to the state courts in postconviction. He argued in his third claim for postconviction relief that his convictions and/or sentences were void or voidable because his trial attorneys were deficient in their presentation of mitigation witnesses from the Loza family, specifically by neglecting to call Petitioner's grandmother, sister, and brother. (App. Vol. III, at 1417-19.) Petitioner supported the claim with the affidavits of anthropologist Dr. Susan Keefe, Petitioner's mother Beatriz Ventura, Petitioner's maternal grandmother Emma Rodas, Petitioner's sister Viviana Loza, Petitioner's sister Beatrix Loza, Petitioner's brother Jesus Loza, Petitioner's trial attorneys Michael D. Hanks and Gregory Howard, clinical psychologist Dr. Julia Hawgood, and Edna Marlow – Dorothy Jackson's foster mother who recovered and turned over to trial counsel letters that Petitioner had sent to Dorothy from prison. The trial court appears to have rejected Petitioner's claims as being barred by *res judicata*, as being without merit, and as being supported by only cumulative evidence. (App. Vol. III, at 1605-09, 1610.)

The last state court to issue a reasoned decision addressing these arguments, the state appellate court, rejected Petitioner's claim concerning counsel's failure to call additional family members as follows:

> Finally, Loza argues that his trial counsel was ineffective for failing to present mitigating evidence from Loza's family. In support of this argument, Loza submitted affidavits from his grandmother, sister, and brother. However, the

record reveals that Loza's mother and two of his other sisters testified about Loza's family history and general character during the mitigation phase of his trial. Since the affidavits submitted by Loza are merely cumulative to the evidence presented at trial, he has failed to establish ineffective assistance of counsel. See Lawson at 315; Combs at 105. Accordingly, Loza's claims of ineffective assistance of counsel are without merit, and his second assignment of error is overruled.

(App. Vol. IV, at 2000.)[5]

As noted *supra*, "[c]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. As the Court previously explained, in the Sixth Circuit, the scope of a court's review of a claim of ineffective assistance of counsel during mitigation is shaped by the degree of counsel's alleged inadequacies. The Sixth Circuit recently explained that, "[o]ur circuit's precedent has distinguished between counsel's *complete* failure to conduct a mitigation investigation, where we are likely to find deficient performance, and counsel's failure to conduct an *adequate* investigation, where the presumption of reasonable performance is more difficult to overcome." *Beuke v. Houk*, 537 F.3d at 643 (citing *Campbell v. Coyle*, 260 F.3d at 552, and *Moore v. Parker*, 425 F.3d at 255). The Sixth Circuit in *Beuke* went on to explain that, where it appears that trial counsel did not entirely abdicate their duty to investigate for mitigating evidence, a reviewing court should closely evaluate whether trial counsel exhibited specific deficiencies that were unreasonable under prevailing professional standards. *Beuke*, 537 F.3d at 643 (citing *Dickerson v. Bagley*, 453 F.3d at 701).

---

[5]     As noted earlier, Petitioner argues that Respondent waived applicability of the AEDPA's deferential standard of review by failing to argue it and urges the Court to conduct *de novo* review. (Doc. # 70, at 28-32.) In the alternative, Petitioner argues that § 2254(d) does not preclude this Court from granting relief because the state court decisions rejecting this claim were based on an unreasonable determination of the facts based on the evidence presented.

The Sixth Circuit has addressed on countless occasions claims alleging ineffective

assistance for the failure to investigate and call additional family members to testify in mitigation

and/or to better prepare the family members who did testify at mitigation. In *Carter v. Mitchell*,

443 F.3d 517, the only mitigation that defense counsel presented consisted of the petitioner's

own statement detailing a troublesome stepfather, problems with anger, and a recent conversion

to religion. *Id.* at 530. The petitioner claimed that his defense counsel should have investigated

and called family members to testify about the petitioner's troubled background, abuse of drugs

and alcohol, history of violent behavior, experience with racial prejudice, and influence by an

alcoholic and philandering father. In support, the petitioner presented affidavits by his mother,

step-father, sister, younger brother, older brother, half-sister, and paternal aunt. The Sixth Circuit

found neither deficient performance nor prejudice. The Sixth Circuit could not find deficient

performance because the three family members whom counsel failed to contact would have

offered little personal insight into the problems described by the petitioner, because there was no

allegation that counsel failed to contact the other four family members, and because the petitioner

presented no evidence as to what counsel did in the way of investigation. *Id.* at 530-31. The

Sixth Circuit went on to find that even assuming counsel had performed deficiently, the

petitioner could not demonstrate that he was prejudiced because the testimony that the

petitioner's family members were prepared to give was either cumulative to the petitioner's own

statement or too damaging to be of much value in mitigation. *Id.* at 531-32.

In *Clark v. Mitchell*, 425 F.3d 270 (6th Cir. 2005), the mitigation presented on behalf of

the petitioner consisted of testimony by an expert, Dr. Kisin, and the petitioner's mother.

Petitioner claimed in habeas that his attorneys were ineffective for failing to investigate and call

additional family members and offered in support affidavits by two mental health experts and

numerous family members. The Sixth Circuit rejected his claim, explaining:

> Our cases reject a requirement that any later-identified cumulative mitigating
> evidence must have been introduced in order for counsel to be effective. As this
> court recently explained, "to establish prejudice, the new evidence that a habeas
> petitioner presents must differ in a substantial way–in strength and subject
> matter–from the evidence actually presented at sentencing." *Hill v. Mitchell*, 400
> F.3d 308, 319 (6th Cir. 2005). This court also held in *Smith v. Mitchell*, 348 F.3d
> 177, 200-02 (6th Cir. 2003), that a petitioner was not prejudiced by his counsel's
> failure to introduce additional mitigating evidence at sentencing where new
> evidence sought to be introduced was merely cumulative to that which had already
> been presented at mitigation.

*Clark*, 425 F.3d at 286. The Sixth Circuit went on to explain that, "[w]hile the opinions of Dr.

Gelbort and Dr. Kandiko, as well as the affidavits from Clark's family, provide further mitigating

details about Clark, they do not significantly expand upon the information that was available to

the jury." *Id*. at 287.

In *Martin v. Mitchell*, 280 F.3d 594 (6th Cir. 2002), trial counsel gave no opening

statement, and then presented testimony by a probation officer (for the purpose of admitting a

presentence investigation report into evidence), the petitioner's mother, and the petitioner's

grandmother. The petitioner argued that counsel were ineffective for failing to conduct an

adequate investigation into the petitioner's background, failing to contact additional family

members, and failing to collect records concerning the petitioner's medical and mental health,

education, employment, and juvenile incarceration. In support, the petitioner provided affidavits

by eight family members averring that they would have testified had they been contacted but

otherwise failing to set forth what they would have testified to. The petitioner's mother, who

stated in her affidavit that she was not prepared for what to testify to during the sentencing

hearing, nonetheless provided testimony concerning the following during the sentencing hearing: the petitioner's problems with juvenile court and in school; the petitioner's juvenile institutionalization; her being on welfare during the petitioner's youth; the lack of financial support that she received from the petitioner's father; the petitioner's abnormal behavior during school; psychiatric testing that the petitioner received at school; abuse that the petitioner suffered at the hands of his mother's alcoholic husband; physical and psychological injuries that the petitioner suffered as the result of a gas explosion; the petitioner's dropping out of school in order to work for money to buy adequate clothing; and the petitioner's employment history. Following her testimony, when defense counsel stated that they had no further witnesses, the trial court asked if there were any family members or acquaintances in the court room, including the petitioner's father, who wished to testify on behalf of the petitioner. Subsequently, the petitioner's grandmother took the stand and testified that she had cared for the petitioner when he was an infant and again when he was five or six years old; that the petitioner wanted to go to church with her during that latter period; that she cooked for the petitioner and his siblings because they did not seem to have adequate food due to a lack of financial support from the petitioner's father; that the petitioner's mother had a difficult time raising her kids because of her asthma and inability to work steadily; and that the petitioner did not have a typical or tight relationship with his father. In closing arguments, defense counsel argued essentially that society had cast the petitioner aside at a young age and that if he was to be institutionalized, they (society) needed to improve. The record contained evidence that the petitioner, at times, was uncooperative with his counsel.

The Sixth Circuit proceeded to address Martin's ineffective assistance of counsel claim by first examining a host of previous decisions addressing similar claims. *Martin*, 280 F.3d at 611-12. Ultimately, the Sixth Circuit found that because counsel presented something in the way of mitigation and conducted some, albeit not exhaustive, investigation, there was no constructive denial of counsel. *Id.* at 613. Following a review of omitted information about the petitioner proferred by a mental health expert, the Sixth Circuit went on to find that counsel did not perform deficiently for failing to investigate and present that information because "the testimony of Martin's mother and grand mother did discuss most, if not all, of the factors in [Dr. Schmidtgoessling's] affidavit." *Id.* at 614. The Sixth Circuit reasoned that even if that information had not been presented within the context of an expert's opinions and conclusions, it nonetheless was sufficiently presented to the jury, not only through the testimony of the petitioner's mother and grandmother but also through the presentence investigation report and psychological evaluation that went to the jury. The Sixth Circuit also held that the petitioner could not demonstrate prejudice because family members did not set forth in the affidavits that petitioner submitted what information they would have testified to and because, as noted earlier, substantial background information concerning the petitioner was presented to the jury.

Viewed against this backdrop, the record in this case does not support a finding that Petitioner's counsel performed unreasonably and to Petitioner's prejudice for failing to call additional family members to testify in mitigation and/or for failing to better prepare those family members who did testify at mitigation. As in *Carter* and *Martin*, the record demonstrates that counsel did investigate and present mitigating evidence, the substance of which was akin to that which Petitioner faults counsel for failing to investigate, develop, and present. The Court

69

previously noted above that the record contains evidence that trial counsel sought funds for mitigation experts at an early stage during the pretrial proceedings and traveled to Los Angeles to interview Petitioner's family members and investigate his background. At the mitigation hearing, trial counsel delivered an opening statement urging the jury to consider Petitioner's difficult background, the testimony that trial counsel anticipated presenting, Petitioner's lack of a significant criminal history, Petitioner's concern for the well-being of Dorothy Jackson and their unborn child, the absence of a nexus between the robberies and killings of the victims, and Petitioner's acceptance of responsibility. (Tr. Vol. VI, at 3384-88.) Trial counsel went on to call clinical psychologist Dr. Roger Fisher, who provided testimony explaining among other things how abandonment by Petitioner's father, difficult upbringing and violent surroundings, and concern for the well-being of his unborn child and its mother would prompt Petitioner to repeatedly and emphatically take responsibility for the murders to protect Dorothy and their unborn child. Trial counsel also presented testimony by Petitioner's youngest sister Samantha Ceja, oldest sister Viviana Loza, and mother Beatriz – all of whom provided information generally about Petitioner's background, upbringing, positive attributes as a brother and son, and relationship with Dorothy Jackson and her family. The foregoing precludes any argument that trial counsel *completely* failed to investigate or present mitigation. The Court accordingly must "closely evaluate" whether Petitioner's attorneys "exhibited specific deficiencies that were unreasonable under prevailing professional standards." *Beuke*, 537 F.3d at 643. Based on the foregoing, the Court answers that inquiry in the negative and finds that Petitioner's attorneys did not perform deficiently in connection with their mitigation investigation and presentation.

70

Even assuming trial counsel performed deficiently, the Court further finds that Petitioner was not prejudiced. Although not "cumulative" in the sense that it was word-for-word duplicative, the omitted information that Petitioner's sister, grandmother, and brother could have provided, there was considerable overlap between the information that Petitioner's sister, grandmother, and brother could have provided and the information that was presented. This Court is of the view that what was omitted was not so substantially different from what was presented that it can be said that but for counsel's failure to present the omitted information, there is a reasonable probability that the jury would have returned life sentences as to all four victims instead of just one of them. *See, e.g., Beuke v. Houk*, 537 F.3d at 645 (finding that although some of the omitted evidence in mitigation, such as the petitioner's low self-esteem and the degree of his parents' sheltering him, was not cumulative, "this non-cumulative evidence is not powerful mitigating evidence that is reasonably likely to have changed the jury's recommendation of death.")

Petitioner asserts that the fact that the jury returned a life verdict as to Georgia Davis is evidence that had trial counsel presented more in the way of mitigation by calling Petitioner's sister, grandmother, and brother, there is a reasonable probability that the jury would have returned life verdicts as to each of the four victims. Petitioner's assertion is pure speculation. There is no way of knowing why the jury returned a life verdict as to Georgia Davis and it is pure speculation to assume that there is a reasonable probability that presentation of the omitted information would have persuaded the jury to return life verdicts as to all four of the victims. In short, considering all of the evidence, as well as the cultural and background evidence that Petitioner argues should have been presented, the Court simply is not persuaded that there is a

71

reasonable probability that better testimony by Petitioner's mother and two sisters, or testimony

by Petitioner's sister, grandmother, and brother would have resulted in a different sentencing

verdict. *See, e.g., Beuke*, 537 F.3d at 644 ("Thus, 'we reweigh the evidence in aggravation

against the totality of available mitigating evidence,' which includes the mitigation evidence that

was omitted because of counsel's alleged deficiencies.") (quoting *Harries v. Bell*, 417 F.3d 631,

639 (6th Cir. 2005).) Again, the Court is mindful that "[t]he petitioner 'need only show that one

juror would have reached a different result to establish prejudice.' " *Beuke*, 537 F.3d at 644-45

(quoting *Gillard v. Mitchell*, 445 F.3d 883, 896 (6th Cir. 2006).)

      Petitioner's case is distinguishable from those in which the Sixth Circuit found

ineffective assistance of counsel for the failure to investigate and present additional mitigation

evidence. The Sixth Circuit has found ineffective assistance where counsel failed to present any

evidence or arguments in mitigation. *See e.g., Austin v. Bell*, 126 F.3d 843, 849 (6th Cir. 1997);

*Hamblin v. Mitchell*, 354 F.3d 482, 490 (6th Cir. 2003); *Rickman v. Bell*, 130 F.3d 1150, 1157 (6th

Cir. 1997) (prejudice inferred because deficiencies were so severe); *Groseclose v. Bell*, 130 F.3d

1161, 1166 (6th Cir. 1997). But Petitioner's is not such a case. In *Harries v. Bell*, 417 F.3d 631

(6th Cir. 2005), the Sixth Circuit found ineffective assistance where counsel limited their

mitigation investigation to telephoning the petitioner's mother and brother; sending requests for

information to institutions where the petitioner had been confined; interviewing the petitioner,

the petitioner's co-defendant, and two state witnesses; declining to obtain a mental health expert

despite indications from the petitioner's mother of mental problems; and failing to adequately

investigate the petitioner's background despite indications of a troubled childhood. Even that

case is distinguishable because here, Petitioner's counsel certainly did more in the way of

72

investigation and presentation and because there is no indication in the record that there were any glaring or obvious leads that Petitioner's counsel inexplicably failed to follow up with during their investigation.

### C. Conclusion.

For the foregoing reasons, the Court is not persuaded that Petitioner's trial counsel performed unreasonably or to his prejudice by failing to obtain a cultural expert for the culpability and mitigation phases of Petitioner's trial, by failing to better prepare those family members who did testify at the mitigation hearing, and by failing to call additional family members to testify at the mitigation hearing. The Court would reach that conclusion under either the deferential standard of review set forth in 28 U.S.C. § 2254(d) or *de novo* review. The Court also concludes, based upon the facts that Petitioner developed and presented and upon this Court's legal and factual conclusions set forth above, that an evidentiary hearing on this claim is not necessary. Accordingly, Petitioner's fourth claim for relief and request for an evidentiary hearing are **DENIED**.

> **Fifth Ground for Relief: The suppression of exculpatory, impeachment evidence that leads to the grant of a defense request for a mistrial creates a bar to retrial under the double jeopardy clause as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution.**

Petitioner's fifth ground for relief concerns the mistrial and retrial that resulted when, prior to Petitioner's initial trial before a three-judge panel, the prosecution failed to disclose to Petitioner's trial counsel a forensic report from the Ohio Bureau of Criminal Identification and Investigation ("BCI") reflecting that blood analysts found not a single trace of blood on five bags of Petitioner's clothes that the police had submitted for blood trace analysis. (Petition, Doc. # 6,

at ¶¶ 79-109.) Petitioner notes that each of the four victims was shot at close range and that at least one of the victims, Gary Mullins, was shot at a range as close as four inches. Petitioner's counsel learned of the existence of the exculpatory report during their cross examination of the State's final witness, even though defense counsel had expressly requested all exculpatory evidence during discovery. Being of the view that a continuance would be insufficient to enable them to remedy the harm from the prosecution's non-disclosure of the report, given that the non-disclosure prejudiced Petitioner's waiver of a jury trial and that defense counsel might have employed a vastly different trial strategy had they known of the report, defense counsel felt compelled to request, and were granted, a mistrial. Petitioner argues herein that his retrial violated his right against being placed in double jeopardy as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution.

Petitioner states that on January 24, 1991, police submitted five bags of Petitioner's clothes to BCI for blood analysis and that on January 29, 1991, BCI forensic scientist Margaret Saupe mailed a written report to Detective Roger Knabel reflecting that she had found no blood on Petitioner's clothing. According to Petitioner, the record reflects that the report was discussed at a pretrial meeting attended by Detective Knabel, Officer Walton, Sergeant Jeffries, and Assistant Butler County Prosecutor Noah Powers. Petitioner further states that prior to his first trial, defense counsel expressly included in their discovery requests any exculpatory evidence and reports and that the prosecution filed a supplemental answer on May 1, 1991 stating in item twenty-two that Petitioner's clothing had not been analyzed for traces of blood. Following disclosure of the report during defense counsel's cross examination of the State's final witness, forensic expert Russell McSeveney, the trial court, over the prosecution's objection, granted  a

74

mistrial without prejudice on August 8, 1991.

On October 10, 1991, Petitioner moved to bar his retrial under the Double Jeopardy Clause, asserting that the prosecutor's misconduct had caused the mistrial. Petitioner also asserted that in addition to failing to disclose the exculpatory BCI report, the prosecution additionally failed to disclose favorable impeachment evidence that Petitioner had requested prior to trial, to wit: various statements by Dorothy Jackson at the grand jury hearing that were inconsistent with her testimony at trial, as well as testimony by Heather Garretson placing Jackson on the front porch of Jackson's home at the morning of the shootings (contradicting Jackson's testimony that she never returned to her home after she left it around 8:00 a.m.). Petitioner states that the trial court, although characterizing the prosecution's actions as "questionable," nonetheless denied his motion to bar retrial.

Citing *Oregon v. Kennedy*, 456 U.S. 667, 675-76 (1982), Petitioner contends that, although a successful motion by a defendant for mistrial typically does not create a double jeopardy bar to retrial, there is a notable exception to that rule when it appears that the prosecution engaged in misconduct intended to goad the defendant into seeking a mistrial. Petitioner insists that "objective facts and circumstances in the record clearly establish that the prosecutor's misconduct was intentional." (Doc. # 6, at 36.) According to Petitioner, the fact that Assistant Prosecutor Noah Powers attended a pretrial meeting during which the BCI blood report was discussed gives rise to an inference that the prosecution intentionally withheld the report, because the prosecution knew about the report and about defense counsel's request for the report. Petitioner also contends that the prosecution's failure to disclose the BCI report was not an isolated incident, pointing to the prosecution's failure to disclose evidence that impeached

75

Dorothy Jackson and presentation of materially false testimony by Jackson as evidence of a pattern of intentional misconduct. Petitioner argues that the prosecution's misconduct that resulted in the mistrial was so egregious as to bar retrial.

Petitioner also submits that, although the Constitution prohibits a State from re-prosecuting a defendant in order to enhance its chance of obtaining a conviction by providing itself with the opportunity to refine and strengthen its case, that is precisely what occurred in Petitioner's case. Petitioner asserts that the prosecution had the benefit of reviewing the mistrial transcript, identifying weaknesses in its case, "improving" Dorothy Jackson's testimony in a number of facets, and refining the testimony of the coroner regarding the times of deaths of the victims to better coincide with evidence against Petitioner. Petitioner concludes by insisting that the prosecutions' misconduct, and the benefits that it received as a result of the misconduct, were multifaceted:

> The State placed itself in an advantageous position. If Loza failed to discover the BCI report and impeachment testimony, the State could proceed with the benefit of its nondisclosure. If Loza discovered the evidence at trial, however, his trial strategy would be so severely undermined that he would have necessarily moved for a mistrial. The State would then re-prosecute after its practice trial with the benefit of honing its case-in-chief.

(Doc. # 6, at ¶ 108.)

In his memorandum in support, Petitioner adds that the Ohio Supreme Court's rejection of Petitioner's claim rested on a factual determination that was clearly rebutted by evidence developed during discovery in this habeas corpus proceeding. (Doc. # 62, at 45-47.) Petitioner points out that the Ohio Supreme Court rejected his double jeopardy claim based on its finding that the prosecution had learned of the existence of the BCI report on the morning of the last day

76

of trial and that there was no evidence that the prosecution deliberately or intentionally withheld the report from defense counsel. (*Id.* at 45, citing *Loza*, 71 Ohio St. 3d at 71.) Petitioner takes aim at that factual finding, noting that Detective Knabel stated in his federal habeas corpus deposition that he had supplied periodic packets of investigative materials to the prosecution and that he had made two copies of his investigative file that included the BCI report and had provided both copies to the prosecution. The fact that Detective Knabel stated during his deposition that he had found two copies of the BCI report in his "back-up file" is important, Petitioner argues, because Detective Knabel had testified during Petitioner's second trial that the prosecution had Detective Knabel's "back-up file." Petitioner also points out that Detective Knabel sat at the prosecutor's table during the first trial with a copy of his investigative file, meaning that the BCI report was physically present at the prosecutor's table during the entire first trial. Petitioner asserts that Detective Knabel stated no less than four times during his deposition that the prosecution had received the BCI report before the first trial and that Detective Knabel's assertion was corroborated by Lieutenant Jeffery's deposition testimony and Detective Walton's trial testimony. All of this, combined with the non-disclosure of the other impeachment evidence set forth above, leaves little doubt, according to Petitioner, that the prosecution knew of the existence of the BCI blood report and deliberately withheld it.

Respondent argues in her Return of Writ that the Ohio Supreme Court correctly denied Petitioner's claim and that this Court should deny habeas corpus relief. (Doc. # 67, at 50-56.) The heart of Respondent's argument is that there is no evidence in the record that the State deliberately withheld favorable evidence, much less intentionally provoked mistrial, and that absent such evidence, retrial following a mistrial that Petitioner requested and obtained was not

barred by the Double Jeopardy Clause. Respondent argues that the Ohio Supreme Court's decision rejecting Petitioner's claim was not contrary to clearly established United States Supreme Court and that federal law actually supports denial of Petitioner's claim. Reiterating her position that the record contains no evidence that the State intentionally provoked a mistrial, Respondent further argues that the Ohio Supreme Court's decision rejecting Petitioner's claim was not based on an unreasonable determination of the facts based on the evidence presented. Respondent concludes by arguing that because Petitioner retained primary control over the course of his trial – namely by seeking a mistrial in order to avail himself of a jury trial rather than a bench trial once he learned about the favorable BCI report – his retrial did not violate the Double Jeopardy Clause.

In his Reply Memorandum, Petitioner states that Respondent's argument that Petitioner's request for a mistrial was motivated by an intention to avail himself of a jury trial rather than a bench trial "glosses over all the reasons for the mistrial requests and improperly ascribes an intent on behalf of Petitioner for the mistrial request." (Doc. # 70, at 33-39.) Petitioner reiterates that "the reason for the mistrial request is that the trial prosecutor did not comply with its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963).

Petitioner initially presented this claim to the state courts by filing a motion to dismiss the indictment on grounds that retrial would violate Petitioner's rights afforded by the Double Jeopardy Clause. Following a hearing on October 10, 1991, the trial court overruled the motion, stating that it was not of the view that there was conduct on the part of the prosecution intended to provoke a mistrial and that the prosecution's conduct, although questionable, was not so overreaching as to create a double jeopardy bar against retrial. (App. Vol. VIII, at 4345-46.)

Petitioner subsequently raised the claim on direct appeal, which the Ohio Supreme Court rejected as follows:

> In his fourth proposition of law, appellant argues that the trial court erroneously denied his motion to bar his retrial on double-jeopardy grounds. Appellant initially waived his right to a jury trial and proceeded before a three-judge panel. During cross-examination of the state's final witness, it was discovered that a chemical analysis of appellant's clothing failed to reveal the presence of blood. The results of this analysis were not made known to the appellant before trial. Over the state's objection, the three-judge panel, in a split decision, granted the defense motion for a mistrial.
>
> In a subsequent motion, appellant claimed the state intentionally provoked a mistrial by deliberately withholding the test results and other evidence, which could have been used to challenge Jackson's credibility. The trial court determined that the state neither intended to provoke a mistrial nor acted in an overreaching manner.
>
> The Double Jeopardy Clause of the Fifth Amendment, made applicable to the states through the Fourteenth Amendment, protects a criminal defendant from repeated prosecutions for the same offense. *Oregon v. Kennedy* (1982), 456 U.S. 667, 671, 102 S.Ct. 2083, 2087, 72 L.Ed.2d 416, 422. When a trial court grants a criminal defendant's request for a mistrial, the Double Jeopardy Clause does not bar a retrial. *Id.* at 673, 102 S.Ct. at 2088, 72 L.Ed.2d at 423. A narrow exception lies where the request for a mistrial was precipitated by prosecutorial misconduct that was intentionally calculated to cause or invite a mistrial. *Id.* at 678-679, 102 S.Ct. at 2091, 72 L.Ed.2d at 427. See, also, *State v. Doherty* (1984), 20 Ohio App.3d 275, 20 OBR 338, 485 N.E.2d 783. Only where the prosecutorial misconduct in question is intended to "goad" the defendant into moving for a mistrial may defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion. *Oregon v. Kennedy, supra*, 456 U.S. at 676, 102 S.Ct. at 2089, 72 L.Ed.2d at 425.
>
> After reviewing the record, we must conclude that the conduct of the state was not intended to provoke the appellant into moving for a mistrial. The prosecution was not aware of the chemical analysis report until the morning of the last day of trial. There is no indication that the state engaged in an intentional act of deception, or that the state intentionally withheld exculpatory evidence. For these reasons, appellant's fourth proposition of law is overruled.

(*Loza*, 71 Ohio St. 3d at 70-71; App. Vol. III, at 1237-38.)

Petitioner contends in his Reply Memorandum that the Ohio Supreme Court's decision denying his claim rested on a factual finding that the record contained no evidence that the State intentionally withheld material evidence and that the State learned of the BCI report on the morning of the last day of the trial. Petitioner argues that the record, as supplemented, shows those conclusions to be false and he can rebut that factual determination by clear and convincing evidence as required by 28 U.S.C. § 2254(e)(1). (Doc. # 70, at 34.) Petitioner points again to the federal habeas corpus deposition testimony of Detective Roger Knabel in which Detective Knabel stated more than once that he did, to the best of his knowledge, provide the prosecution with a copy of the BCI report in question. (*Id.* at 34-36.) Petitioner states, "[i]t strains credibility to assert the prosecutors did not know of this report when they received it [by] no less than three methods from Knabel and had it sitting next to them for the entirety of the first trial." (*Id.* at 36.) Petitioner contends that because he has sustained his burden under § 2254(e)(1) of rebutting the state court's factual determination by clear and convincing evidence, this Court may review his claim *de novo*. (*Id.* at 37 (citing *Killian v. Poole*, 282 F.3d 1204, 1207 (9th Cir. 2002)).) Petitioner argues in the alternative that the Ohio Supreme Court's findings are unreasonable under § 2254(d)(2), also removing any bar by the AEDPA to this Court granting relief on Petitioner's claim. Petitioner adds to this that because the Ohio Supreme Court failed to consider all legally relevant facts – namely the testimony of Detective Walton during Petitioner's second trial that Assistant Prosecutor Powers attended a pretrial meeting during which the BCI report was discussed – this Court must assess his claim *de novo*. (*Id.* at 39.)

The Fifth Amendment, made applicable to the states by the Fourteenth Amendment, protects the criminally accused from being twice placed in jeopardy for the same offense, either

by being twice punished or twice tried. *United States v. Koubriti*, 509 F.3d 746, 749 (6th Cir. 2007) (citing *United States v. Cameron*, 953 F.2d 240, 243 (6th Cir. 1992).) As the Sixth Circuit has explained, however, "[t]he law is clear 'that the Double Jeopardy Clause's general prohibition against successive prosecutions does not prevent the government from retrying a defendant who succeeds in getting his first conviction set aside, through direct appeal or collateral attack, because of some error in the proceedings leading to conviction.' " *Koubriti*, 509 F.3d at 749 (quoting *Lockhart v. Nelson*, 488 U.S. 33, 38 (1988).)

A narrow exception exists to the general rule set forth above where a defendant requests and obtains a mistrial as a result of prosecutorial misconduct. The United States Supreme Court carved out that exception in *Oregon v. Kennedy*, 456 U.S. 667 (1982) as follows: "Only where the government conduct in question is intended to 'goad' the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion." *Id*. at 676. In the Sixth Circuit, "in order to prove prosecutorial misconduct that triggers double jeopardy, the defendant must demonstrate more than a deliberate act on the part of the prosecutor: 'there must be a showing that the prosecutor's deliberate conduct was intended to provoke the defendant into moving for a mistrial.' " *United States v. Colvin*, 138 F.App'x 816, 820 (6th Cir. 2005) (quoting *United States v. White*, 914 F.2d 747, 752 (6th Cir. 1990).)

The record contains no direct evidence that the prosecution in this case intended to provoke a mistrial during Petitioner's first trial. First, contrary to Petitioner's representation of the record, the record certainly supports a finding that the prosecution did not learn of the existence of the BCI blood report until the testimony of the prosecution's final witness and that a

81

simple clerical mistake was the culprit. Detective Roger Knabel, who was the lead investigator

of the crimes, testified during the hearing on Petitioner's motion to bar retrial that he submitted a

box of Petitioner's clothing to BCI and that he subsequently received a report from BCI analyst

Margaret Saupe indicating that Petitioner's clothes contained no traces of blood. (App. Vol.

VIII, at 4318.) With respect to what he did with that report, Detective Knabel testified that he

simply placed it in his master file and never discussed it with anyone. (*Id*. at 4318-19, 4324.) He

explained that at a pretrial meeting that included Assistant Country Prosecutor Noah Powers,

Detective Knabel turned over to Mr. Powers a xeroxed copy of Detective Knabel's master file

and that, inexplicably, the BCI report was not in the file that Detective Knabel turned over. (*Id*.

at 4319-20.) Detective Knabel further testified that, following the mistrial, he went back and

reviewed his master file and found an extra copy of the BCI report – plausibly the copy of the

report that should have but inadvertently was not placed in the copy of the file that Detective

Knabel turned over to Mr. Powers. (*Id*. at 4327-28, 4330-31.) He stated more than once during

his testimony that the fact that the report did not make it into the prosecution's copy of the file

was an accident and nothing more. (*Id*. at 4325.)

Detective Robert Walton was the officer responsible for transporting evidentiary items to

BCI for testing. During Petitioner's retrial, Detective Robert Walton testified during cross

examination that among the items that he transported to BCI were five bags of Petitioner's

clothes and that he (Detective Walton) assumed that BCI would test them for the presence of

blood. (App. Vol. V, at 2940.) Regarding the results of those tests, Detective Walton testified

that he never saw Margaret Saupe's BCI report and that he <u>thought</u> the test results <u>may</u> have been

discussed during a meeting prior to Petitioner's first trial at which Detective Knabel, Sergeant

Jeffery, and the prosecutor's office were also present. (*Id.* at 2942-43.) When pressed, Detective Walton explained that although he may have heard or assumed that the negative blood results were discussed at that meeting, at no point were they actually discussed in his presence. (*Id.* at 2943, 2952.)

In fact, if there is any direct evidence of the prosecution's subjective intent, it is evidence that the prosecution did <u>not</u> intend to provoke a mistrial. During the hearing on Petitioner's motion to bar retrial, Assistant County Prosecutor Noah Powers testified that the first time he became aware of the BCI report was during the testimony of the State's final witness (App. Vol. VIII, at 4337-38), that he had no intention of withholding the report and would have disclosed it to defense counsel had he been aware of it (*Id.* at 4338), and that he had no intention of causing a mistrial (*Id.* at 4338-39). In determining whether there was an intent on the part of the prosecution to provoke Petitioner to request a mistrial, this Court cannot simply ignore Mr. Powers' testimony, indulging a presumption that because the testimony was self-serving, it was inherently, presumptively false or unworthy of being believed.

Based on the foregoing evidence, the state courts acted reasonably in finding not only that the prosecution did not intentionally withhold the BCI blood report from Petitioner's defense counsel, but also that the prosecution did not intentionally act to provoke a mistrial. Petitioner argues that evidence developed during federal habeas corpus discovery undercuts the state courts' finding, but this Court does not agree.

In a May 16, 2001 deposition, Roger Knabel testified as he had during the hearing on Petitioner's motion to bar retrial that he had made two extra copies of his master original file. (Knabel Deposition, at 51-52, 100-101.) He also testified that he thought he had given one if not

83

both of the extra copies to the prosecutor's office. (*Id*. at 52.) He confirmed that he had sat at

the prosecutor's table for both of Petitioner's trials and that he had had with him his master

original file. (*Id*. at 85-88, 101.) Concerning the BCI blood report in question, Knabel testified

largely as he had during the hearing on Petitioner's motion to bar retrial that he did not know

how defense counsel did not receive a copy of the BCI report. (*Id*. at 90.) Knabel testified that

he believed that he had provided a copy of the report to Mr. Powers before Petitioner's first trial

as a part of Knabel's entire file. (*Id*. at 90-91, 97.) Knabel testified that he did not recall having

a conversation with anyone about the test results reflected in the BCI report. (*Id*. at 98.) George

Jeffery, who had been Detective Knabel's supervisor at the time of Petitioner's case, testified at a

May 16, 2001 deposition that he was sure that Detective Knabel had turned over "the lab report"

and that he had no reason to believe that the prosecutor's office had not received the report.

(Jefferey Deposition, at 42.) None of the other depositions that this Court reviewed set forth

information constituting clear and convincing evidence to rebut or otherwise establish as

unreasonable the state courts' finding that the prosecution had not intentionally withheld the BCI

report and had not deliberately acted to cause a mistrial.

The most that the habeas corpus depositions permit this Court to infer is that the

prosecution might have been in possession or aware of the BCI report. The Court bases that on

Detective Knabel's testimony that he made two copies of his original master file, Detective

Knabel's testimony during the hearing on Petitioner's motion to bar retrial that at least one of his

back-up copies contained two copies of the BCI report, and Detective Knabel's deposition

testimony that he provided both extra copies of his file to the prosecution. This testimony gives

rise to at least a plausible inference that the prosecution was in possession of the BCI report, even

84

if unknowingly. None of that establishes that the prosecution intentionally withheld the BCI report from defense counsel. Even assuming that the prosecution was aware of the BCI report and deliberately withheld it – the latter of which is not demonstrated by any evidence in the record – none of that amounts to direct evidence that any such misconduct was committed in order to provoke a mistrial. The most that could reasonably be inferred from any assumption that the prosecution intentionally withheld the BCI report from defense counsel is that they did so to enhance their chances for obtaining a conviction by withholding partially exculpatory evidence. The cases are clear, however, that evidence of overzealousness and overreaching on the part of the prosecution in an attempt to obtain conviction, in the absence of evidence that the prosecution was attempting to goad the defendant into seeking a mistrial, falls short of creating a double jeopardy bar to retrial. *See, e.g., Koubriti*, 509 F.3d at 749 (finding no intent to cause mistrial despite numerous acts of non-disclosure and other misconduct on the part of the prosecution in connection with first trial); *United States v. Newsome*, 849 F.2d 1474 (Table), 1988 WL 66136, No. 87-6148, at *4 (6th Cir. Jun. 28, 1988) (finding that the government's intentional withholding of evidence that it was expressly directed to disclose was subject to censure but did not constitute deliberate attempt to force a mistrial sufficient to bar retrial).

In the instant case, because the record is devoid of an direct evidence that the prosecution's misconduct was intended to cause a mistrial, the Court must examine the objective facts and circumstances, *Oregon v. Kennedy*, 456 U.S. at 675, in an effort to determine whether the prosecution's misconduct was intended not to enhance its chances of obtaining a conviction, but to provoke a mistrial so that it could have a brand new chance to try to obtain a conviction. The objective facts and circumstances in this case do not favor Petitioner's claim. The

prosecution's case was not glaringly weak or obviously in need of strengthening. The fact that the prosecution modified its case following the mistrial, without more, does not demonstrate that the prosecution intended to provoke a mistrial for the purpose of strengthening its case. Further, the prosecution in this instance opposed Petitioner's motion for a mistrial, giving rise to an inference that the prosecution was satisfied with the strength of its case and confident in its chance for obtaining convictions.

Petitioner argues that the prosecution engaged in a pattern of misconduct involving the withholding of material information and subsequently strengthened its case in connection with the withheld material. According to Petitioner, the nexus between that pattern of misconduct and the manner in which the prosecution strengthened the case it presented during Petitioner's retrial supports a finding that the prosecution deliberately attempted to cause a mistrial in order to strengthen its case and try again to convict Petitioner. Petitioner asserts specifically that the prosecution, in addition to deliberately withholding the BCI report, also deliberately withheld material impeachment evidence. Petitioner explains that contrary to Dorothy Jackson's testimony that she never returned to her home after she left around 8:30 a.m. on the morning of the shootings, Heather Garretson testified during the first trial and before the grand jury that she saw Dorothy on the porch of her home some time after 8:30 a.m. Petitioner explains that in view of the fact that impeaching Jackson's credibility was crucial to defense counsel's case, it was misconduct for the prosecution not to have disclosed prior to trial Garretson's testimony.

Petitioner further asserts that the prosecution presented materially false testimony during the first trial. Specifically, Petitioner asserts that Dorothy admitted before the grand jury that she had discarded a slipper that was used to muffle the gunshots during the shooting but then

86

subsequently testified during Petitioner's first trial that it was Petitioner who had discarded the slipper. Despite that material inconsistency, Petitioner argues, the prosecution neither disclosed the inconsistency to defense counsel nor informed the trial court of Jackson's ostensible perjury.

Petitioner argues that the prosecution benefitted from the mistrial by using the opportunity to identify and remedy weaknesses in its case that became apparent during Petitioner's first trial. For instance, according to Petitioner, Dorothy Jackson's testimony improved by becoming less convoluted and including additional details about the shootings that bolstered the prosecution's theory that Petitioner had committed the shootings not only with prior calculation and design but also to escape detection for the crime of child stealing. Petitioner further asserts that the prosecution improved the coroner's testimony as to the time of death. During the first trial, Petitioner asserts, the coroner testified that none of the victims was shot before 11:30 a.m. – a timeframe which, according to Petitioner, supported his theory of innocence. During the retrial, however, the coroner testified that Gary Mullins died at 11:00 a.m. – a time that, according to Petitioner, inculpated Petitioner. That the prosecution benefitted so substantially from the mistrial and retrial, Petitioner argues, supports a finding that the prosecution acted deliberately to provoke a mistrial. Petitioner's argument is belied by the record and nonetheless falls short of demonstrating that the prosecution deliberately goaded Petitioner into requesting a mistrial.

Assistant Prosecutor Noah Powers testified during the hearing on Petitioner's motion to bar retrial that the first time he had learned of Dorothy's changed testimony regarding the discarded slipper was when she stated as much during her trial testimony. (App. Vol. VIII, at 4339.) Powers testified that he had been prepared to disclose Jackson's inconsistent grand jury

87

testimony but did not follow through because defense counsel failed to request it during their cross examination of Jackson. Powers testified that although that may have been a mistake on his part, he never had an intent to mislead defense counsel. (*Id.*) Powers explained that Jackson denied repeatedly after the first trial that she had ever testified to the grand jury that she was the one who had discarded the slipper, even in the face of the transcript of her grand jury testimony admitting responsibility for discarding the slipper. (*Id.* at 4339-40.) Regarding Heather Garretson's testimony impeaching Jackson, Powers testified that the first he became aware of Garretson's testimony was during juvenile proceedings at which defense counsel was also present and privy to testimony and subsequent transcript. (*Id.* at 4340.) Powers stated on several occasions during his testimony that he believed that he had complied with his obligations to disclose and that he never had an intent to mislead defense counsel.

This Court is not free to just ignore Powers' testimony and it does not appear that any evidence developed during habeas corpus discovery – specifically Powers' May 18, 2001 deposition – undercuts Powers' earlier testimony. The foregoing, in short, undermines any argument by Petitioner that the prosecution acted deliberately to cause a mistrial. Again, assuming that the prosecution withheld material impeachment evidence and/or presented materially false evidence – a finding that this Court declines to make – the most that that establishes is that the prosecution acted overzealously in an effort to obtain a conviction. Even combined with what Petitioner characterizes as improvements that the prosecution made to its case during the retrial, the foregoing does not establish that the prosecution acted deliberately to cause a mistrial. *See, e.g., Koubriti*, 509 F.3d at 749-50 (finding no evidence of intent to goad defendant into requesting mistrial despite numerous acts of misconduct by the prosecution

88

including the withholding of material evidence).

For the foregoing reasons, Petitioner has failed to persuade the Court that Petitioner's retrial violated the Double Jeopardy Clause or that the state courts' decision rejecting Petitioner's claim involved an unreasonable determination of the facts based on the evidence presented. Nor is the Court persuaded that Petitioner has rebutted by clear and convincing evidence any state court factual findings concerning this claim. Accordingly, Petitioner's fifth ground for relief is **DENIED**.

**Sixth Ground For Relief**: **There is insufficient evidence to sustain Petitioner's convictions and death sentences in violation of his rights as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution.**

The trial court erred in overruling Petitioner's motion for acquittal, Petitioner argues in his Sixth ground for relief, because the State failed to prove beyond a reasonable doubt that Petitioner committed any of the four aggravated murders. (Petition, Doc. # 6, at ¶¶ 110-135.) Citing the standard set forth in *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979), namely that a conviction violates the Due Process Clause if no rational trier of fact could find the accused guilty beyond a reasonable doubt on each element of the charged crime, Petitioner asserts that the State's case fell below that standard in several regards. Petitioner argues first that with respect to the State's forensic proof of his identity as the offender, "an average mind would harbor reasonable doubt whether Loza killed anyone." (Doc. # 6, at ¶ 113.) Petitioner points out that no blood or gunshot residue were found on his clothing and that his fingerprints were not found on the murder weapon.

As for other evidence that the State offered to prove Petitioner's identity as the shooter, Petitioner asserts that his videotaped confession was coerced and unreliable and that the record

89

establishes that he lacked detailed information about the crimes that the offender would have known. Petitioner points out that those were details that he had no motivation to conceal once he had already confessed to the four murders and that Dorothy Jackson did know. Petitioner also asserts that Dorothy Jackson's testimony relating his purported confession to the shootings was legally insufficient because " 'a physically verifiable [medical] fact directly contradicts' her crucial testimony." (Doc. # 6, at ¶ 123 (quoting *United States v. Narcisco*, 446 F. Supp. 252, 282-83 (E.D. Mich. 1977)).) Petitioner explains that Jackson's testimony that she and Petitioner left for the bus station around 11:00 a.m. after Petitioner had already committed the four murders contradicts testimony by the coroner, Dr. Burkhardt, that Gary Mullins died between 11:30 a.m. and 12:30 p.m. and died immediately after being shot. Petitioner points out that Dr. Burkhardt also testified that none of the victims were shot before 11:30 a.m. "By Jackson's account," Petitioner emphasizes, "Loza confessed to her well over half hour before the crimes happened." (Doc. # 6, at ¶ 125.)

Petitioner argues that he is actually innocent of the aggravated murders for which he was convicted and sentenced to death and points additionally to letters that he wrote to Dorothy Jackson from prison, which he submitted during state postconviction proceedings, acknowledging her involvement in the murders. Petitioner asserts that the only evidence that he killed Cheryl Senteno in connection with stealing her purse was Dorothy Jackson's testimony that he had admitted as much; Petitioner points out that the police never found Senteno's purse in the dumpster where Jackson claimed Petitioner had discarded the purse. Petitioner argues that the letters submitted in postconviction also reveal his true motivation for confessing to the murders: to protect Dorothy and their unborn child. "Now that Loza's child is no longer

90

threatened, he has advanced his innocence and swears that Jackson admitted to him that she committed the murders." (Doc. # 6, at ¶ 128.)

Petitioner emphasizes that Dorothy Jackson's testimony also lacks credibility because she had a strong incentive to fabricate her testimony and inculpate Petitioner: to deflect blame from herself and because she was a cooperating witness. Petitioner asserts that much of Jackson's testimony implicating him was uncorroborated and littered with contradictions. Relying on exhibits attached to his Rule 7 motion to supplement the record, Petitioner elaborates in his memorandum in support that Jackson is borderline mentally retarded and had a psychological profile suggesting her capability of committing the murders. (Doc. # 62, at 48-55.) Petitioner notes that even Assistant County Prosecutor Noah Powers remarked during his habeas corpus deposition testimony about the lack of remorse or grief exhibited by Dorothy Jackson over the fact that four of her family members were dead. (Doc. # 62, at 53 (citing Powers Deposition at 51).)

Petitioner argues that his convictions for murdering Georgia Davis and Gary Mullins to escape detection for the crimes of child stealing and contributing to the delinquency of a minor are legally insufficient because he had a valid affirmative defense. Petitioner explains that his reasonable belief that he was spiriting Dorothy Jackson from Ohio to California in order to protect her welfare and safety establishes an affirmative defense to the crime of child stealing. Petitioner also notes that Jackson had made it clear that she intended to return to California with or without Petitioner.

Respondent argues in her return of writ that the State presented sufficient probative evidence Petitioner killed all four victims. (Doc. # 67, at 56-60.) Respondent contends that

*Jackson v. Virginia,* cautions that reviewing courts are not to become triers of fact and instead must defer to the jury's ability to resolve conflicts in testimony, to weigh evidence, and to draw reasonable inferences. Respondent asserts that the Ohio Supreme Court's decision rejecting Petitioner's claim on direct appeal was based on factual findings that are supported by the record and entitled to a presumption of correctness. Respondent maintains that the weight given to evidence and the credibility given to witness testimony are for the trier of fact to determine. Regarding the lack of scientific evidence linking Petitioner to any of the murders, Respondent argues simply that there is no constitutional requirement for a particular degree of scientific evidence necessary to convict a defendant of a crime. Respondent points out that Petitioner's confession was held to be voluntary. Respondent also asserts that, although Petitioner's confession may have been lacking in certain details, there were a great many details that Petitioner did confirm with no glaring inconsistencies to the evidence that was adduced. Respondent opines that Petitioner's motive for denying knowledge of certain details is his alone and beyond the scope of the evidence, and does not rise to the level of reasonable doubt as to Petitioner's guilt as a matter of law. Respondent asserts that any argument by Petitioner that the jury was troubled by the lack of details in Petitioner's confession is pure post-trial speculation.

Respondent also submits that the record contains sufficient probative evidence that Petitioner killed all four victims. Respondent points out that Heather Garretson observed no gunshot residue or blood spatters on Dorothy Jackson's clothes. Respondent asserts that Dorothy Jackson's testimony recounting Petitioner's confession to her was corroborated by not only Petitioner's videotaped confession to the police but also Petitioner's own words in a letter to his mother. Respondent also argues that any alleged inconsistencies in Jackson's testimony were

explored fully by defense counsel during cross examination and the jury still believed her

testimony. Respondent disputes Petitioner's argument that Jackson had a pecuniary interest in

lying, asserting that the $25 per day that she was paid for each day that she was detained as a

material witness hardly creates an incentive to lie. Regarding Petitioner's argument that there

was insufficient evidence to convict him of killing anyone to avoid detection for the crime of

child stealing, Respondent disagrees, arguing that the record establishes that Petitioner knew or

believed that he did not have Jackson's mother's permission to take Jackson to California.

Respondent also points out that Petitioner presented evidence concerning Jackson's abusive

household but that the jury still must not have believed that he had established an affirmative

defense to the crime of child stealing by a preponderance of the evidence. Respondent

emphasizes that that determination was made by the trier of fact based on the witnesses'

credibility. Respondent concludes there was ample evidence in the record to establish that

Petitioner committed the murders to avoid detection and that that is sufficient to satisfy due

process.

In his reply, Petitioner begins by emphasizing the importance of the lack of scientific

evidence linking anyone to the murders. (Doc. # 70, at 39-44.) Petitioner points out as

significant the fact that Dorothy Jackson's clothes had been laundered before they were examined

by BCI, making it highly unlikely that BCI would find any traces of blood on her clothes.

Petitioner also notes that it was the failure by the prosecution to disclose a BCI report indicating

that Petitioner's clothes had no traces of blood that fueled the mistrial, thereby demonstrating

how important scientific evidence, and particularly blood evidence, was to the case due to the

nature of the shootings. Petitioner argues that the fact that BCI found no blood on Petitioner's

clothes is remarkable in view of the fact that all of the victims were shot at close range, Dorothy

Jackson's testimony that blood splashed on Petitioner when he allegedly shot Cheryl Senteno,

and testimony that Petitioner had not changed his clothes between the shootings and his arrest.

Petitioner disputes Respondent's assertion that the murder weapon was found in

Petitioner's possession; Petitioner asserts that the firearm was found among the U-Haul boxes

that contained both Petitioner's and Dorothy Jackson's possessions. The only testimony linking

Petitioner to the firearm was that of Dorothy Jackson, and according to Petitioner, "she simply is

not believable." (Doc. # 70, at 41.) To this point, Petitioner also points out that it was Dorothy

Jackson who arranged for Judy Smith to buy the weapon and bullets and Dorothy Jackson who

took possession of the weapon and bullets after Smith purchased them.

Petitioner assails Respondent's "gloss[ing] over" the fact that Petitioner, in spite of his

intention to inculpate himself and deflect attention away from Dorothy Jackson and onto himself,

could not provide significant details surrounding the crimes that Jackson did recount. Petitioner

asserts that "the fact that [Petitioner] could not recall significant facts is more than an indication

that he had no idea what really happened." (Doc. # 70, at 41.) Petitioner also dismisses as

insignificant Respondent's reliance on the fact that Heather Garretson did not notice any gun

residue or traces of blood on Dorothy Jackson clothes. Petitioner points out that Garretson

actually provided other testimony linking Jackson to the murders when she testified that she

observed Jackson on the porch of Jackson's home later on the morning of the shootings,

contradicting Jackson's own testimony that she never returned to her home after she left earlier in

the morning.

94

Regarding Respondent's argument that payments to Dorothy Jackson as a material

witness who was detained provided no incentive to lie, Petitioner counters that "it certainly

cannot be discounted as an incentive." (Doc. # 70, at 42.) In connection with this argument,

Petitioner assails Butler County for its refusal to pursue charges against Jackson in connection

with the actual shootings, despite the revelation following Petitioner's conviction of evidence

indicating that Dorothy was involved in the shootings.

Petitioner argued in his third proposition of law on direct appeal to the Ohio Supreme

Court that his conviction was not supported by sufficient evidence. (App. Vol. III, at 1236.) The

Ohio Supreme Court addressed his claim as follows:

> In proposition of law three, appellant contests the constitutional
> sufficiency of the evidence with which he was convicted. Appellant argues that
> his confession was involuntary and therefore is not to be believed, that Jackson's
> testimony is neither reliable nor credible, that he had an affirmative defense to the
> child-stealing charge, that the state did not scientifically link Loza to the crime,
> and that the state's evidence did not establish beyond a reasonable doubt that
> appellant killed anyone. Appellant's assertions are without merit.

> The inquiry with regard to the issue of the sufficiency of evidence must
> focus on whether the evidence could reasonably support a finding of guilt beyond
> a reasonable doubt. "[T]he relevant question is whether, after viewing the
> evidence in the light most favorable to the prosecution, *any* rational trier of fact
> could have found the essential elements of the crime beyond a reasonable doubt."
> *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d
> 560, 573. If there is sufficient evidence upon which a jury could conclude that all
> of the elements of an offense have been proved beyond a reasonable doubt, the
> evidence is legally sufficient. *State v. Eley* (1978), 56 Ohio St.2d 169, 10 O.O.3d
> 340, 383 N.E.2d 132, syllabus.

> In his first challenge to the sufficiency of the evidence, appellant asserts
> that his confession was not voluntarily made. We already have determined that
> appellant's confession was voluntarily made; therefore, the issue need not be
> addressed further.

In his second challenge to the sufficiency of the evidence, appellant argues that Jackson's testimony was neither reliable nor credible. The weight to be given evidence and the credibility of witnesses are primarily for the trier of fact. *State v. Waddy* (1992), 63 Ohio St.3d 424, 430, 588 N.E.2d 819, 825 (citing *State v. DeHass* [1967], 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus). As has been previously stated by this court, "[n]ot even in a capital case may we sit as a 'thirteenth juror' * * * as to a judgment of conviction." (Citation omitted.) *State v. Tyler* (1990), 50 Ohio St.3d 24, 33, 553 N.E.2d 576, 589.

Our independent review of the record establishes that the state produced evidence of appellant's guilt beyond a reasonable doubt. In addition to appellant's videotaped confession, appellant confessed to Jackson in person and in letters that he wrote to Jackson while he was in jail. Appellant also confessed to the murders in a letter that he wrote to his mother. Appellant was alone with the victims in the house at the time of the murders. Personal items belonging to Davis were found in the dumpster where appellant was seen disposing of various items, and personal items of Davis and Senteno were also found among appellant's personal items which were packed in U-Haul boxes found at the Greyhound station. Appellant was identified as driving Mullins' truck. Forensic evidence established that the Raven .25 found among appellant's personal items in the U-Haul boxes was the murder weapon. Having found the evidence of appellant's guilt sufficient to support the convictions, appellant's challenge is without merit.

In his third challenge to the sufficiency of the evidence, appellant claims to have an affirmative defense to specification one in the bill of particulars, which states: " * * * Jose Trinidad Loza committed the above offense for the purpose of escaping detection, apprehension, trial, and punishment for other offenses committed by him, to wit: child-stealing and contributing to the delinquency of a minor with respect to his victim's minor child, Dorothy Jackson." Loza asserts that he reasonably believed that his conduct was necessary to preserve Jackson's health or welfare. See R.C. 2905.04(B). Each death specification in a multiple-count aggravated murder case must be considered separately. *State v. Hooks* (1988), 39 Ohio St.3d 67, 529 N.E.2d 429. Loza's contention that his convictions must be overturned is without merit, because each aggravated murder charge had multiple death penalty specifications attached of which Loza was found guilty.

Appellant further contends that the state failed to establish his identity as the offender through scientific evidence. Although laboratory technicians did not find any blood or gun powder residue on appellant's clothing, it must be noted that the .25 caliber bullets did not spatter much blood, as can be evidenced from the crime scene photos and videotape. Although no blood or gun powder residue scientifically linked the appellant to the crime, there was sufficient probative

evidence from which reasonable minds could conclude that Loza committed the
crimes alleged. Accordingly, appellant's third proposition of law is without merit.

(*Loza*, 71 Ohio St. 3d at 68-70; App. Vol. III, at 1236-37.)

As noted above, Respondent argues that 28 U.S.C. § 2254(e)(1) requires this Court to
presume as correct the factual findings made by the Ohio Supreme Court. Petitioner disputes
that § 2254(e)(1) applies, asserting that the Ohio Supreme Court's decision rejecting his
insufficiency of the evidence claim was a legal conclusion, not a factual conclusion. Petitioner
also contends that Respondent's failure to argue the applicability of the standard of review set
forth in § 2254(d) requires this Court to exercise *de novo* review rather than a deferential
standard of review. Petitioner argues in the alternative that, even assuming that § 2254(d)(2)
applies, the Ohio Supreme Court's decision was unreasonable based evidence presented because
the Ohio Supreme Court did not consider and discuss the many facts that were favorable to
Petitioner.

In *Jackson v. Virginia*, 443 U.S. 307 (1979), the United States Supreme Court held that as
a matter of fundamental due process, a criminal conviction cannot stand unless each essential
element is proven beyond a reasonable doubt. The Supreme Court explained that when
reviewing a challenge to the constitutional sufficiency of the evidence supporting a criminal
conviction, "the relevant question is whether, after viewing the evidence in the light most
favorable to the prosecution, *any* rational trier of fact could have found the essential elements of
the crime beyond a reasonable doubt." *Id*. at 319. The Supreme Court cautioned, with respect to
the role of a reviewing court, that "[t]his familiar standard gives full play to the responsibility of
the trier of fact fairly to resolve conflicts in testimony, to weigh the evidence, and to draw

reasonable inferences from basic facts to ultimate facts." *Id.* Thus, after reviewing the evidence in a light most favorable to the prosecution and respecting the trier of fact's role in determining witnesses' credibility and weighing the evidence, a federal court must grant habeas corpus relief "if it is found that upon the record evidence at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Id.* at 324.

As the Sixth Circuit has explained, "[i]n a habeas proceeding, however, we cannot simply conduct de novo review of the state court's application of [the *Jackson v. Virginia*] rule, but must review its sufficiency-of-the-evidence decision under the highly deferential standard of the AEDPA." *Saxton v. Sheets*, 547 F.3d 597, 602 (6th Cir. 2008). In *Tucker v. Palmer*, 541 F.3d 652 (6th Cir. 2008), the Sixth Circuit explained in more detail:

> Accordingly, the law commands deference at two levels in this case: First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the Michigan Court of Appeals' consideration of the trier-of-fact's verdict, as dictated by the AEDPA.

*Tucker*, 541 F.3d at 656. *See also Parker v. Renico*, 506 F.3d 444, 448 (6th Cir. 2007); *Nash v. Eberlin*, 258 F.App'x 761, 765 (6th Cir. 2007). This Court recognizes, however, that "even after AEDPA, [the Court] must 'distinguish reasonable speculation from sufficient evidence' when reviewing a state court's application of *Jackson*." *Smith v. Romanowski*, No. 07-1578, 2009 WL 1884451, at *6 (6th Cir. Jul. 1, 2009) (Moore, J., dissenting) (quoting *Brown v. Palmer*, 441 F.3d 367, 352 (6th Cir. 2006).)

Petitioner argues that the AEDPA standard of review does not apply because Respondent failed to raise it. Petitioner's argument is not well taken and his reliance on *Mason v. Hanks*, 97 F.3d 887, 892 n.1 (7th Cir. 1996), is misplaced. There, the Court of Appeals for the Seventh

Circuit was faced with an appeal from the district court's denial of habeas corpus relief in a case to which the AEDPA would not have applied: the petitioner in *Mason* filed his habeas corpus petition in the district court before the AEDPA became effective. *See, e.g., Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *Holman v. Gilmore*, 126 F.3d 876, 879-880 (7th Cir. 1997). On appeal, the Seventh Circuit remarked in a footnote that after it had heard oral arguments, the President signed into law the AEDPA. The Seventh Circuit went on to state that it was not required to consider whether the AEDPA was applicable because, among other reasons, the State had failed to ask the court to consider it, causing the court to regard the matter as waived. Given the procedural posture of that case, this Court is not persuaded that it supports the remarkable argument that the AEDPA's standards of review do not control a federal court's review of a habeas corpus petition unless the respondent raises the argument. That argument likens the AEDPA to an affirmative defense and Petitioner has not cited any authority holding that the AEDPA's standard of review is an affirmative defense that may be waived if it is not raised.

Thus, the inquiry before this Court is whether the Ohio Supreme Court's application of *Jackson v. Virginia* in rejecting Petitioner's sufficiency of the evidence claim contravened or unreasonably applied clearly established federal law as determined by the United States Supreme Court. As noted in more detail above, the Ohio Supreme Court relied on the following evidence established at trial as constituting sufficient evidence to support Petitioner's convictions as a matter of due process: Petitioner's videotaped confession, Petitioner's confession to Dorothy Jackson in person and subsequently in letters from jail, Petitioner's confession to his mother in a letter from jail, the fact the Petitioner was alone with the victims in the house during the time of their murders, the fact that personal items belonging to Georgia Davis were found in a dumpster

99

in which Petitioner was observed discarding items, the fact that personal items belonging to

Georgia Davis and Cheryl Senteno were found among Petitioner's possessions that were packed

in U-Haul boxes at the bus station, the fact that Petitioner was observed driving Gary Mullins'

truck, the fact that the .25 Raven established as the murder weapon was found among Petitioner's

possessions in the U-Haul boxes, and the fact that even assuming that Petitioner had an

affirmative defense to the child-stealing specification, his death sentences were supported by

other capital specifications.

To the extent that Petitioner challenged his own confession as involuntary and unreliable,

the Ohio Supreme Court reminded that it had already found Petitioner's confession to be

voluntary. To the extent that Petitioner challenged Dorothy Jackson's testimony as unreliable,

the Ohio Supreme Court reminded that the weight to be given evidence and the credibility to be

given witnesses belong exclusively within the provence of the trier of fact. Regarding

Petitioner's assertion that he had an affirmative defense to the offense of child-stealing alleged in

one of the capital specifications, the Ohio Supreme Court reminded that Petitioner was found

guilty of the other capital specifications attached to the aggravated murder counts. Finally, the

Ohio Supreme Court dismissed as insignificant the fact that no blood or gunshot residue was

found on Petitioner's clothes or otherwise linking him to the murders, because the crime scene

photographs and videotapes reflected that the .25 caliber bullets resulted in very little blood

spatter. Based on its own review of the state court record, this Court cannot disagree with, much

less find unreasonable, the determinations made by the Ohio Supreme Court.

It is important to remember, when reviewing a sufficiency of the evidence challenge, that

this Court "do[es] not reweigh the evidence, re-evaluate the credibility of the witnesses, or

substitute [its] judgment for that of the jury." *Brown v. Konteh*, 567 F.3d 191, 2005 (6th Cir.

2009). Petitioner attempts to evade this well-settled principle by offering reasons why the Court

should disregard certain testimony and evidence not as a matter of re-evaluating the credibility of

the witnesses or reweighing the evidence but as a matter of recognizing that the testimony and

evidence are incompetent as a matter of law. Petitioner relies on *United States v. Narcisco*, 446

F. Supp. 252, 282-83 (E.D. Mich. 1977), to support his position that Dorothy Jackson's crucial

testimony recounting Petitioner's alleged confession to her is legally insufficient to sustain

Petitioner's convictions because physically verifiable medical evidence directly contradicts

Jackson's testimony. In *Narcisco*, the district court stated that "[i]t is a well accepted general

proposition of law that a verdict cannot be based 'on evidence which cannot possibly be true, is

inherently unbelievable, or is opposed to natural laws.' " *Id*. at 282 (citations omitted). The

district court went on to observe that "[m]ost commonly this rule is applied when a physically,

verifiable fact directly contradicts crucial testimony necessary to sustain a verdict." *Id*.

 Although persuasive at first glance, however, this authority cuts against Petitioner's

argument as much as it appears to support Petitioner's argument. *Narcisco* went on to caution:

  The power to disregard testimony because of its inherent lack of
believability is one that has been used sparingly. *Peters v. Fitzpatrick*, 310 F.2d
704 (7th Cir. 1962). The courts have held that:

   "Unless in the light of the circumstances the testimony is so
inherently improbable and impossible of belief as in effect to
constitute no evidence at all, it may not be disregarded in
determining the sufficiency of the evidence to support the
judgment." *Hobart v. Hobart Estate Co.*, 26 Cal.2d 412, 159 P.2d
958, 966 (1945).

*Narcisco*, 446 F. Supp.at 283. In light of that caution, even assuming that Petitioner's argument

101

finds support in the law, his argument finds little support in the record.

       This Court is not persuaded that a witness's inability to recall or recount a fact with precision or certainty necessarily renders his or her testimony "inherently improbable and impossible of belief as in effect." In this regard, Petitioner appears to mischaracterize the record to make his argument that the testimony of Dorothy Jackson is contradicted by a verifiable medical fact or is otherwise so unreliable as to enable or even require this Court to disregard her testimony. Petitioner emphasizes that Dorothy's crucial testimony concerning Petitioner's alleged confession to her as they walked around the block on the morning of the shootings cannot be believed because the time that Dorothy testified that they left for the bus station – "around 11:00 a.m." – is contradicted by the times of death and/or times of the shootings testified to by the coroner, Dr. Burkhardt. Petitioner's argument is undercut by the fact that notwithstanding Petitioner's assertion from cross examination testimony that Dr. Burkhardt pinpointed with certainty when the victims were shot and/or died, the fact remains that much of Dr. Burkhardt's testimony concerning the times the victims were shot and/or died was couched in terms of estimates, not times certain. Dr. Burkhardt gave no opinion about the time that Georgia Davis was shot or died. (App. Vol. V, at 2818-19.) Dr. Burkhardt testified that Gary Mullins died "*around* 11:00 a.m. * * * *give or take*." (*Id.* at 2823-24 (emphasis added).) Dr. Burkhardt estimated that Cheryl Senteno died around 4:00 to 6:00 p.m. on January 16, 1991 and offered no opinion about what time she was shot. (*Id.* at 2828.) As to Jerri Luanna Jackson, who did not die until several weeks after having been shot, Dr. Burkhardt gave no opinion as to what time she was shot. (*Id.* at 2832.)

102

Further, it is important to remember that neither Dorothy Jackson, nor any of the other witnesses for that matter, testified with firm certainty or exact precision as to the various times, on the morning of the shootings, that Dorothy Jackson: first arrived at Judy Smith's house, left for a brief time to meet Petitioner outside between Smith's home and Jackson's home, returned to Smith's house, left Smith's house to walk to a phone booth with Heather Garretson, or left Smith's house for good and departed with Petitioner. For instance, when Judy Smith was asked on cross examination whether Dorothy Jackson had left Smith's house by 11:00 a.m., Judy Smith answered, "I *believe* so." (App. Vol. V, at 2578 (emphasis added).) Dorothy Jackson, when asked on direct examination what time she left Judy Smith's house for good to meet Petitioner, testified "*around* 11:00 a.m." (*Id.* at 2608.) Kathy Mills, Judy Smith's daughter, testified on direct examination that between 10:30 and 11:00 a.m., Dorothy Jackson left Smith's house for ten minutes to meet Petitioner outside (App. Vol. VI, at 3014) and that after Jackson returned, Jackson did not leave Smith's house for good until between 11:30 and noon. (*Id.* at 3015.) Heather Garretson testified during Petitioner's case in chief that she and Dorothy Jackson left Smith's home so that Jackson could use a pay phone to inquire about bus schedules "[*p*]*robably* around 9:00. I can't really remember." (*Id.* at 3142 (emphasis added).) Garretson estimated that it might have been as early as between 9:00 and 9:30 that Jackson left Smith's house to join Petitioner outside for ten minutes (*Id.* at 3154), contrary to the testimony of other witnesses that it was between 10:30 and 11:00. Garretson testified that Jackson left Smith's house for good to leave with Petitioner in Gary Mullins' truck "*probably* around 11:00." (*Id.* at 3155-56 (emphasis added).)

103

As demonstrated above, many of the times provided by the witnesses were imprecise and even contradictory, but that fact does not render their testimony, or specifically that of Dorothy Jackson, so unreliable as to make Jackson's testimony incompetent as a matter of law. Finally, so long as Petitioner is splitting hairs about time frames, it bears noting that if, as Petitioner asserts, Dorothy Jackson "claimed that Petitioner and her departed for the bus station well over half an hour before the coroner opines any of the victims was shot" (Doc. # 62, at 51), then Dorothy Jackson can no more be implicated in the shootings than Petitioner.

Petitioner also insists that Dorothy Jackson's ability to recall more details about the shootings during her statement to police and trial testimony than Petitioner was able to recall during his videotaped confession suggests that she, rather than Petitioner, was the shooter. This argument is unpersuasive. It is more accurate to say that Petitioner *did* not, rather than *could* not, provide details during his videotaped confession and the reason for that, as Respondent points out, is beyond the scope of the record and not for this Court to speculate on. There are any number of explanations for why Petitioner failed to provide detailed information to detectives during his confession, only one of which is that Petitioner did not know them because Dorothy Jackson, rather than Petitioner, shot the victims. Petitioner's arguments are not enough to call into question the legal competency of his videotaped confession, especially when it is viewed along with Petitioner's confession to Dorothy Jackson and his own mother in letters that he wrote from jail.

In a continuing effort to undermine Dorothy Jackson's credibility as a matter of law and implicate her in one or more of the shootings, Petitioner emphasizes that Jackson's insistence that she never returned to her house after she left it between 8:30 and 9:00 on the morning of the

104

shootings is contradicted by Heather Garretson's testimony that she observed Dorothy Jackson on the porch of Jackson's home between 9:00 and 9:30 when Dorothy briefly left Judy Smith's house to meet Petitioner outside. Petitioner places too much emphasis on Garretson's testimony in this regard. First, it does not establish that Dorothy Jackson went into her house, only that she was on the porch. Further, despite Jackson's insistence that she was never on her porch on the morning of the shootings (App. Vol. V, at 2673-74), the fact remains that Garretson's testimony about seeing Jackson on the porch is not inconsistent with testimony indicating that on the morning of the shootings, Jackson left Judy Smith's house for approximately ten minutes to meet Petitioner outside between Smith's house and Jackson's house (App. Vol. VI, at 3154).

Additionally, Petitioner emphasizes that no blood or gunshot residue was found on his clothing, in spite of the fact that he was wearing the same clothes when he was detained that he had worn when he allegedly shot the victims. Concomitantly, Petitioner points out, Dorothy Jackson's clothes were laundered several times before they were tested, making it all but certain that no blood or gunshot residue would be detected. Again, Petitioner places too much emphasis on this evidence. This Court's review of the crime scene photographs and videotape reflects that for whatever reason, there was very little blood surrounding any of the four victims. That being so, the absence of blood or gunshot residue on Petitioner's clothes is not as exculpatory as Petitioner would have this Court believe.

Also undermining the credibility of Dorothy Jackson's testimony, Petitioner argues, is the undisputed fact that it was Dorothy who arranged for Judy Smith to buy the .25 Raven and bullets. That fact does not undermine Jackson's testimony, however, when it is also undisputed that Dorothy Jackson testified that she asked Smith to buy that gun for Petitioner (App. Vol. V, at

105

2592) and that Judy Smith testified to the same (App. Vol. V, at 2561). The Court is not free to assess for itself the credibility of that sworn testimony.

Jackson's motivation to deflect blame from herself was explored by defense counsel during cross examination and, as noted above, this Court cannot second-guess the jury's credibility determination as to Jackson's testimony. Similarly, the fact that Dorothy Jackson's testimony indicating that it was Petitioner who threw the slipper that was used to muffle gunshots on to the roof of the bus station contradicted her early statements and testimony that she was the one who discarded the house slipper does not undercut the competency of her testimony because her inconsistent statements on that fact were explored on cross examination and for the jury to consider in assessing her credibility. (App. Vol. V, at 2684-86.) Petitioner argues additionally that Dorothy Jackson had a psychological profile suggesting that she was capable of committing the murders. Although that argument was not raised during trial, such that the Court would be forced to defer to the trier of fact's acceptance or rejection of it, it hardly rises to the level of undercutting Jackson's crediblity or the other probative evidence implicating Petitioner as the perpetrator.

Petitioner emphasizes that his videotaped confession, as well as letters that he wrote from jail implicating himself in the murders, predate his affidavit in which he now swears, ostensibly because he no longer fears for his child's safety, that he did not shoot the four victims and that Dorothy did. But Petitioner's argument forces this Court to answer the impossible question that is always posed when a person's subsequent sworn statement contradicts previous sworn statements or testimony and ultimately that must defeat Petitioner's argument: namely, was Petitioner lying in his videotaped confession and letters from jail or is he lying now? *Cf. In re*

106

*Byrd*, 269 F.3d 561, 575 (6th Cir. 2001). Petitioner argues that his subsequent affidavit is more credible because he no longer feared for the safety of child and therefore was not driven by a motivation to lie to protect Jackson and their unborn baby that drove him when he confessed to detectives and in letters that he wrote from jail. But an equally if not more plausible explanation is that his subsequent affidavit was motivated – not by the urge to come clean and tell the truth – but by a desire not to be put to death.

Petitioner also attacks the sufficiency of several of the death penalty specifications attached to the murder counts. Specifically, he argues that there is insufficient evidence proving that he robbed Cheryl Senento of her purse because her purse was never found in his possession or in the dumpster where Dorothy Jackson stated that he discarded it. Petitioner also challenges the sufficiency of specifications that he killed the victims in order to escape detection for the crime of child stealing on the basis that Petitioner had an affirmative defense to that charge – namely, his good faith belief that he was spiriting Jackson away to protect her safety and welfare. The Ohio Supreme Court pointed out, however, that each aggravated murder charge had multiple death penalty specifications attached of which Loza was found guilty. Because each death penalty specification is considered separately, Petitioner cannot establish that there was insufficient evidence to support his death sentence when he attacks the sufficiency of evidence as to only one of several death penalty specifications. Petitioner offers little (and there is little he could offer) to challenge that principle.

Based on this Court's review of record, the Court is satisfied that there was sufficient evidence to support Petitioner's convictions and that the Ohio Supreme Court's application of *Jackson v. Virginia* in rejecting Petitioner's challenges to the sufficiency of the evidence did not

contrave or unreasonably apply clearly established Supreme Court precedent. Accordingly,

Petitioner's sixth ground for relief is **DENIED**.

> **Eighth Ground for Relief: The trial court's purpose instruction created conclusive presumption of guilt and relieved the State of its burden to prove guilt beyond a reasonable doubt thereby depriving Petitioner of his rights as guaranteed by the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.[6]**

Petitioner argues that the trial court's instruction on purpose and intent, combined with

certain components of the prosecution's closing argument, had the effect of creating a conclusive

presumption that relieved the State of its burden to prove the essential element of purpose.

(Petition, Doc. # 6, at ¶¶ 142-148.) Petitioner points to the following jury instruction:

> Purpose and intent mean the same thing. The purpose with which a person does an act is known only to himself unless he expresses it to others or indicates it by his conduct. The purpose with which a person does an act is determined from the manner in which it is done, the weapon used, and all the other facts and circumstances in evidence. **If a wound is inflicted upon a person with a deadly weapon in a manner calculated to destroy life, the purpose to cause the death may be inferred from the use of the weapon.** A deadly weapon is any instrument, device or thing capable of inflicting death and designed or specifically adapted for use as a weapon or possessed, carried, or used as a weapon.

(*Id.* at ¶ 143 (quoting T.p. 1064-64 (emphasis added)).) Petitioner also points to the following

portion of the prosecution's closing argument, and asserts that the instruction and argument

combined had the effect of creating a conclusive presumption that relieved the State of its burden

to prove the essential element of purpose:

> **Now, the fact that the defendant used a firearm to shoot each victim in the head is a fact from which you can infer that he had the purpose to cause the death of each and every victim.** Now, his purpose may also be garnered from his conduct after the fact, his taking of Gary Mullins' truck and the other victims'

---

[6]     In its June 11, 2002 *Opinion and Order*, the Court denied Petitioner's seventh ground for relief as procedurally defaulted. (Doc. # 56, at 38-49.)

108

property, keeping the cash and disposing of the other items including items of evidence. Look at the fact that he threw away the purses after he takes the money. Look at the fact that he uses the truck as a getaway vehicle, a way to escape, a way to get away from being apprehended.

(Doc. # 6, at ¶ 144 (quoting T.p. 976 (emphasis added)).)

Petitioner reasons that the combination of the jury instruction and closing argument had the effect of creating a conclusive presumption that because a deadly weapon was used, Petitioner's purposeful intent had been established. Petitioner also asserts that the trial court compounded the error by failing to instruct the jury that the inference was not conclusive and that it was for the jury to decide whether Petitioner had acted with purposeful intent. Petitioner argues that the United States Supreme Court denounced such conclusive presumptions in *Sandstrom v. Montana*, 442 U.S. 510 (1979), due to the tendency of conclusive presumptions to invade the fact-finding function assigned to the jury. Petitioner concludes by reiterating that the Due Process Clause requires the State to prove each essential element of a charged offense beyond a reasonable doubt and prohibits the State from shifting to the defendant the burden of persuasion on any element or fact necessary for conviction.[7]

In her Return of Writ, Respondent begins by noting that the Ohio Supreme Court rejected Petitioner's claim as meritless when he raised it on direct appeal. (Doc. # 67, at 60-62.) Respondent frames her argument by asserting that Petitioner is not entitled to habeas corpus relief unless he can demonstrate that the jury instructions, taken as a whole, were so infirm as to render his trial fundamentally unfair. (*Id.*at 60-61 (citing *Estelle v. McGuire*, 502 U.S. 62, 72 (1991)).) After acknowledging that the Due Process Clause, as interpreted in *In re Winhip*, 397

_____

[7]    Petitioner expands upon these arguments in his Memorandum in Support only by offering additional case law in support of his claim. (Doc. # 62, at 55-57.)

U.S. 358 (1970), requires the State to prove each essential element of a charged offense beyond a

reasonable doubt, Respondent asserts that the jury instruction at issue did not violate *Sandstrom*.

Respondent emphasizes that the trial court instructed the jury that it *may* infer purpose or intent

from the fact that a firearm was used. Respondent notes additionally that the trial court also

instructed the jury that the State was required to establish that Petitioner had had specific

intention to cause death as to each victim that was shot. Respondent also points out that the trial

court, in giving the instruction assailed by Petitioner, was following O.R.C. § 2901.22(A) and

O.J.I. § 409.01(6). Respondent reasons that "may be inferred" does not equate "the law

presumes." (*Id.* at 61.) Respondent concludes by arguing that based on the foregoing, the Ohio

Supreme Court's decision rejecting Petitioner's claim was not based on findings that contravened

or unreasonably applied clearly established federal law.

Petitioner raised this claim on direct appeal in his twenty-second proposition of law,

which the Ohio Supreme Court addressed as follows:

> In proposition of law twenty-two, appellant argues that the trial court's
> instructions on "purpose" created an unconstitutional conclusive presumption and
> relieved the state of its burden to prove this element beyond a reasonable doubt.
>
> The trial court defined "purpose" as follows: "Purpose and intent mean the
> same thing. * * * The purpose with which a person does an act is determined from
> the manner in which it is done, the weapon used, and all the other facts and
> circumstances in evidence. If a wound is inflicted upon a person with a deadly
> weapon in a manner calculated to destroy life, the purpose to cause the death may
> be inferred from the use of the weapon." The trial court did not create a
> conclusive presumption with this instruction. The court used the word "may,"
> indicating that this was a permissible presumption—one the jury could choose to
> accept or not. See *State v. Edwards*, 49 Ohio St.2d at 45, 3 O.O.3d at 26, 358
> N.E.2d at 1061. This proposition of law is without merit.

(*Loza*, 71 Ohio St. 3d at 80-81; App. Vol. III, at 1245.)

Petitioner argues that the Ohio Supreme Court's decision was unreasonable and contrary to United States Supreme Court authority. (Doc. # 70, at 44.) Specifically, Petitioner faults the Ohio Supreme Court for simply holding that the instruction at issue did not create a conclusive presumption without identifying, articulating, and applying the correct legal standard. Petitioner argues that because the Ohio Supreme Court did not identify the applicable standard set by the United States Supreme Court, the AEDPA erects no bar to this Court's review of Petitioner's claim. And when this Court conducts *de novo* review, Petitioner argues, this Court should find that the jury instruction at issue was constitutionally infirm under *Sandstrom v. Montana*, 442 U.S. 510 (1979).

The Court begins its analysis by reminding Petitioner that some measure of the AEDPA's deferential review, set forth in 28 U.S.C. § 2254(d), <u>does</u> govern this Court's review of his claim in spite of the failure of the Ohio Supreme Court to identify, articulate, or apply United States Supreme Court precedent. As the Sixth Circuit explained in *Howard v. Bouchard*, 405 F.3d 459 (6th Cir. 2005):

> Where, however, the state court disposes of a constitutional claim but fails to articulate its analysis, the rule is less clear. The Petitioner argues that because the state courts did not articulate their reasoning for denying the due process claim, the federal court should review the constitutional claims de novo. The Respondent argues that the state court's result remains entitled to deferential review.

> We have taken an intermediate approach—in between de novo review and complete deference. We have held that a federal habeas court must conduct an independent review of the record and applicable law to determine whether, under the AEDPA standard, the state court decision is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented. *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000) (citing *Aycox v. Lytle*, 196 F.3d 1174, 1177-78 (10th Cir. 1999)).

The independent review, however, is not a full, de novo review of the
claims. *Id.* As we held in *Harris*, the review remains deferential, because the
court cannot grant relief unless the state court's result contradicts the strictures of
AEDPA. *Id.*

*Howard*, 405 F.3d at 467-68. *See also Hawkins v. Coyle*, 547 F.3d 540, 546-47 (6th Cir. 2008)

("[W]e must focus on the *result* of the state court's decision, applying AEDPA deference to the

result reached not the reasoning used.") (emphasis in original) (citation and internal quotation

marks omitted).

Accordingly, the question before the Court is whether the Ohio Supreme Court's decision

rejecting Petitioner's claim challenging the trial court's "purpose" instruction contradicted the

strictures of the AEDPA. The Court answers that question in the negative. Because it appears

that the instruction that Petitioner challenges creates a permissible inference rather than a

conclusive presumption, Petitioner's argument is all but foreclosed by Sixth Circuit precedent.

In *Campbell v. Coyle* – albeit in the context of a constitutional challenge to the trial court's

refusal to give a lesser-included offense instruction – the Sixth Circuit recognized "the

constitutional prohibition on placing conclusive presumptions on the elements of a crime in the

jury instructions." *Campbell v. Coyle*, 260 F.3d 531, 544 (6th Cir.2001) (citing *Francis v.*

*Franklin*, 471 U.S. 307, 313 (1985), and *Sandstrom v. Montana*, 442 U.S. 510, 524 (1979).) In

subsequent cases, however, the Sixth Circuit has distinguished between cases where a jury

instruction creates a conclusive presumption on an essential element and those where the jury

instruction creates only a permissible inference concerning an essential element, prohibiting only

the former as relieving the State of its burden to prove each essential element of a charged

offense beyond a reasonable doubt. In *Lane v. Carlton*, 149 F.App'x 374 (6th Cir. 2005), the

112

petitioner, who had been convicted of first-degree murder, argued that the trial court gave an instruction that allowed the jury to infer the essential element of malice, thereby unconstitutionally relieving the prosecution of its burden to prove that element beyond a reasonable doubt. The Sixth Circuit rejected the petitioner's challenge, finding that the challenged language was "cast in a decidedly non-mandatory vein" by using such words as "may" and "infer." *Id*. at 378. The Sixth Circuit also found the challenged language permissible because of the trial court's repeated reminders to the jury that the inference was rebuttable, that the State always has the burden of proving each essential element beyond a reasonable doubt, that an inference never places a burden of proof on the defendant, and that the jurors were not required to draw the inference at issue. *Id*.

The Sixth Circuit rejected a similar challenge in *Lee v. Russell*, 49 F.App'x 544 (6th Cir. 2002). There, the petitioner had challenged certain jury instructions that, according to him, led the jury to believe that a person's proximity to a shooting may be sufficient to support a finding of guilt even without proof that that the shooter knew others were present. Noting that the State is "barred from using evidentiary presumptions that relieve the state of the burden of persuasion beyond a reasonable doubt on the crime's essential elements," *Id*. at 548, the Sixth Circuit explained that:

> In conducting an inquiry into a presumptive jury instruction, a court must ascertain whether the "challenged portion of the instruction creates a mandatory presumption ... or merely a permissive inference." [*Francis v. Franklin*, 471 U.S.] at 314, 105 S.Ct. 1965. "A mandatory presumption instructs the jury that it must infer the presumed fact if the State proves certain predicate facts.... A permissive inference suggests to the jury a possible conclusion to be drawn if the State proves predicate facts, but *does not require* the jury to draw the conclusion." *Id*. (emphasis added). While a mandatory presumption violates a defendant's rights under the due process clause, a permissive inference violates it only when the

113

conclusion suggested by the permissive inference "is not one that reason and common sense justify in light of the proven facts before the jury." *Id.* at 314-15, 105 S.Ct. 1965.

*Lee*, 49 F.App'x at 548. The Sixth Circuit went on to reject the petitioner's claim, agreeing with the state courts "that the jury instruction was no more than a permissible inference." *Id.* at 549. The Sixth Circuit relied on its determination that the record contained sufficient evidence upon which the jury could find a rational relationship between the established facts and the inference that it made from those facts, as well as on the fact that the jury instructions as a whole repeatedly emphasized that the jury was required to find beyond a reasonable doubt that the petitioner knew that others were present and accordingly allowed for only a permissive inference. *Id.*

     *Lane* and *Lee* are to be contrasted, therefore, with the result that the Sixth Circuit reached in *Caldwell v. Bell*, 288 F.3d 838 (6th Cir. 2002). There, the Sixth Circuit recognized, and the State even conceded, that the following instruction violated *Sandstrom*'s prohibition against conclusive presumptions on essential elements: " '[w]hen the defendant is shown to have used a deadly weapon, and death is clearly shown to have resulted from its use, it is a presumption of law that the killing was done maliciously, that is, with the malice necessary to support a conviction of murder in the second degree.' " *Id.* at 843. In finding that the error warranted habeas corpus relief, the Sixth Circuit explained that, "[o]nce the faulty instruction was given . . . a conscientious juror could have entertained a reasonable doubt that the State had proved malice and still voted to convict Caldwell of murder, because the trial judge had told him to presume malice from the use of a gun and the prosecutor indicated that the State had proved all the elements of first degree murder and that malice can come from the use of a deadly weapon." *Id.*

114

*See also Houston v. Dutton*, 50 F.3d 381, 386-87 (6th Cir. 1995) ("Once jurors had been instructed to presume malice, they were unable seriously to consider the defense's theory of accident.").

Petitioner's case more closely resembles *Lane* and *Lee* than *Caldwell* and *Houston*. In Petitioner's case, the trial court instructed the jury that it "may infer" intent to cause death from the fact that a firearm was used, not that it *must presume* intent to cause death from the fact that a firearm was used. The trial court several times reminded the jury that the State was required to prove each element of each charged offense beyond a reasonable doubt and that beyond an affirmative defense, Petitioner was not required to prove anything. In short, the Court is not persuaded that the challenged instruction created a conclusive presumption that relieved the prosecution of its duty to prove the essential element of intent beyond a reasonable doubt. That being so, the Court cannot find that the Ohio Supreme Court's decision rejecting Petitioner's claim contravened or unreasonably applied clearly established federal law as determined by the Supreme Court. For the foregoing reasons, Petitioner's eighth ground for relief is **DENIED**.

**Ninth Ground for Relief: The trial court's supplemental jury instructions improperly impinged on the jury's deliberations thereby depriving petitioner of his rights as guaranteed by the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.**

In his ninth ground for relief, Petitioner takes issue with supplemental instructions that the trial court gave in response to a question by the deliberating jurors. (Petition, Doc. # 6, at ¶¶ 149-154.) Following approximately three days of deliberations, the jury posed the following written question to the trial court: "To whom it may concern: We the jury would like to have clarified how to decide a verdict on a specification to a count when a unanimous decision cannot

115

be reached? The jury instructions have not made this clear to us. Foreman, Douglas E. Robertson." (*Id.* at ¶ 150.) Petitioner argues that the following supplemental charge went beyond being responsive and in effect coerced a verdict from the jury:

> THE COURT: Again, a word of caution, ladies and gentlemen. After you've commenced your deliberations, it's important that the Court chooses its words carefully and that you refrain from any remarks that may affect the rights of either party to this action or which may disclose your opinion as a member of the jury. We realize that this is a new and a difficult assignment for you and the process of discussion and deliberation in the jury room is necessarily slow and requires consideration and patience. The secrecy which surrounds your efforts presents – prevents others, including the Court, from knowing when your efforts will result in a verdict. Now, I received the following note from the foreman, which says, "We the jury would like to have clarified how to decide a verdict on a specification to a count when a unanimous decision cannot be reached. The jury instructions have not made this clear to us.

> The Court recognizes, ladies and gentlemen, the amount of time that you have spent and you've diligently applied yourself to attempting to resolve the numerous matters that are brought to your attention by way of verdicts in this case, the verdict forms. And that you have – you started your deliberations on Tuesday afternoon and here it is late Thursday morning and you have deliberated some over sixteen and a half hours, according to my calculations; and obviously there are still problems here with arriving at a conclusion.

> Now, with respect to this specific inquiry, if the jury is unable to agree on a – to a verdict on a particular specification, as that is my understanding of this note, and you have exhausted all reasonable efforts to resolve your differences and you are convinced that further deliberations on that specification would not serve a useful purpose, the foreman shall note on the form, the verdict form, that particular specification, that the jury is unable to agree on a verdict on that specification, and sign the form as foreman. You will then process to the next verdict form as instructed on the bottom of the form, which you've just signed.

> Now, I have some comments here that may be of some assistance. The principal mode provided by our constitution and laws for deciding questions of fact in criminal cases is by jury verdict. In a large proportion of cases, absolute certainty cannot be attained or expected. Although the verdict must reflect the verdict of each individual juror and not mere acquiescence in the conclusions of your fellows, each question submitted to you should be examined with proper regard and deference to the opinions of others. You should consider it desirable

that this case be decided. You're selected in the same manner and from the same source as any future jury would be. There's no reason to believe that the case will ever be submitted to a jury more capable, impartial or intelligent than this one. Likewise, there's no reason to believe that more or clearer evidence will be produced by either side. It is your duty to decide the case if you can conscientiously do so. You should listen to one another's arguments with a disposition to be persuaded. Do not hesitate to reexamine your views and change your position if you are convinced that it is erroneous. If there is disagreement, all jurors should reexamine their positions given that a unanimous verdict has not been reached. Jurors who favor a particular verdict should consider whether their doubt is reasonable. Considering that it is not shared by others, whether their doubt or conviction is reasonable, considering it's not shared by others equally honest, you've heard the same evidence with the same desire to arrive at the truth and under the same oath. Likewise, jurors for a different verdict should not – should ask themselves whether they might not reasonably doubt the correctness of a judgment not concurred in by all other jurors. Now, bearing in mind these admonitions and these matters that we bring forth, I'm going to ask you now to return and – or resume your deliberations.

(Doc. # 6, at ¶ 151 (quoting Supplemental Transcript, Supplemental Instruction, pp. 2-4).)

Petitioner notes that the jury returned its guilty verdicts later that day.

Petitioner complains that once the trial court correctly explained the procedure for deciding the specification, it went on to give a charge pursuant to *State v. Howard*, 537 N.E.2d 188 (Ohio 1989), that was unnecessary, not responsive to the jury's specific request, and far beyond the limits courts have imposed on an *Allen* charge.[8] Petitioner explains that the jury in his case was not inquiring how to proceed with its deliberations but rather how to give effect to its verdict. By giving a *Howard* charge, Petitioner argues, the trial court encouraged the jury to resume its deliberations and reconsider a verdict it had already reached. In essence, according to Petitioner, the trial court impinged on the jury's deliberative process and coerced a verdict.

_____

[8]     (Doc. # 62, at 58 (citing *Allen v. United States*, 164 U.S. 492 (1896)).) In *Allen*, the Supreme Court found no error in supplemental instructions given in response to a question posed by the jury urging jurors who appeared to be deadlocked essentially to return to deliberations with a mind to reconsider their previous views.

117

*Allen*, 164 U.S. at 501-502.

Respondent argues that Petitioner is not entitled to habeas corpus relief because the Ohio

Supreme Court rejected his claim on direct appeal and because the United States Supreme Court

has long sanctioned the use of a supplemental charge such as the one that the trial court gave in

Petitioner's case. (Doc. # 67, at 62-63.) Respondent points out that the trial court in Petitioner's

case did advise the jurors in its supplemental charge that if they decided that further deliberations

would not serve a useful purpose then they were free to return to the courtroom without a verdict

on whatever specification upon which they could not reach a unanimous verdict. Respondent

asserts that the trial court did no more than remind the jurors of the desirability of reaching a

verdict. Respondent concludes by arguing that the fact that the jury returned with verdicts later

on the day that the trial court gave the supplemental charge demonstrates that the jury was not

irreconcilably deadlocked and that the resulting verdict was not coerced by the trial court's

supplemental charge.

Petitioner raised his claim challenging the supplemental charge on direct appeal. The

Ohio Supreme Court rejected his claim as follows:

> In his next proposition of law, appellant asserts that the trial court erred in
> giving a supplemental charge to the jury. The supplemental charge that the trial
> court gave was previously approved in *State v. Howard* (1989), 42 Ohio St.3d 18,
> 537 N.E.2d 188, paragraph two of the syllabus.
>
> After deliberating for a protracted period of time, the jury asked for
> clarification on how to decide a specification in a unanimous verdict could not be
> reached. The court advised the jury to exhaust all reasonable efforts to reach a
> unanimous verdict, gave the *Howard* charge, and told the foreman to note on the
> verdict any failure to reach a unanimous verdict. After continuing its
> deliberations for several more hours, the jury reached a unanimous verdict.

Because the trial court gave a supplemental instruction that was previously approved by this court, appellant's twenty-third proposition of law is without merit.

(*Loza*, 71 Ohio St. 3d at 81; App. Vol. III, at 1245.)

In his reply, Petitioner continues to argue that the trial court erred in giving the supplemental charge that it gave because once a jury requests guidance on how to fill out a verdict form properly, a trial court should never give an *Allen* charge essentially directing the jury to revisit a verdict that the jury has already reached. (Doc. # 70, at 46-49.) Petitioner argues that the facts demonstrate the coercive aspects of the trial court's supplemental charge, insofar as the jury had deliberated for three days without being able to reach a unanimous verdict on a specification, received the *Allen* charge, and then suddenly reached guilty verdicts later the same day. Concerning the effect of the Ohio Supreme Court's decision, Petitioner argues that because the Ohio Supreme Court relied on the fact that it had previously approved the supplemental charge that Petitioner's trial court gave, the AEDPA standard of review does not control this Court's review of Petitioner's claim. Petitioner explains that the Ohio Supreme Court's decision failed to identify or articulate the controlling federal legal standard and failed to provide guidance as to the case upon which it relied. Petitioner further explains that the Ohio Supreme Court did not, in fact, apply the controlling federal legal standard calling upon it to examine the unique factual "context and all of the circumstances" surrounding Petitioner's case and the supplemental charge. (*Id.* at 48 (quoting *Lowenfeld v. Phelps*, 484 U.S. 231, 237 (1988)).)

For reasons discussed more fully above in connection with Petitioner's eighth ground for relief, Petitioner's suggestion that the AEDPA's standard of review does not apply is not well taken. The question before the Court is whether the Ohio Supreme Court's decision rejecting

119

Petitioner's claim challenging the trial court's supplemental charge contradicted the strictures of

the AEDPA. And as with Petitioner's eighth ground for relief, the Court must answer that

question in the negative because Petitioner's claim challenging the trial court's supplemental

charge is essentially foreclosed by Sixth Circuit precedent.

In *Allen v. United States*, 164 U.S. 492, 501 (1986), the Supreme Court found no error in

the trial court giving a supplemental charge to a deadlocked jury essentially encouraging it to try

to reach a verdict if possible. The Supreme Court has since suggested that the constitutionality of

any such "*Allen*" charge depends on whether the charge was coercive. *See, e.g., Lowenfeld v.*

*Phelps*, 484 U.S. 231, 241 (1988) (holding on the facts before it that the combination of polling

the jury and giving a supplemental charge was not coercive such as to deny the defendant any

constitutional rights); *see also Mason v. Mitchell*, 320 F.3d 604, 640 (6th Cir. 2003). In *State v.*

*Howard*, 42 Ohio St. 3d 18 (1989), the Ohio Supreme Court held that a traditional *Allen* charge

was not a proper supplemental instruction to be given to juries deadlocked on the question of

conviction or acquittal and approved the following supplemental instruction instead:

> The principal mode, provided by our Constitution and laws, for deciding
> questions of fact in criminal cases, is by jury verdict. In a large proportion of
> cases, absolute certainty cannot be attained or expected. Although the verdict
> must reflect the verdict of each individual juror and not mere acquiescence in the
> conclusion of your fellows, each question submitted to you should be examined
> with proper regard and deference to the opinions of others. You should consider
> it desirable that the case be decided. You are selected in the same manner, and
> from the same source, as any future jury would be. There is no reason to believe
> the case will ever be submitted to a jury more capable, impartial, or intelligent
> than this one. Likewise, there is no reason to believe that more or clearer
> evidence will be produced by either side. It is your duty to decide the case, if you
> can conscientiously do so. You should listen to one another's arguments with a
> disposition to be persuaded. Do not hesitate to reexamine your views and change
> you position if you are convinced it is erroneous. If there is disagreement, all
> jurors should reexamine their positions, given that a unanimous verdict has not

been reached. Jurors for acquittal should consider whether their doubt is reasonable, considering that it is not shared by others, equally honest, who have heard the same evidence, with the same desire to arrive at the truth, and under the same oath. Likewise, jurors for conviction should ask themselves whether they might not reasonably doubt the correctness of a judgment not concurred in by all other jurors.

*Howard*, 42 Ohio St. 3d at paragraph two of the syllabus. The Sixth Circuit has approved the use of this "*Howard*" charge. *See e.g., Brown v. Bradshaw*, 531 F.3d 433, 437 (6th Cir. 2008); *Mason v. Mitchell*, 320 F.3d at 641-42.

In *Brown v. Bradshaw*, the Sixth Circuit found no constitutional error in the giving of an *Allen / Howard* charge during the penalty phase of a capital trial. *Brown*, 531 F.3d at 437. There, the jury had found the petitioner guilty of two counts of capital murder. During the second day of deliberations in the penalty phase, the jury informed the trial court that it had reached an agreement on one of the sentencing recommendations but that it was deadlocked on the other sentencing recommendation. The trial court gave a *Howard* charge, albeit modified to make it appropriate for the penalty phase of a capital trial. In so doing, the trial court denied defense counsel's request that it also inform the jury about the possibility that it might not be able to reach a verdict. The jury eventually returned with a death verdict as to one of the victims and a life verdict as to the other victim. Upon polling the jurors, the trial court learned that one of the jurors had given a compromise verdict; the trial court re-read its penalty phase instructions, without the *Howard* charge, and sent the jurors back to deliberate anew. Several hours later, the jury returned with the same verdicts, minus any indication by any juror of a compromise verdict. Concerning the petitioner's challenge, based on *Lowenfeld v. Phelps*, that the trial court's *Howard* charge resulted in a coerced verdict, the Sixth Circuit held:

Here, the trial court's *Howard* charge did not violate clearly established Federal law. The *Howard* charge is no more coercive than the *Allen* charge. As in *Allen* and *Lowenfeld*, the supplemental charge given here merely encouraged the jurors to consider each other's views and to ask themselves whether their own views were reasonable under the circumstances. *See Lowenfeld*, 484 U.S. at 237-38, 108 S.Ct. 546. Such a supplemental instruction is permissible because it is not coercive and because it respects the states's strong interest in "having the jury express the conscience of the community on the ultimate question of life or death." *Id*. at 238, 108 S.Ct. 546 (internal quotations omitted). The trial court, in short, did not order the jury to reach a verdict.

*Brown*, 531 F.3d at 437.

In *Mason v. Mitchell*, the Sixth Circuit also approved of the use of an *Allen* charge given during penalty phase deliberations.[9] There, after nearly a day of penalty phase deliberations, the jury informed the trial court that it was unable to reach a unanimous decision on any one of the sentencing options. The trial court gave an *Allen* charge and then subsequently asked the jury foreman whether, after an additional period of time and in light of the supplemental charge, he was of the view the jury might reach an agreement. The foreman answered "no," but agreed to return to the jury room to discuss it with his fellow jurors. The jury continued to deliberate throughout that day and, after fifteen minutes of deliberations the following morning, returned a unanimous recommendation that the petitioner be sentenced to death. In rejecting the petitioner's challenge to the trial court's giving of an *Allen* charge, the Sixth Circuit noted that the relevant inquiry was whether the charge had been coercive. At the outset, the Sixth Circuit agreed with the Ohio Supreme Court's determination that the jury's indication that it had been unable to reach a unanimous decision on any of the sentencing options was not tantamount to the

---

[9]     The Court is not of the view that a *Howard* charge given during penalty phase deliberations is materially distinguishable from a *Howard* charge given during culpability phase deliberations.

122

jury being "irreconcilably deadlocked." *Id*. at 642. The Sixth Circuit reasoned that the fact that

the trial court's supplemental charge was followed by four more hours of deliberations and

eventually a unanimous verdict, rather than a return by the jury foreman to indicate that the jury

was hopelessly deadlocked, indicated that the *Allen* charge was not an error. As further evidence

that the *Allen* charge was not coercive, the Sixth Circuit noted that although the *Lowenfeld* jury

deliberated for only thirty more minutes after the *Allen* charge, the jury in *Mason*, by comparison,

deliberated for more than three hours after the trial court gave the *Allen* charge.

     *Bedford v. Collins*, 567 F.3d 225 (6th Cir. 2009), also involved the giving of an *Allen*-type

charge during penalty phase deliberations. A day into its penalty phase deliberations, the jury

sent a note to the trial court asking " 'what would happen' " if it could not reach a unanimous

sentencing recommendation and whether there was a time frame for reaching a decision. *Id*. at

237 (quoting Joint Appendix at 2462).) After consulting with the parties, the trial court informed

the jury that there was no fixed time limit for reaching a decision and urged the jury to make

every reasonable effort to agree on a sentencing recommendation in view of the time it had

already expended and the fact that it was in the best position to make a fair decision. The trial

court also suggested that the jury first determine whether it was deadlocked, and, if so, to return

one of the life-sentence recommendations. Despite numerous challenges that the petitioner had

raised in habeas corpus arguing that the supplemental instruction had been coercive, the Sixth

Circuit found no coercion warranting habeas corpus relief. Concerning the petitioner's challenge

that the charge had omitted the standard language instructing all of the jurors to reconsider their

views, the Sixth Circuit found that, "[b]y instructing the entire jury to make every reasonable

effort to agree on a recommendation if they could do so in good faith, the trial court at least

123

implicitly encouraged all of the jurors to reconsider their positions." *Id.* at 238. The Sixth
Circuit also rejected the petitioner's challenge that the charge failed to caution the jurors not to
abandon their conscientiously held views, stating that, "[t]here is no iron-clad rule that a trial
court's failure to include that reminder, though unfortunate and ill-advised, is invariably fatal to
the conviction." *Id.* The petitioner's final challenge was that the charge had misled the jury into
believing that if it failed to reach a unanimous sentencing recommendation, another jury would
be selected to complete the task, "when in reality a deadlock would force the jury to impose a life
sentence." *Id.* The Sixth Circuit also rejected that challenge, explaining that even though the
first part of the instruction was inaccurate, "the trial court quickly corrected its mistake,
clarifying that if the jury deadlocked, they should return a life-sentence recommendation." *Id.*

Notwithstanding the Sixth Circuit authority set forth above, Petitioner's arguments may
be read as attempting to distinguish his case from these Sixth Circuit cases in two respects. First,
he emphasizes that the *Howard* charge in his case was not responsive to the question actually
posed by the jury. Petitioner asserts that the jury in his case asked for guidance not on how to
proceed if they were irreconcilably deadlocked, but on how to fill out a verdict form indicating
that they were unable to reach a unanimous verdict on one of the capital specifications. Giving
the *Allen* / *Howard* charge under these circumstances was improper, Petitioner argues, because it
coerced a jury into reconsidering a decision that it had already reached, *i.e.*, rather than
encouraging deadlocked jurors to return to deliberations with a mind toward considering each
other's views. *Mason* and *Bedford* speak to this argument, however, and like the Sixth Circuit in
those cases, this Court is not persuaded that the trial court's supplemental charge was
unresponsive and therefore coercive.

124

This Court is not persuaded that the record in Petitioner's case supports a finding that his jury had resolved not to reach a verdict and was simply asking the trial court for guidance as to how to give effect to that verdict, or non-verdict, on the verdict form(s). The question posited by the jury was somewhat vague on whether the jury was deadlocked on a specification or whether further deliberations would be useful. Petitioner's argument that his "jury indicated they had already made their decision and merely needed guidance on how to fill out the form, not guidance on how to continue deliberations" is not supported by the record. (Doc. # 62, at 61.) As did the jury in Petitioner's case, the jury in *Mason* informed the trial court "that it was 'unable to reach a unanimous decision on any one of the sentencing options.' " *Mason*, 320 F.3d at 640. The Sixth Circuit found that this was not tantamount to an indication that the jury was hopelessly deadlocked. Even more akin to Petitioner's case was *Bedford*, where the jury sent a note to the trial court asking " 'what would happen' " if it could not reach a unanimous sentencing recommendation. The Sixth Circuit obviously did not perceive that question as one asking for guidance on how to fill out the verdict form rather than guidance on how to continue deliberations. *Bedford*, 567 F.3d at 238.

Second, Petitioner emphasizes that the state courts did not follow the *Lowenfeld* standard requiring consideration of the unique facts and circumstances of Petitioner's case in determining whether an *Allen / Howard* charge was warranted. Petitioner's argument misses the mark, however, because notwithstanding the failure of Ohio Supreme Court to articulate and apply the standard, the result did not involve a contrary or unreasonable application of clearly established federal law. The record in this case does not support a finding that the guilty verdicts were coerced. The trial court in Petitioner's case did inform the jury that if it could not reach a

125

unanimous verdict on one of the specifications, it could return to the court room with that fact noted on the verdict form in question. Rather than returning with another question or a verdict form reflecting non-unanimity, the jury resumed deliberations and after four or five hours reached a verdict on all charged counts and specifications. As the Sixth Circuit in *Mason* observed, after receiving an *Allen* charge, "[t]he *Lowenfeld* jury deliberated for only thirty more minutes" before returning with guilty verdicts. *Mason*, 320 F.3d at 642.

In view of how the Sixth Circuit has treated *Allen / Howard* charges such as the one that the trial court gave in Petitioner's case and on the facts of Petitioner's case, Petitioner has not persuaded this Court that the trial court's *Allen / Howard* charge in his case resulted in a verdict by the jury that was coerced. It does not appear that the jury was deadlocked or was asking only for guidance on how to fill out a verdict form reflecting that it had not reached a unanimous verdict. And even after being informed by the trial court that it was possible that they might not reach a verdict on the specification in question, the jurors never returned to the court room suggesting that they could not reach a verdict and instead continued their deliberations until they reached a verdict with which each juror agreed upon being polled. That being so, the Court is not persuaded that the Ohio Supreme Court's decision rejecting Petitioner's claim was a result that contravened or unreasonably applied clearly established federal law. For that reason, Petitioner's ninth ground for relief is **DENIED**.

> **Tenth Ground for Relief: The trial court erred in instructing the jury on punishment at the culpability phase thereby depriving Petitioner of his rights as guaranteed by the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.**

In his Memorandum in Support, Petitioner expressly withdraws this claim. (Doc. # 62, at 61.) Accordingly, Petitioner's tenth ground for relief is **DENIED**.

**Eleventh Ground for Relief: The reasonable doubt instruction permitted the jurors in Petitioner's case to return a verdict of guilty on a degree of proof below beyond a reasonable doubt thereby depriving Petitioner of his rights as guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

Petitioner challenges as unconstitutional the standard "reasonable doubt" instruction set forth in O.R.C. § 2901.05 and given by the trial court during both the culpability and penalty phases of Petitioner's trial. (Petition, Doc. # 6, at ¶¶ 161-166.) During the culpability phase, the trial court gave the following instruction defining the "reasonable doubt" standard:

> Reasonable doubt is present when after you have carefully considered and compared all the evidence, you cannot say you are firmly convinced of the truth of the charge. Reasonable doubt is a doubt based on reason and common sense. Reasonable doubt is not mere possible doubt because everything relating to human affairs or depending on moral evidence is open to some possible or imaginary doubt. Proof beyond a reasonable doubt is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his own affairs.

> If after a full and impartial consideration of all the evidence you are firmly convinced of the truth of the charge, the State has proved its case beyond a reasonable doubt. If you're not firmly convinced of the truth of the charge, you must find the Defendant not guilty.

(App. Vol. VI, at 3272.) During the penalty phase, the trial court tailored the "reasonable doubt" instruction as follows:

> Reasonable doubt is present when after you have carefully compared all of the evidence, you cannot say that you are firmly convinced that the aggravating circumstances outweigh the mitigating factors. Reasonable doubt is not mere possible doubt because everything relating to human affairs or depending on moral evidence is open to some possible or imaginary doubt. Proof beyond a reasonable is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his own affairs.

(App. Vol. VI, at 3534.)

Petitioner presents several challenges supporting his argument that Ohio's standard "reasonable doubt" instruction fails to convey to jurors the stringent "beyond a reasonable doubt" standard. (Doc. # 6, at ¶ 162.) Petitioner argues that the "willing to act" language provides the jury with no guidance because it is too lenient. Petitioner points out that the Supreme Court in *Holland v. United States*, 348 U.S. 121, 140 (1954), voiced strong disapproval of the "willing to act" language in defining proof beyond a reasonable doubt. (Doc. # 6, at ¶ 164.) Petitioner reasons that "ordinary people, such as jurors, are frequently required to make important decisions based upon proof of a lesser nature by choosing the most preferable course of action." (*Id*. at ¶ 165.) Petitioner also argues that the "firmly convinced" language represents only a "clear and convincing" standard, which is less stringent than the "beyond a reasonable doubt" standard. In his memorandum in support, Petitioner adds that references to "moral evidence" are also universally rejected. (Doc. # 62, at 63.) Petitioner explains that references to "moral evidence" further undermine the constitutionally mandated "beyond a reasonable doubt" standard where, as here, the references are not placed in a proper context and permit the jurors to convict based on subjective morality. (*Id*. at 65-66.) Petitioner concludes by arguing that the flawed "reasonable doubt" definition constitutes structural error requiring the reversal of his convictions. (*Id*. at 66.)

Respondent urges this Court to dismiss Petitioner's claim on the merits, arguing that the trial court in this instance read verbatim "reasonable doubt" instructions that have been approved by the Sixth Circuit. (Doc. # 67, at 64 (citing *Thomas v. Arn*, 704 F.2d 865, 869 (6th Cir. 1982); and *Byrd v. Collins*, 209 F.3d 486, 527 (6th Cir. 2000)).) Respondent also argues that the claim is meritless because the "reasonable doubt" instruction was not contrary to any United States

128

Supreme Court precedent.

Petitioner presented this claim in his thirty-first proposition of law on direct appeal and the Ohio Supreme Court rejected it as follows:

> In proposition of law thirty-one, appellant contends that the trial court committed error by instructing the jury in accordance with the statutory definition of "reasonable doubt" in R.C. 2901.05(D). In *State v. Van Gundy* (1992), 64 Ohio St.3d 230, 232, 594 N.E.2d 604, 606, this court stated: " 'The definition of "reasonable doubt" set forth in R.C. 2901.05 correctly conveys the concept of reasonable doubt and, therefore, is not an unconstitutional dilution of the state's requirement to prove guilt beyond a reasonable doubt.' " Citing *State v. Nabozny* (1978), 54 Ohio St.2d 195, 8 O.O.3d 181, 375 N.E.2d 784, paragraph two of the syllabus. This contention, therefore, is rejected.

(*Loza*, 71 Ohio St. 3d at 81; App. Vol. III, at 1245.)

In his reply, Petitioner attacks the Ohio Supreme Court's decision for failing to correctly identify and articulate the governing legal principle and asserts that, because of that failure, this Court must review Petitioner's claim *de novo* rather than evaluating whether the Ohio Supreme Court's decision contravened or unreasonably applied clearly established United States Supreme Court precedent. (Doc. # 70, at 49-50.) Petitioner explains that "[i]nstead of assessing how a jury may have reasonabl[y] interpreted the instruction, the Ohio Supreme Court rejected the claim in finding that the instruction did not create a presumption." (*Id.* at 49.) Although the Court is not certain what "presumption" Petitioner is referring to, as that argument is not consistent with the several challenges that Petitioner raised in his Petition and memorandum in support against the trial court's "reasonable doubt" instructions, the Court concludes that Petitioner's claim nonetheless fails for other reasons.

First, for reasons discussed more fully above, any failure by the Ohio Supreme Court to identify and apply controlling United States Supreme Court precedent does <u>not</u>, contrary to

Petitioner's argument, remove Petitioner's claim from the deferential standard of review set forth in 28 U.S.C. § 2254(d). Petitioner is not entitled to relief on this claim unless the result of the Ohio Supreme Court's decision rejecting the claim contravened or unreasonably applied clearly established United States Supreme Court precedent. Sixth Circuit precedent forecloses any possibility of this Court finding as much. In addition to the *Thomas v. Arn* and *Byrd v. Collins* decisions cited by Respondent, the Sixth Circuit has in several other cases explicitly approved of the giving of Ohio's statutory "reasonable doubt" instruction in both phases of a capital trial. *See, e.g., White v. Mitchell*, 431 F.3d 517, 534 (6th Cir. 2005) (citing *Buell v. Mitchell*, 274 F.3d 337, 366 (6th Cir. 2001).) Beyond the foregoing, Petitioner has not cited, and the Court is not otherwise aware of, any clearly established United States Supreme Court precedent that the Ohio Supreme Court's decision rejecting Petitioner's "reasonable doubt" challenge contravened. That being so, Petitioner is not entitled to habeas corpus relief on this claim and Petitioner's eleventh ground for relief is **DENIED**.

> **Twelfth Ground for Relief: The warrantless arrest of Petitioner by the Middletown police in Warren County deprived him of his rights as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution.**
>
> > **A. The police lacked probable cause to arrest Jose Loza.**
> >
> > **B. Detective Knabel lacked a reasonable suspicion to seize Loza.**
> >
> > **C. Detective Knabel's intrusive actions exceeded the boundaries of Terry.**
> >
> > **D. The fruits of the illegal seizure must be suppressed.**

Petitioner argues that the warrantless arrest of him by Middletown Police Detective Roger Knabel deprived Petitioner of his rights guaranteed by the Fourth and Fourteenth Amendments. (Petition, Doc. # 6, at ¶¶ 167-200; Memorandum in Support, Doc. # 62, at 67-74.) Petitioner raises four sub-parts to his claim. First, Petitioner argues that Detective Knabel lacked the probable cause necessary to permit his warrantless arrest of Petitioner. Asserting that he was under arrest as of the time that he was cuffed and placed in a police cruiser, Petitioner argues that the facts available to Detective Knabel at the time that Knabel arrested Petitioner did not satisfy the probable cause requirement – namely, facts that would " 'warrant a man of reasonable caution and belief [to believe] that an offense has been committed.' " (*Id*. at ¶ 175 (quoting *Beck v. Ohio*, 379 U.S. 89, 96 (1964)).) Petitioner reasons that at the time he was placed under arrest, the only information available to Detective Knabel was in a letter discarded in a private dumpster that contained a passage about alleged shootings in Los Angeles. Petitioner notes that Knabel did not confirm the content, possession, or authorship of that letter before placing Petitioner under arrest. Petitioner asserts that Detective Knabel never would have been able to secure an arrest warrant on the basis of such flimsy facts. Petitioner further argues that no information furnished by Dorothy Jackson to authorities could have satisfied the probable cause requirement, as that information was provided <u>after</u> Petitioner had already been placed under arrest.

The second part of Petitioner's argument is that even assuming *arguendo* that Petitioner was not placed under arrest at the bus station, Detective Knabel lacked reasonable suspicion to seize Petitioner consistent with *Terry v. Ohio*, 392 U.S. 1 (1968). (Doc. # 6, at ¶¶ 180-188.) " 'A police officer may stop an individual, question him, and perform a carefully limited pat down search for weapons where the officer reasonably concludes that criminal activity may be

afoot.' " (Doc. # 62, at 70 (quoting *United States v. Harris*, 192 F.3d 580, 584 (6th Cir. 1999)).)

Viewed against the totality of the circumstances, Petitioner argues, Detective Knabel's

investigatory stop of Petitioner was improper. Petitioner explains that Detective Knabel's

suspicion of Petitioner was based on a telephone call from Gary Hoertt about a letter discarded in

Hoertt's business's dumpster purporting to detail past criminal conduct in a different jurisdiction

– shootings in Los Angeles – that neither Hoertt nor Knabel observed or confirmed. In view of

the fact that Knabel approached Petitioner with his pistol drawn and frisked Petitioner for

weapons, Petitioner reasons, it was that letter rather than the mere illegal dumping of refuse that

prompted Knabel's investigatory stop of Petitioner. (Doc. # 62, at 72 n.26.) Further, according

to Petitioner, Detective Knabel even admitted that he had had no objective and particularized

basis for concluding that Petitioner had been involved in any crime, stopping Petitioner on the

basis of a dubious letter and/or on the basis of Petitioner's ethnicity and California license plates.

(Doc. # 6, at ¶¶ 186-188.) Finally, Petitioner remarks in a footnote that Detective Knabel seized

Petitioner outside of Knabel's jurisdiction in violation of O.R.C. § 2953.03(D) and that seizures

that violate a state statute also require suppression of the fruits of that seizure. (*Id.* at 65-66

n.11.)

Third, Petitioner asserts that assuming *arguendo* that Detective Knabel had a reasonable

basis to stop and question Petitioner, Detective Knabel's actions exceeded the permissible

boundaries set forth in *Terry*. (*Id.* at ¶¶ 189-193.) Petitioner argues that "[a] police officer may

arrest a suspect after a Terry stop but only if the officer develops probable cause to arrest the

suspect during the investigation." (*Id.* at ¶ 189 (citing *Florida v. Royer*, 460 U.S. 491 (1983)).)

Petitioner points out that Detective Knabel approached Petitioner with his service weapon drawn,

132

directed Petitioner to place Petitioner's hands on the hood of Knabel's police cruiser, patted down the outside of Petitioner's clothing, cuffed him and placed him inside the cruiser despite not finding a weapon, and then proceeded to question Petitioner while inside the cruiser. Petitioner argues that Detective Knabel exceeded the permissible bounds of the *Terry* stop by continuing to restrain Petitioner even after no weapon was found. Petitioner emphasizes that any reasonable person, upon being confronted by an officer with pistol drawn and then being handcuffed and placed in the back of a police cruiser, would believe that he had been placed under arrest.

The fourth part of Petitioner's argument is that the fruits of the illegal seizure described above must be suppressed. (Doc. # 6, at ¶¶ 194-200.) Petitioner argues that his confession and consent to search were coerced by police interrogation tactics and that the time between Knabel's illegal arrest of Petitioner and Petitioner's confession and consent to search does not " 'purge the primary taint of the unlawful invasion.' " (*Id*. at ¶ 195 (quoting *Wong Sun v. United States*, 371 U.S. 471, 486 (1963)).) Petitioner argues that there were no intervening factors to mitigate his illegal arrest, emphasizing the transfer of Petitioner between various police departments, as well as the flagrancy of Detective Knabel's actions. Petitioner argues that his illegal arrest and/or seizure requires suppression not only of his confession and evidence recovered as a result of his consent to search, but also of all of Dorothy Jackson's statements to Detective Knabel and Warren County law enforcement officers, as those statements, too, directly resulted from Petitioner's illegal arrest and/or seizure.

Respondent argues that Petitioner's claim does not warrant habeas corpus relief, pointing out that the Ohio Supreme Court's factual findings in rejecting the claim on direct appeal are

133

entitled to a presumption of correctness. (Doc. # 67, at 65.) Respondent also argues the United

States Supreme Court's decision in *Stone v. Powell*, 428 U.S. 465 (1976), precludes this Court

from even entertaining Petitioner's claim. (*Id*. at 65-66.) Finally, to the extent that Petitioner is

arguing that Detective Knabel seized Petitioner outside of Knabel's jurisdiction in violation of

O.R.C. § 2935.03(D), Respondent argues that this Court lacks jurisdiction to reexamine state

court determinations of state law questions. (*Id*. at 66.)

Petitioner presented his claim challenging his warrantless arrest on direct appeal. The

Ohio Supreme Court rejected it as follows:

> Appellant's sixth and seventh propositions of law are interrelated. In
> proposition of law six, appellant asserts that Detective Knable lacked probable
> cause to arrest him, and, therefore, the ensuing confession must be suppressed. In
> proposition of law seven, appellant argues that the trial court committed plain
> error in admitting appellant's statements to Knable following the investigatory
> stop.

> Appellant argues that Knable had neither probable cause nor a reasonable
> suspicion to believe that appellant had committed any crime and, therefore, his
> warrantless seizure was unjustified. We disagree.

> In order to warrant a brief investigatory stop, the police officer "must be
> able to point to specific and articulable facts which, taken together with rational
> inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*
> (1967), 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889, 906. Such a stop
> must be viewed in light of the totality of the surrounding circumstances presented
> to the police officer. *State v. Freeman* (1980), 64 Ohio St.2d 291, 18 O.O.3d 472,
> 414 N.E.2d 1044. The standard for reviewing such police conduct is an objective
> one: would the facts available to the officer at the moment of the seizure or the
> search " 'warrant a man of reasonable caution in the belief' that the action taken
> was appropriate?" *Terry*, 392 U.S. at 22, 88 S.Ct. at 1880, 20 L.Ed.2d at 906;
> *State v. Williams* (1990), 51 Ohio St.3d 58, 60-61, 554 N.E.2d 108, 111.

> Knable was able to point to specific and articulable facts which warranted
> his actions. Knable stopped Loza because of the letter that was found in the
> dumpster indicating that there was a drive-by shooting in Los Angeles in which
> three people were killed and the author of the letter, Loza, left Los Angeles

because the police were searching for him. Loza was identified as the man who had disposed of items in the dumpster. An empty gun box was found in close proximity to the letter in the dumpster. Knable could not be sure whether Loza or his companion was armed. It was necessary for Knable to prevent Loza from leaving the area while he went to talk to Dorothy Jackson. Loza was detained in the back of Knable's car until Warren County deputies arrived. Once the deputies arrived, Knable instructed them to remove Loza's handcuffs, as there was no longer a need to restrain him.

Appellant's contention that the statements he made to Knable after being stopped should be suppressed because he was not given *Miranda* warnings is baseless. Knable merely asked Loza his name and other general questions associated with a police investigation. This type of questioning is not affected by the Supreme Court's holding in *Miranda*. *Miranda v. Arizona* (1966), 384 U.S. 436, 477-478, 86 S.Ct. 1602, 1629-1630, 16 L.Ed.2d 694, 725-726.

Under the circumstances, Knable was justified in stopping Loza, conducting a limited search for weapons, and detaining Loza until the Warren County deputies arrived. The circumstances surrounding the stop rendered Knable's conduct reasonable and appropriate under the guidelines established by *Terry* and its progeny. Accordingly, we reject appellant's sixth and seventh propositions of law.

(*Loza*, 71 Ohio St. 3d at 71-72; App. Vol. III, at 1238-37.)

Petitioner begins his reply arguments by asserting that "district courts have found that review of Fourth Amendment claims brought by habeas corpus petitioners is appropriate notwithstanding Stone v. Powell." (Doc. # 70, at 50 (citing *Carlson v. Ferguson*, 9 F. Supp. 2d 654 (S.D. W. Va. 1998)).) Petitioner also argues that because Detective Knabel's actions were not justified under the circumstances, Petitioner's warrantless arrest was unreasonable and contrary to the United States Constitution, and the Ohio Supreme Court's finding that Detective Knabel's testimony established specific and articulable facts justifying the arrest was an unreasonable determination of the facts based on the evidence presented. (Doc. # 70, at 51-52.)

Before determining whether Petitioner's claim is meritorious, this Court must as a threshold matter determine whether it can entertain Petitioner's claim. In *Stone v. Powell*, 428 U.S. 465, 481-82 (1976), the Supreme Court held "that where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." In other words, except under extremely limited circumstances, *Stone v. Powell* essentially precludes habeas corpus review of alleged Fourth Amendment violations.

The Sixth Circuit has "set forth two distinct inquiries a court must perform when determining whether a petitioner may raise a claim of illegal arrest in a habeas action." *Machacek v. Hofbauer*, 213 F.3d 947, 952 (6th Cir. 2000) (citing *Riley v. Gray*, 674 F.2d 522 (6th Cir. 1982)). In *Machacek*, the Sixth Circuit proceeded to explain:

> First, the "court must determine whether the state procedural mechanism, in the abstract, presents the opportunity raise a fourth amendment claim. Second, the court must determine whether presentation of the claim was in fact frustrated because of a failure of that mechanism." *Id.* at 526.

*Machacek*, 213 F.3d at 952. *See also Harding v. Russell*, 156 F. App'x 740, 745 (6th Cir. 2005); *Crump v. LeCureux*, No. 92-1027, 974 F.2d 1338, 1992 WL 214521, at *3 (6th Cir. Sep. 3, 1992). Regarding the first inquiry, the Sixth Circuit has held that Ohio, by providing for the filing of a pretrial motion to suppress and the opportunity to take a direct appeal from any ruling denying a motion to suppress, has in place a state procedural mechanism that presents the opportunity for full and fair litigation of a Fourth Amendment claim. *Riley v. Gray*, 674 F.2d at 526; *see also Harding v. Russell*, 156 F. App'x at 745; *Seymour v. Walker*, 224 F.3d 542, 553 (6th Cir. 2000).

136

Turning to the second inquiry, the Court is not persuaded that Petitioner's presentation of his Fourth Amendment claim was frustrated by any failure of Ohio's procedural mechanism. Petitioner filed a pretrial motion to suppress on May 9, 1991 in which he raised essentially the same arguments that form the basis of his twelfth ground for relief before this Court. (App. Vol. X, at 4597.) The trial court conducted a hearing on June 10, 1991, during which Petitioner's trial attorneys conducted extensive questioning of Gary Hoertt, Colonel William Dunn, Detective Roger Knabel, and Detective J.R. Abshear. (App. Vol. VII, at 3833-3911.) The trial court denied Petitioner's motion from the bench. (*Id*. at 3911.) Petitioner raised his Fourth Amendment claim on direct appeal, (App. Vol. II, at 745-762), challenging the trial court's adverse ruling rather than the hearing process itself. The foregoing belies any argument that Petitioner did not have an opportunity to fully and fairly litigate his Fourth Amendment claim.

That being so, the Court concludes that review of Petitioner's twelfth ground for relief is barred by *Stone v. Powell*. Petitioner's twelfth ground for relief is **DENIED** pursuant to *Stone v. Powell*.

> **Thirteenth Ground for Relief: The police failed to inform Petitioner of his *Miranda* rights during a custodial interrogation in violation of his rights as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution.**

Petitioner argues that Detective Knabel violated Petitioner's Fifth and Fourteenth Amendment rights by questioning Petitioner in the back of Knabel's cruiser without first advising Petitioner of his *Miranda* rights. (Petition, Doc. # 6, at ¶¶ 201-206.) Petitioner reasons that after Detective Knabel approached Petitioner in the Greyhound parking lot with his pistol drawn, patted him down, handcuffed him, and placed him in the back of Knabel's police vehicle,

Knabel had effectively placed Petitioner in custody. Thus, Petitioner argues, Knabel violated Petitioner's Fifth and Fourteenth Amendment rights when Knabel proceeded to question Petitioner under those circumstances without first advising Petitioner of his *Miranda* rights. Petitioner asserts that the relevant inquiry is whether a reasonable person in his place would have considered himself to have been in custody, which Petitioner insists must be answered in the positive. Knabel's handcuffing Petitioner, combined with Knabel's brandishing of his pistol and placing Petitioner in the back of a police vehicle, would lead any reasonable person in that position to believe that he was in police custody.

Petitioner expands upon these arguments in his memorandum in support, emphasizing the incriminating information that Detective Knabel sought and obtained from Petitioner during the un-*Mirandized* questioning. (Doc. # 62, at 74-81.) When Knabel questioned Petitioner about a "bothersome letter" that contained potentially incriminating information about an alleged shooting in Los Angeles, Petitioner reported that his name was Jose Rodriguez, that Dorothy Jackson's name was Cynthia Rodriguez, that she was Petitioner's wife, and that they were returning to California. That information, Petitioner points out, was used against Petitioner at his trial. Petitioner explains that because Detective Knabel sought to learn Petitioner's name not as a means of generally ascertaining Petitioner's identity but to determine whether Petitioner had authored the letter admitting to a drive-by shooting in Los Angeles, Detective Knabel's questions were not simply routine booking questions and required *Miranda* warnings. (*Id.* at 76-80.) Further, according to Petitioner, when Detective Knabel proceeded to ask Petitioner questions about the letter, Detective Knabel went beyond asking "routine booking questions." (*Id.* at 80.)

138

Respondent argues that Petitioner is not entitled to relief on this claim, asserting that the Ohio Supreme Court's decision rejecting the claim did not contravene or unreasonably apply clearly established United States Supreme Court precedent. (Doc. # 67, at 36-38.) Arguing that *Miranda* warnings are not required for "routine booking questions," Respondent takes issue with Petitioner's contention that the questions that Detective Knabel asked Petitioner were not merely "routine booking questions." To that point, Respondent also argues that there is no evidence in the record of Detective Knabel's intent when he questioned Petitioner, contrary to Petitioner's argument that Detective Knabel intended to learn whether Petitioner had authored the incriminating letter. Finally, Respondent argues that *Miranda* warnings also do not apply to routine questions asked during a *Terry* stop and that Detective Knabel conducted nothing more intrusive or custodial than a *Terry* stop.

As noted above in connection with Petitioner's twelfth ground for relief, the Ohio Supreme Court rejected Petitioner's claim challenging Detective Knabel's un-*Mirandized* questioning as follows:

> Appellant's contention that the statements he made to Knable after being stopped should be suppressed because he was not given *Miranda* warnings is baseless. Knable merely asked Loza his name and other general questions associated with a police investigation. This type of questioning is not affected by the Supreme Court's holding in *Miranda*. *Miranda v. Arizona* (1966), 384 U.S. 436, 477-478, 86 S.Ct. 1602, 1629-1630, 16 L.Ed.2d 694, 725-726.

(*Loza*, 71 Ohio St. 3d at 72; App. Vol. III, at 1239.)

In his reply, Petitioner asserts that the Ohio Supreme Court's decision contravened or unreasonably applied clearly established federal law because of the Ohio Supreme Court's failure to recognize that Detective Knabel had arrested Petitioner and that Detective Knabel had

subsequently interrogated Petitioner without first giving *Miranda* warnings. (Doc. # 70, at 52-

53.) Petitioner explains that:

> Detective Knabel had already placed Loza in custody at the time he asked these
> [routine booking] questions, and the purpose of these questions was to determine
> if the person he had in custody was the author of the letters regarding a shooting in
> California. By asking Loza his name, Knabel was attempting to get Loza to
> incriminate himself. Prior to asking these questions, Loza should have been fully
> advised of his right, guaranteed under the United States Constitution, to remain
> silent.

*(Id.* at 52.)

The Court is not persuaded that the Ohio Supreme Court's decision contravened or

unreasonably applied clearly established United States Supreme Court precedent as Petitioner

argues. The Fifth and Fourteenth Amendments protect the criminally accused from being

compelled to incriminate themselves. In *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966), the

United States Supreme Court held that in order to protect a suspect's Fifth Amendment right, a

suspect subjected to custodial interrogation must first be advised of his right against self-

incrimination. In *Terry v. Ohio*, as discussed in connection with Petitioner's twelfth ground for

relief, the Supreme Court held that a police officer may stop an individual, question him, and

perform a carefully limited pat down search for weapons where the officer reasonably concludes

that criminal activity may be afoot. 392 U.S. at 30-31. In the instant case, the essence of the

Ohio Supreme Court's decision was that general questions associated with a police

investigation–incident to a *Terry* stop, although the Ohio Supreme Court did not articulate as

much–do not require *Miranda* warnings. That conclusion is supported by United States Supreme

Court precedent. *See, e.g., Berkemer v. McCarty*, 468 U.S. 420, 439 (1984) (stating that during a

*Terry* stop, an "officer may ask the detainee a moderate number of questions to determine his

140

identity and to try to obtain information confirming or dispelling the officer's suspicions."); *see also Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt County*, 542 U.S. 177, 187-88 (2004). The Sixth Circuit has held that a detainee subjected to a *Terry* stop, even if not free to leave, is not entitled to the full panoply of *Miranda* rights. *See, e.g., United States v. Salvo*, 133 F.3d 943, 949 (6th Cir. 1998); *see also United States v. Wright*, 220 F. App'x 417, 421 (6th Cir. 2007).

The issue before the Court is not whether Petitioner was placed under arrest or was subjected to a *Terry*-type stop. Even if Petitioner was under arrest, police could still ask general identification-type questions of Petitioner, which is all that Knabel did. Knabel testified that he expressly told Petitioner that he was being held until Warren County deputies arrived to talk to him about the letter. (App. Vol. VII, at 3879.) Detective Knabel also testified that Warren County officials arrived within ten minutes from the time that Knabel placed Petitioner in the back of Knabel's police vehicle. The Court is also of the view that Detective Knabel had not only reasonable suspicion to conduct a *Terry*-type stop but also probable cause to place Petitioner under arrest. Gary Hoertt and Detective Knabel found in a dumpster in which Petitioner had been observed discarding items a letter referencing a shooting in Los Angeles and an empty .25 Raven box. When Knabel approached Petitioner walking away from the dumpster, Knabel observed Petitioner reaching into his right coat pocket. Those facts were sufficient to provide Knabel with reasonable suspicion that criminal activity had taken or was about to take place. Knabel testified that he handcuffed Petitioner before placing Petitioner in the back of his police vehicle for Petitioner's and Knabel's own protection. (App. Vol. VII, at 3868-69.) Knabel explained that it was an unmarked police vehicle in which the backseat was not caged.

As for what occurred after that, regardless of whether it was a *Terry*-type stop or an arrest, the record does not support Petitioner's representation of the scope of Detective Knabel's questioning of Petitioner. According to Detective Knabel's testimony at the June 10, 1991, suppression hearing, after Knabel observed Petitioner walking away from the dumpster into which Petitioner had been observed discarding items, Knabel moved from his police vehicle toward Petitioner. Knabel drew his firearm to his side, had his badge visible, verbally identified himself as a police officer, and directed Petitioner to place his hands on the hood of Knabel's car. (App. Vol. VII, at 3867.) After patting down Petitioner, Knabel advised Petitioner that the reason he was being stopped was because of items that Petitioner had discarded in a nearby dumpster, including a letter. Knabel asked no questions about the letter, either in front of his police vehicle or when Petitioner was placed in the back of the vehicle. In fact, it does not appear that Knabel asked any questions of Petitioner once Petitioner was placed in the back of Knabel's police vehicle. Knabel merely made a statement that he was stopping Petitioner because of the letter. (*Id*. at 3877-78.) In response to Knabel's statement, Petitioner simply said "yes." (*Id*. at 3878.) Petitioner did not confirm that he had written the letter or supply any information about the letter or the other items found in the dumpster.

While still outside of his police vehicle, Knabel proceeded to ask Petitioner's name, which, as noted above, is a permissible question incident to an investigatory stop and need not be preceded by *Miranda* warnings. After Petitioner answered that his name was Jose Rodriguez, Knabel also asked Petitioner if anyone was with him. (App. Vol. VII, at 3877-78.) Petitioner responded that his wife was inside the bus station, that her name was Cynthia Rodriguez, and that they were traveling to California. (*Id*.) Detective Knabel's general questions to ascertain

142

Petitioner's identity and the identity of his companion, regardless of whether they were incident to a *Terry*-type stop or an arrest, did not require *Miranda* warnings. The Ohio Supreme Court's decision concluding as much did not contravene or unreasonably apply clearly established federal law.

In short, this Court cannot find that the Ohio Supreme Court's decision rejecting Petitioner's claim contravened or unreasonably applied clearly established federal law or involved an unreasonable determination of the facts. That being so, habeas corpus relief is not warranted. Petitioner's thirteenth ground for relief is **DENIED**.

> **Fourteenth Ground for Relief: Petitioner was deprived of his rights as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution when the police obtained a consent to search after eliciting a coercive confession.**

Petitioner states that following detectives' interrogation of him that led to a coerced confession, detectives sought and obtained from Petitioner consent to search Petitioner's belongings. Among the items that officers recovered from sealed U-Haul boxes that were seized from Petitioner and Dorothy Jackson at the bus station was a gun. Petitioner argues that his consent to search his belongings was not voluntary under the totality of the circumstances. (Petition, Doc. # 6, at ¶¶ 207-211.) He explains that his consent directly followed a confession that was coerced, that only thirty-five minutes separated Petitioner's coerced confession and consent to search, and that nothing happened in the interim to diminish the coercive atmosphere. Petitioner also points to the fact that he was in police custody, as well as his youth, immaturity, limited education, and ignorance of the law as factors to consider when determining the coerciveness of the atmosphere that produced his confession and consent to search. Petitioner

argues that the fruit of his coerced consent, a .25 caliber pistol, should have been suppressed.

Petitioner expands upon these arguments considerably in his memorandum in support. (Doc. # 62, at 81-93.) Petitioner argues that several factors should be considered to determine if consent to search was voluntary under the totality of the circumstances. In addition to his own personal characteristics, Petitioner asserts that the Court should consider the scope of police coercion and hostility toward Petitioner's family, to wit: threats by the police against Dorothy Jackson and Petitioner's unborn child. Petitioner also argues that the Court should consider improper inducements, such as promises of leniency for Jackson, Petitioner's unborn child, and even Petitioner himself, as well as the fact that officers intimated that Petitioner might be able to see Jackson if he cooperated with them. Petitioner goes on to argue that the police employed trickery and deception in obtaining his coerced confession and consent to search, stating to Petitioner that one of the shooting victims, Luanna Jackson, was still alive and had identified Petitioner as her assailant. Finally, Petitioner points to the coercive atmosphere inherent in prolonged detention and custodial questioning, especially when preceded by Petitioner being approached by Detective Knabel at gunpoint. Under the totality of these circumstances, Petitioner argues, his consent to search was not voluntary and the fruits of his invalid consent – the .25 Raven pistol – should have been suppressed.

Respondent addresses Petitioner's second, thirteenth, and fourteenth grounds together. (Doc. # 67, at 33-39.) After quoting the Ohio Supreme Court's decision rejecting Petitioner's claims and explaining why Petitioner's confession was not involuntary, Respondent states that, "[i]n the absence of coercive police activity the admission of Loza's statements and his written consent to the search of his U-Haul box neither violated his *Miranda* rights nor his due process

144

rights." (*Id.* at 36.) Respondent further argues that the trial court correctly denied Petitioner's motion to suppress and that the United States Supreme Court's *Stone v. Powell* decision precludes this Court from even entertaining Petitioner's claim challenging the voluntariness of his consent to search. (*Id.* at 38-39.)

In his reply, Petitioner takes issue with Respondent's arguments in two respects. (Doc. # 70, at 53-54.) First, concerning Respondent's *Stone v. Powell* argument, Petitioner contends that "district courts have found that review of Fourth Amendment claims brought by habeas petitioners is appropriate notwithstanding Stone v. Powell." (*Id.*) Second, Petitioner argues that because Respondent did not argue that the AEDPA's § 2254(d) standard of review was applicable to this claim, this Court should review his claim *de novo*. (*Id.* at 54.)

Turning to Petitioner's latter argument first, the Court notes that Petitioner presented his claim challenging the voluntariness of his consent to search as his fifth proposition of law on direct appeal. The Ohio Supreme Court addressed that claim along with Petitioner's second proposition of law arguing that his confession was involuntary because of psychological coercion, trickery, and deception by the police. (App. Vol. III, at 1235-36.) After determining that Petitioner's confession was voluntary, the Ohio Supreme Court rejected Petitioner's second and fifth propositions of law. Although the Court has already rejected Petitioner's argument that Respondent's failure to argue the applicability of the AEDPA's standard of review requires *de novo* review, this Court need not determine whether the Ohio Supreme Court's decision contravened or unreasonably applied clearly established federal law. For the reasons discussed more fully in denying Petitioner's twelfth ground for relief, this Court concludes that review of Petitioner's fourteenth ground for relief is barred by *Stone v. Powell*. Ohio, by providing for the

145

filing of a pretrial motion to suppress and the opportunity to take a direct appeal from any ruling denying a motion to suppress, has in place a state procedural mechanism that presents the opportunity for full and fair litigation of a Fourth Amendment claim. *Riley v. Gray*, 674 F.2d at 526; *see also Harding v. Russell*, 156 F. App'x at 745; *Seymour v. Walker*, 224 F.3d 542, 553 (6th Cir. 2000). Further, this Court is not persuaded that Petitioner's presentation of his Fourth Amendment claim was frustrated by any failure of Ohio's procedural mechanism. Accordingly, Petitioner's fourteenth ground for relief is **DENIED** pursuant to *Stone v. Powell*.

> **Fifteenth Ground for Relief: Allowing a juror to sit in a death case who believes that the responsibility for imposing the death sentence rests solely with the trial court deprives Petitioner's rights as guaranteed by the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.**

Petitioner alleges that a constitutional violation occurred when juror Nevaline Halcomb was permitted to remain on his jury, despite the fact that Halcomb had given several answers during voir dire suggesting that she believed that the decision of whether to impose the death penalty rested with the trial court. (Petition, Doc. # 6, at ¶¶ 212-216.) Petitioner explains that in *Caldwell v. Mississippi*, 472 U.S. 320, 328-29 (1985), the United States Supreme Court held " 'that it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere.' " (*Id.* at ¶ 215.)

Petitioner points to the following statements that Juror Halcomb made during individual voir dire:

> MR. HOLCOMB: Okay. And you can sit there as a lady of your own convictions and you can hear all the evidence and you can call this case the way you see it, whether it's in favor of the State of Ohio, whether it's in favor of this Defendant? You can call it the way you see it?

146

MS. HALCOMB: Yes, I could say what I felt. **It's up to the Judge to really make the decision**.

* * *

THE COURT: Ms. Halcomb, listen to the question I'm going to ask you. Listen carefully. If, in a proper case, where the facts warrant it and the law permits it, could you join in signing a verdict form which might approve the imposition of the death penalty?

MS. HALCOMB: Yes, I think I could if I thought the crime was bad enough. But **I feel like that's your decision** what would happen.

(Doc. # 6, at ¶ 213 (quoting T.pp. 230, 231-32 (emphasis added)).)

Petitioner further argues that Juror Halcomb's beliefs were confirmed, and the error accordingly compounded, by certain jury instructions that the trial court gave during both the culpability and sentencing phases. Petitioner isolates the following jury instruction from the culpability phase:

You may not discuss or consider the subject of punishment. Your duty is confined to the determination of the guilt or innocence of the Defendant and to the determination of any additional findings that may be submitted to you. In the event you find the Defendant guilty, **the duty of determining punishment is placed by law – In this instance it may be upon the court**.

(*Id.*at ¶ 214 (quoting T.pp. 1114-1115 (emphasis added)).) Petitioner goes on to single out the following jury instructions from the sentencing phase:

Members of the jury, we have heard the evidence and the arguments of counsel. You will now decide what sentence you will **approve** for each of the four counts of aggravated murder with specifications.

* * *

With respect to each of the four homicides involved in this case, you shall **approve** the sentence of death if unanimously; that is, all twelve of you find by proof beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors.

147

*    *    *

> Whenever all twelve – I say again "all twelve" – of you agree to **approve** a
> verdict for each count of the indictment, you will complete and sign the applicable
> verdict forms in ink and advise the Bailiff that you have completed your
> deliberations.

(*Id.* at ¶ 214 (quoting T.pp. 157, 163, 166 (emphasis added)).)

In his memorandum in support, Petitioner adds several additional arguments assailing the

propriety of the trial court's sentencing phase instructions, and specifically, the manner in which

the impropriety exacerbated Juror Halcomb's belief that the responsibility for sentencing

Petitioner to death rested with the trial court. (Doc. # 62, at 94-98.) First, Petitioner points out

that it is not technically correct under Ohio law to define a jury's sentencing verdict as a

"recommendation," in view of the fact that under Ohio law, when a jury issues one of the life

sentence verdicts, it is more than a recommendation because the trial court is <u>not</u> permitted to

reject that verdict and impose death. Second, Petitioner argues that the trial court erred in using

the word "approve" instead of "recommend." Finally, Petitioner also argues that the decision of

*Mapes v. Coyle*, 171 F.3d 408, 415 (6th Cir. 1998), in which the Sixth Circuit rejected a *Caldwell*

argument raised against Ohio's sentencing statute, is inapposite in the instant case because

*Mapes* did not involve the added issue in voir dire presented here where a juror made statements

suggesting a belief that ultimate responsibility for sentencing Petitioner to death would rest with

the trial court.

Respondent argues that Petitioner is not entitled to habeas corpus relief on this claim.

(Doc. # 67, at 66-69.) Respondent begins by noting that the Ohio Supreme Court rejected

Petitioner's claim on direct appeal. Turning to the facts, Respondent argues that Juror Halcomb

148

dispelled any initial confusion that she may have had about her understanding of a juror's role in the sentencing process, affirmatively answering that she would follow the law and instructions. To that point, Respondent argues that neither the prosecutor nor the trial court either misstated Ohio law about the juror's role in the sentencing process or allowed the jurors to minimize their role through dependence on the appellate process. Respondent insists that the trial court's use of the word "approve" in the jury instructions is synonymous with the word "recommend." Finally, Respondent notes that the Ohio Supreme Court has repeatedly rejected this identical claim and found no *Caldwell* problem with Ohio's sentencing statute.

In his reply, Petitioner begins by "rest[ing] on his earlier briefing regarding the constitutional deficiencies regarding the voir dire of Juror Halcomb," and then proceeds to raise several arguments contesting the validity not only of Respondent's arguments but also of the Ohio Supreme Court's decision. (Doc. # 70, at 55-58.) Concerning Respondent's argument that Juror Halcomb affirmatively responded to questions regarding whether she could follow the law and instructions, Petitioner notes that "the reliance on affirmative responses to leading questions particularly when considering a juror's ability to understand his or her sentencing function in a death penalty case was rejected in Morgan v. Illinois, 504 U.S. 719 (1992.)." (*Id*. at 55.) Petitioner further asserts that the fact that Juror Halcomb affirmatively responded to a question whether she could follow the trial court's instructions actually establishes constitutional error because the instructions were constitutionally flawed insofar as they did not accurately convey the jury's role in the sentencing process.

Turning to *Caldwell v. Mississippi*, Petitioner continues to insist that the trial court in this instance did not correctly instruct the jury as to Ohio's sentencing law because the trial court

149

instructed the jury that it had to "approve" a death sentence, rather than "recommend" a death sentence. Petitioner argues that the word "approve" is not synonymous with the word "recommend" because whereas "approve" connotes agreement with a course of action already initiated, "recommend" connotes initiation or suggestion of a course of action to be taken. Petitioner argues that *Caldwell* prohibits misleading jurors in a way that allows them to feel less responsible than they should for their sentencing decision.

Petitioner also argues in his reply that the AEDPA does not erect a bar to this Court's consideration of his claim because the Ohio Supreme Court did not properly address Petitioner's claim. (Doc. # 70, at 57-58.) The Ohio Supreme Court rejected Petitioner's claim as follows:

> In proposition of law eleven, appellant asserts that a prospective juror who believes that the responsibility for determining punishment in a capital case rests with the trial court should not be permitted to serve on a capital jury.
>
> During voir dire, a prospective juror twice indicated that she believed it was up to the court to determine what the punishment should be in the event the appellant was found guilty. However, when defense counsel asked whether she could "listen to the Court, listen to the instructions, listen to the evidence, follow the rules of law the Judge says applies, and make your decision accordingly," the juror clearly indicated that she understood her responsibility as a juror and would follow the law as instructed. In addition, the juror did not express any reluctance in sitting on the jury, and she agreed that [illegible] verdicts were hers.
>
> Appellant also contests the trial court's instructions during the guilt phase of the trial, which indicated that any recommendation of death by the jury would only be a recommendation and would not be binding on the court. "The jury in the penalty phase of a capital prosecution may be instructed that its recommendation to the court that the death penalty be imposed is not binding and that the final decision as to whether the death penalty shall be imposed rests with the court." *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph six of the syllabus. This court has repeatedly stated our preference that no comment be made on the question of who bears the responsibility for determining the appropriateness of a death sentence. However, we also have held that such an instruction accurately states Ohio law and does not constitute reversible error. *State v. Henderson* (1988), 39 Ohio St.3d 24, 30, 528 N.E.2d

1237, 1243. See, also, *State v. Williams* (1986), 23 Ohio St.3d 16, 21-22, 23 OBR 13, 18-19, 490 N.E.2d 906, 912; *State v. Steffen* (1987), 31 Ohio St.3d 111, 113-114, 31 OBR 273, 275, 509 N.E.2d 383, 387-388. Appellant's eleventh proposition of law is, therefore, without merit.

(*Loza*, 71 Ohio St. 3d at 73-74; App. Vol. III, at 1240.)

Petitioner argues that the Ohio Supreme Court did not consider the unique instruction in Petitioner's case that the jury merely "approve" a sentence rather than recommend a sentence. In other words, according to Petitioner, the Ohio Supreme Court committed error by characterizing the instructions in his case as having used the word " recommend" and then relying on authority that approves of the use of the word "recommend." Petitioner argues that the Ohio Supreme Court also did not consider United States Supreme Court authority and specifically excluded reliance on federal authority by basing its rejection of Petitioner's federal constitutional claim on state authority. Petitioner argues that the Ohio Supreme Court additionally ignored principles of state court opinions and *Caldwell* about the requirement that a sentencing jury be accurately instructed. Petitioner further argues that the Ohio Supreme Court, notwithstanding its refusal to rely on or cite federal law, did in fact fail to reasonably apply *Caldwell* by failing to determine whether Petitioner's jury had been accurately informed of its function. Finally, Petitioner reiterates that the Ohio Supreme Court was incorrect in noting that Petitioner's jury had been instructed with the "recommendation" language.

Petitioner's claim is without merit. First, as to the answers provided by Juror Halcomb during individual voir dire, having read the voir dire of Juror Halcomb in its entirety, this Court is satisfied that whatever misunderstanding she may have had and conveyed concerning the role that the jury would play in determining whether Petitioner should be sentenced to death was

151

corrected through subsequent questioning by the trial court, prosecution, and defense counsel. (App. Vol. V, at 2442-45.) Second, concerning the trial court's instruction during the culpability phase that, "[i]n the event you find the Defendant guilty, the duty of determining punishment is placed by law – In this instance, it may be upon the Court," (App. Vol. VI, at 3327-28), the Court is not persuaded that that isolated instruction permitted the jurors to feel less responsible for their role in eventually determining whether Petitioner should be sentenced to death. To find otherwise would be to ignore the fact that the prospective jurors were reminded vividly and repeatedly throughout the voir dire process that if Petitioner were found guilty of capital murder, the jury would be required to weigh whether he should be sentenced to death.

Finally, concerning the several occasions during the mitigation phase instructions when the trial court used the word "approve" rather than "recommend" when instructing the jurors how to determine whether Petitioner should receive the death sentence or one of the life sentences, the Court is not persuaded that the instructions at issue rose to the level of a *Caldwell* or any other constitutional error. At issue in *Caldwell* were comments by the prosecution during closing arguments telling the jurors that their sentencing decision would not be final and would be "automatically reviewable" by the state's Supreme Court. 472 U.S. at 325-26.

The Sixth Circuit noted in *Buell v. Mitchell*, 274 F.3d 337 (6th Cir. 2001), that "[i]n decisions subsequent to *Caldwell*, the Supreme Court has reiterated that '[t]o establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law.' " *Buell*, 274 F.3d at 353 (quoting *Dugger v. Adams*, 489 U.S. 401, 407 (1989)). *See also Mapes v. Coyle*, 171 F.3d 408, 414 (6th Cir. 1999) ("in order to make out a *Caldwell* violation, a defendant must show that the prosecutor or trial

152

judge improperly described the jury's role under state law in order to 'water down' its responsibility."); *Kordenbrock v. Scroggy*, 919 F.2d 1091, 1101 (6th Cir. 1991) (same). Accordingly, in *Buell*, the Sixth Circuit found that the trial court's instruction to the jury that its sentencing verdict would be a recommendation and that the final decision rested with the trial court did not violate *Caldwell* because the instruction complied with the letter of Ohio law, described with accuracy the jury's role in the sentencing process, and did not diminish the jury's sense of responsibility, as had been done in *Caldwell*. *Buell*, 274 F.3d at 353.

In the instant case, notwithstanding the trial court's substitution of the word "approve" for "recommend" or the differences between the meanings of those words, the tenor of the trial court's mitigation phase charge, when read in its entirety, was clear: the jurors were charged with determining whether death, or one of the life sentences, was appropriate for Petitioner. (App. Vol. VI, at 3529-38.) Nothing about the trial court's use of the word "approve" instead of "recommend" had the effect of diminishing the jury's sense of responsibility. *See Mapes*, 171 F.3d at 415 (finding that erroneous instruction regarding binding nature of life sentence recommendation "could not have diminished the jury's sense of responsibility in *Caldwell* terms"); *Kordenbrock*, 919 F.2d at 1101 ("We find no misstatement of state law sufficient to trigger a *Caldwell* violation in the instant case.").

Petitioner makes much of the fact that a central tenet of *Caldwell* is the requirement that the jury be <u>accurately</u> instructed on state law and that the trial court in this case violated *Caldwell* by inaccurately instructing the jury to "approve" a sentence rather than "recommend" a sentence, as set forth in Ohio's sentencing statute. The Court disagrees. First, as discussed more fully above, the essence of a *Caldwell* violation is not merely an inaccurate instruction, but an

153

instruction that has the effect of watering down the jury's sense of responsibility. Further,

contrary to Petitioner's colloquial definitions of the words "approve" and "recommend," the

meanings of those words are not as different as Petitioner asserts. According to *The American*

*Heritage Dictionary of The English Language* (4th ed. 2000), the word "approve" is defined as:

"(1) to consider right or good; think or speak favorably of. (2) To consent to officially or

formally; confirm or sanction. (3) *Obsolete* To prove or attest." The word "recommend" is

defined as: "(1) To praise or commend (one) to another as being worthy or desirable; endorse.

(2) To make (the possessor, as of an attribute) attractive or acceptable. (3) To commit to the

charge of another; entrust. (4) To advise or counsel." Any difference between those meanings is

a difference without distinction. In fact, an argument could be made that, to the extent the

meanings of the two words are different, the word "recommend" denotes more passivity than the

word "approve," in contrast to Petitioner's argument that "approve" connotes acquiescence to a

course of action already initiated, while "recommend" connotes initiation of a course of action.

In short, the Court is not persuaded that Petitioner's death sentence rested on a

determination made by a sentencer that had been led to believe that the responsibility for

determining the appropriateness of Petitioner's death sentence rested elsewhere. The individual

voir dire of Juror Halcomb, read in its entirety, does not support a finding that Juror Halcomb

misunderstood the jury's role in the sentencing process. Further, the trial court did not instruct

the jury in a manner that permitted the jurors to believe that the responsibility for determining the

appropriateness of Petitioner's death sentence rested elsewhere. Accordingly, the result of the

Ohio Supreme Court's decision rejecting Petitioner's claim did not contravene clearly established

United States Supreme Court precedent. Petitioner's fifteenth ground for relief is therefore **DENIED**.

> **Sixteenth Ground for Relief: The trial court erred in failing to conduct a voir dire of a juror when it learned that a seated juror had a problem that may impact the juror's impartiality in deprivation of Petitioner's rights as guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

Petitioner argues that his right to a fair and impartial jury was violated when the trial court failed to conduct a voir dire of juror Martha Zecher after learning that her impartiality might be compromised. (Petition, Doc. # 6, at ¶¶ 217-220.) After the jury was seated, Juror Zecher sent a note to the trial court explaining that her husband was very upset about her selection as a juror and wanted her to be excused. According to the note, Juror Zecher's husband said that Mrs. Zecher may as well leave home for three weeks. Citing *Remmer v. United States*, 347 U.S. 227, 229 (1954), Petitioner argues that failing to voir dire Juror Zecher about the note and allowing her to sit on his jury violated his right to a capital jury free from extraneous influences. Petitioner assails not only the trial court, but also defense counsel, for the failure to conduct a voir dire of Juror Zecher. (Doc. # 62, at 98-99.) Petitioner argues that no confidence can be maintained in any verdict returned under such circumstances.

In asserting that Petitioner is not entitled to relief on this claim, Respondent begins by noting that Petitioner failed to object to this issue at trial and raised the claim for the first time on direct appeal. (Doc. # 67, at 69-70.) Respondent goes on to argue that the trial court did not abuse its discretion in retaining Juror Zecher because, as factually determined by the Ohio courts, the record contains no evidence that Juror Zecher could not perform her duties as a juror. To this point, Respondent points out that when the trial court inquired of all of the prospective jurors

whether they would have a problem spending one or more nights away from home, only one

juror–not Ms. Zecher–answered in the affirmative. Respondent concludes by arguing that the

state court determination rejecting Petitioner's claim is not contrary to United States Supreme

Court precedent and that the Ohio Supreme Court's factual findings are entitled to a presumption

of correctness, further circumscribing this Court's review of Petitioner's claim.

In his reply, Petitioner states only that he "stands on his briefing as submitted in the merit

brief." (Doc. # 70, at 59.)

The Ohio Supreme Court rejected Petitioner's claim as follows:

> In his twelfth proposition of law, appellant argues that the trial court
> should have conducted additional voir dire when it learned that a seated juror had
> a problem that might affect the juror's ability to be impartial. The trial court
> received a note from a juror's husband which reflected that he was very upset
> about her jury selection, that he wanted her to be excused, and that she might as
> well leave home for three weeks. Defense counsel did not challenge the seating of
> this juror for cause, nor did he exercise any of his peremptory challenges to
> prevent this juror from serving. The juror never expressed reluctance to sit on the
> jury; it was her husband who was reluctant to have her absent for a protracted
> period of time. The trial court did not abuse its discretion by retaining this juror.
> This proposition of law is meritless.

(*Loza*, 71 Ohio St. 3d at 74; App. Vol. III, at 1240.)

The Court is not persuaded that the failure of the trial court and/or defense counsel to voir

dire Juror Zecher or the fact that she remained on the jury panel constituted error. Accordingly,

the Court cannot find that the Ohio Supreme Court's decision rejecting Petitioner's claim

contravened or unreasonably applied clearly established federal law or involved an unreasonable

determination of the facts based on the evidence presented.

When credible evidence suggests that a juror has been exposed to improper extraneous

influence, the trial court must conduct a hearing to determine the facts and circumstances, the

156

impact on the juror, and whether the events at issue were prejudicial. *See Remmer v. United States*, 347 U.S. 227, 229-30 (1954); *see also Smith v. Phillips*, 455 U.S. 209, 215 (1982). The defendant bears the burden of proving actual bias or prejudice. *See, e.g., State v. Zelinka*, 862 F.2d 92, 95-96 (6th Cir. 1988); *United States v. Pennell*, 737 F.2d 521, 532 (6th Cir. 1984). (App. Vol. V, at 2459-2560.) Under these circumstances, the Court is not persuaded that the failure to conduct such a voir dire or allowing Juror Zecher to sit on the jury amounted to constitutional error. The Court simply cannot find that the situation constituted credible evidence of improper exposure to extraneous influences. The Ohio Supreme Court found that there was no evidence that Juror Zecher was reluctant to serve and that the trial court did not abuse its discretion by retaining Juror Zecher on the panel. The Supreme Court's finding was not unreasonable based on the record, as there was no evidence at any time during or after the trial from Juror Zecher or any juror who served with her that Juror Zecher's service was distracted, that her impartiality was compromised, or that her verdict was improperly influenced. That being so, the Court is not persuaded that Juror Zecher's presence on the jury panel amounted to a violation of Petitioner's right to a fair and impartial jury uncompromised by improper extraneous influences.

For the foregoing reasons, the Ohio Supreme Court's decision rejecting Petitioner's claim did not contravene or unreasonably apply clearly established federal law and was not based on an unreasonable determination of the facts based on the evidence presented. Accordingly, Petitioner's sixteenth ground for relief is **DENIED**.

157

**Seventeenth Ground for Relief: Invidious racial discrimination infects [the]
death penalty in Ohio and in Petitioner's case, thereby depriving Petitioner
of his rights as guaranteed by the Sixth, Eighth, and Fourteenth
Amendments to the United States Constitution.**

    **A. Racism in Butler County.**

    **B. Death sentences disproportionate for Hispanics in Ohio.**

    **C. Fair cross-section violation.**

    **D. Equal Protection violation.**

Petitioner argues that the taint of racism throughout several facets of the proceedings

against him renders his death sentence unconstitutional. (Petition, Doc. # 6, at ¶¶ 221-229.) In

the first of four sub-parts to his claim, Petitioner argues that in Butler County–as well as in the

State of Ohio and throughout all thirty-seven states that have capital punishment–the death

penalty is meted out disproportionately to those defendants who are racial minorities and/or those

defendants accused of killing white victims. (*Id*. at ¶¶ 222-225.) Petitioner notes that at the time

he filed the instant petition, four of the six persons sentenced to death in Butler County were

minorities, despite the fact that racial minorities constituted only 4.5 % of the population in

Butler County. Petitioner also notes that only two of the six death row inmates from Butler

County were accused of killing minority victims. Petitioner further notes that Butler County has

never sentenced to death a single white inmate accused of killing a minority victim. Continuing

with his statistical arguments, Petitioner points out that "Butler County sent one (1) (or 16.67%)

Hispanic to death row, Loza, despite a Hispanic population of 1,467 (or .5%)." (*Id*. at ¶ 223.)

Arguing that discriminatory effect exists when a similarly situated defendant of a different race

was not prosecuted, Petitioner notes that despite the fact that his "white girlfriend" Dorothy

Jackson knew details surrounding the shootings that Petitioner did not know, and often gave different accounts of the events, "[f]rom the time Loza and Jackson were arrested, they were treated differently." (*Id.* at ¶ 224.) Finally, Petitioner asserts that minorities rarely, if ever, sit on capital juries in Butler County and that under-representation of minorities is not a random result of the jury selection process.

In sub-part (B) of his seventeenth claim, Petitioner argues that the death penalty in Ohio is meted out disproportionately to Hispanics. (*Id.* at ¶ 226.) Petitioner notes that, as of the time that he filed his petition, three of the 134 death row inmates (2.23%) were Hispanic, despite the fact that Hispanics constitute only 1.2% of the population in Ohio. Petitioner further notes that "[n]ot a single inmate on Ohio's death row has been convicted of the murder of a Hispanic." (*Id.*)

Sub-part (C) of Petitioner's argument contends that Petitioner was denied a representative jury from a fair cross-section of the community. Petitioner argues that he can satisfy the three factors for establishing a *prima facie* violation of the fair cross-section requirement, to wit: (1) that the group alleged to have been excluded was a distinctive group in the community; (2) that the representation of this group in the pool from which juries were selected was not fair and reasonable in relation to the number of persons from the group within the community; and (3) that the under representation is due to systematic exclusion of the group in the jury selection process. Petitioner complains that the state courts denied him an opportunity to explore and develop this constitutional violation. Petitioner notes that when he raised this claim in postconviction proceedings, the state trial court found that he had failed to prove the third element and that the state appellate court considered only the third element. Petitioner also notes

159

that the trial court denied him the opportunity to conduct needed discovery on this issue.

Finally, in sub-part (D) of his claim, Petitioner summarily states that "[e]qual protection rights are clearly violated when members of racial minorities are excluded from juries." (*Id.* at ¶ 229 (citing *Batson v. Kentucky*, 476 U.S. 79 (1986)).)

Petitioner expands considerably on these arguments in his memorandum in support, recounting the results of discovery that this Court granted him leave to conduct. (Doc. # 62, at 99-107.) Petitioner asserts that "[t]he discovery discloses that the vestiges of racism not only resided in Butler County at the time of his trial, but impacted the investigation and the decision to charge Petitioner with a capital offense." (*Id.* at 99-100.) Relying on the deposition of Detective Voris, who was present when Petitioner was arrested, Petitioner notes that law enforcement officers referred to Petitioner not as a suspect, arrestee, or even "perp," but as "the Mexican." (*Id.* at 100.) Petitioner goes on to note that despite deposition answers provided by Detective Knabel, Major Schwarber, Detective Duvelius, Detective Abshear, former Detective Walton, and Lieutenant Jeffery condemning the use of racially derogatory terms as unprofessional and even intolerable, the use of racially derogatory terms in reference to Petitioner was pervasive and indicative of race and/or ethnicity as the reason that officers focused their investigation on Petitioner.

Former Detective Gingerich, according to Petitioner, was of the view that the use of racially derogatory names was "okay" if done " 'jokingly among the guys.' " (*Id.* at 101 (quoting Gingerich Deposition, at 13, 27).) Petitioner notes that Detective McCloud testified that he had heard the term "wetback" used more than once by more than one fellow officer. According to Petitioner, Detective McCloud's testimony was corroborated during Detective Abshear's

deposition. Petitioner also asserts that the crime scene video tape, although "garbled," contains

audio of one of the law enforcement officers stating that a " 'wetback from California' "

committed the offense. (Doc. # 62, at 102 n.35.) Petitioner argues that Detective Knabel's

admission during his deposition to having made racist statements is that much more significant in

view of the fact that, according to prosecutor Noah Powers' deposition, it was essentially

Detective Knabel who made the death penalty charging decision. (*Id*. at 103.) Petitioner

summarizes the facts supporting the arguments in his memorandum in support as follows:

> Thus, discovery disclosed that a detective who considered Petitioner to be
> a "wetback" made the charging decisions as to Petitioner, who faced the
> maximum allowed by Ohio law, and Dorothy Jackson. Discovery demonstrates
> Ohio treated Dorothy Jackson, the white girlfriend, quite differently than
> Petitioner, the "Mexican" – or as Knabel subsequently described, a "wetback."
> The lead detective for Ohio referred to Petitioner in a racially derogatory fashion
> before any investigations, before evidence had been collected and before making
> his charging decision.

(Doc. # 62, at 102-104.)

Citing *Wayte v. United States*, 470 U.S. 598, 608 (1985), Petitioner asserts that a

prosecutor's exercise of discretion regarding whom to prosecute may not be deliberately based on

an unjustifiable factor such as race. Recognizing that the Supreme Court has held that proving an

Equal Protection violation requires a petitioner to prove discriminatory effect and discriminatory

purpose on the part of the State, Petitioner argues that officers' use of racially derogatory terms in

reference to Petitioner, as well as the disparate treatment that Petitioner received compared to

Dorothy Jackson, constitutes the requisite showing. Petitioner also notes that the "[t]he Sixth

Circuit has recognized that 'the racial imbalance in the State of Ohio's capital sentencing system

is glaringly extreme' and 'is, to say the least, extremely troubling.' " (Doc. # 62, at 105-106

161

(quoting *Coleman v. Mitchell*, 268 F.3d 417, 441-442 (6th Cir. 2001)).) Consistent with the Sixth

Circuit's position that discrimination can be proved through inferences from valid relevant

statistical evidence of disparate impact of other circumstantial evidence, Petitioner asserts that

even setting aside the racial remarks made by numerous law enforcement officers in reference to

Petitioner, this Court may infer discrimination on the basis of the difference between the manner

in which Petitioner and Dorothy Jackson were treated.

Respondent argues that Petitioner is not entitled to habeas corpus relief on this claim.

(Doc. # 67, at 71-75.) Respondent begins by noting that Petitioner failed to raise this claim on

direct appeal and presented it to the state courts for the first time in his postconviction action.

Respondent goes on to note that although the state trial court rejected Petitioner's claim as barred

by *res judicata*, the state appellate court subsequently rejected Petitioner's claims on the merits.

Seizing upon the findings and conclusions reached by the state appellate court, Respondent

likewise asserts that there existed several race-neutral reasons justifying the fact that officers

focused their investigation and prosecution on Petitioner rather than Dorothy Jackson, including

the fact that Jackson was a juvenile and that the amount of evidence implicating Petitioner was

significant and substantial. (Doc. # 67, at 73.) Respondent also asserts that the depositions

relied on by Petitioner support Respondent's position that the investigation and prosecution of

Petitioner was based on the evidence against him and the lack of evidence implicating Jackson..

(*Id*. at 73-74.) Respondent also dismisses the emphasis placed by Petitioner on isolated, garbled

derogatory comments as evidence of discriminatory purpose or racism on the part of Butler

County officers or prosecutors. Citing *McClesky v. Kemp*, 481 U.S. 279 (1987), as Petitioner

does, Respondent asserts that the statistical evidence offered by Petitioner is insufficient to

162

establish that Butler County and Ohio mete out capital punishment disproportionately upon

minorities and/or those who murder whites. To this point, Respondent also notes that Petitioner

made no attempt to offer evidence of bias specific to his own case and that Petitioner's

statistically based claim is not even actionable in habeas corpus.

Petitioner presented the essence of this claim to the state courts in several claims for relief

in his postconviction action, supported by evidence outside the record. The last state court to

issue a reasoned decision addressing those claims, the Ohio Court of Appeals for the Twelfth

Appellate District, rejected the claims as follows:

> In his third assignment of error, Loza contends that the trial court erred by
> dismissing the third, sixth, and tenth claim for relief in his petition for
> postconviction relief. In his sixth claim for relief, Loza alleged that he was
> selectively prosecuted because of his race. In his tenth claim for relief, Loza
> alleged that the death penalty is disproportionately imposed against defendants
> who are racial minorities and/or those defendants accused of killing white victims.
> In his third claim for relief, Loza alleged that he was denied his constitutional
> right to have a jury chosen from a fair cross-section of the community.

> In his sixth claim for relief, Loza argued that the trial court erred by failing
> to find that the Butler County Prosecutor's decision to prosecute him for murder
> was based upon his Hispanic race. A presumption of regularity supports
> prosecutorial decisions and unless there is clear evidence to the contrary, courts
> presume that prosecutors have properly discharged their official duties. United
> States v. Armstrong (1996), __ U.S. __, 116 S.Ct. 1480, 1486. If a prosecutor has
> probable cause to believe that an accused committed an offense, the decision
> whether to prosecute, and what charges to file or bring before a grand jury,
> generally rests entirely within the prosecutor's discretion. Id. However, pursuant
> to the equal protection component of the Due Process Clause of the Fifth
> Amendment, a prosecutor's decision whether to prosecute may not be based upon
> "an unjustifiable standard such as race, religion, or other arbitrary classification."
> Id. In order to establish a claim of selective prosecution, a defendant must show
> that a prosecutorial policy "had a discriminatory effect and that it was motivated
> by a discriminatory purpose." Id. at 1487, quoting Oyler v. Boles (1962), 368
> U.S. 448, 456, 82 S.Ct. 501. In a race case, a defendant must show that similarly
> situated individuals of a different race were not prosecuted. Id.

Loza argues that since Jackson, who is Caucasian, was similarly situated and not prosecuted for murder, he has established a claim of selective prosecution. However, unlike Loza, Jackson was a juvenile at the time that the murders were committed. Further, since the amount of evidence implicating Loza was significant and substantial, See Loza, 71 Ohio St.3d at 69, there was a race-neutral explanation for the prosecutor's decision. See State v. Keene (Sept. 20, 1996), Montgomery App. No. 14375, unreported. Therefore, Loza failed to show that the decision to prosecute him for murder was based upon his race and the trial court properly dismissed his sixth claim for relief.

In his tenth claim for relief, Loza argued that the death penalty is disproportionately imposed against defendants who are racial minorities and/or those defendants accused of killing white victims. In rejecting similar arguments, the United States and Ohio Supreme Courts have held that a defendant must show that racial considerations affected the sentencing process in his individual case. McCleskey v. Kemp (1987), 481 U.S. 279, 107 S.Ct. 1756; State v. Steffen (1987), 31 Ohio St.3d 111. Like the defendants in McCleskey and Steffen, Loza has only offered statistics in support of his argument, and statistics are insufficient to show that race affected the sentencing process in this case. See McCleskey at 297, 1770; Steffen at 124-125. Therefore, the trial court properly dismissed Loza's tenth claim for relief.

In his third claim for relief, Loza argued that he was denied his constitutional right to have a jury chosen from a fair cross-section of the community. Specifically, Loza argued that racial minorities are excluded from capital juries in Butler County, Ohio. In support of his argument, Loza submitted the affidavits of three defense attorneys. J. Gregory Howard and Michael D. Shanks, who served as trial counsel for Loza, stated that there were not any Hispanics or African-Americans on Loza's jury. In addition, Howard stated that he represented Michael Benge in a capital trial and there were not any Hispanics or African-Americans on Benge's jury. Shanks stated that he represented Kevin Watson and Von Clark Davis in capital trials and there were not any Hispanics or African-Americans on their panels. Loza also submitted the affidavit of defense attorney Craig Hedric, who stated that he represented Clifford Williams in a capital trial and there were not any Hispanics or African-Americans on his panel. Howard, Shanks, and Hedric further stated that a minority rarely sits on a jury in a criminal case.

The Sixth and Fourteenth Amendments to the United States Constitution guarantee a right to a jury chosen from a fair cross-section of the community. Taylor v. Louisiana (1975), 419 U.S. 522, 528, 95 S.Ct. 692; State v. Puente (1982), 69 Ohio St.2d 136, 138. "Defendants are not entitled to a jury of any particular composition *** but the jury wheels, pools of names, panels, or venires

from which juries are drawn must not systematically exclude distinictive groups in the community and thereby fail to be reasonably representative thereof." Taylor at 538. Thus, in order to demonstrate that there has been a violation of the fair cross-section requirement, a defendant must show:

> (1) that the group alleged to be excluded is a distinctive group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under representation is due to systematic exclusion of the group in the jury-selection process.

Duren v. Missouri (1979), 439 U.S. 357, 364, 99 S.Ct. 664, 668.

The affidavits submitted by Loza do not establish that the representation of Hispanics and African-Americans on Butler County juries is not fair and reasonable in relation to the number of Hispanics and African-Americans in Butler County. The affidavits only cite a few examples where African-Americans and Hispanics have not served in capital trials and many of the examples do not clearly state whether the trial involved a three-judge panel or a jury panel. Further, the examples are not sufficient to establish under representation because, according to statistics provided by Loza, the total minority population of Butler County is only 4.5% and the Hispanic population of Butler County is only .5%.

Even assuming that Loza could show Hispanics and African-Americans were under represented on Butler County juries, Loza has made absolutely no showing that this under representation was due to the systematic exclusion of these groups in the jury-selection process. In fact, the trial court noted that Butler County uses voter registration lists to select jurors and this method of selection has consistently been upheld by the Ohio Supreme Court. See State v. Roe (1989), 41 Ohio St.3d 18; State v. Esparza (1988), 39 Ohio St.3d 8, 13. Therefore, Loza has failed to show that he was denied his constitutional right to have a jury chosen from a fair cross-section of the community and the trial court properly dismissed his third claim for relief. Accordingly, since we found that the trial court properly dismissed Loza's third, sixth, and tenth claims for relief, Loza's third assignment of error is overruled.

In his fourth assignment of error, Loza contends that the trial court erred by denying his motion for discovery to pursue his claim of selective prosecution based upon race. In order to obtain discovery on a selective prosecution claim, a defendant must produce some evidence that similarly situated members of other races were treated differently. Armstrong, __ U.S. __, 116 S.Ct. at 1489. The Supreme Court reasoned that "the justifications for a rigorous standard for the

elements of a selective prosecution claim thus require a correspondingly rigorous
standard for discovery in aid of such a claim." Armstrong at 1488. As discussed
with respect to Loza's third assignment of error, he has not produced evidence
that similarly situated members of other races were treated differently.
Accordingly, Loza was not entitled to discovery and his fourth assignment of error
is overruled.

(App. Vol. IV, at 2000-2006.)

With respect to the race-neutral reasons relied upon by the state courts in postconviction

and offered by Respondent for why Petitioner was targeted and prosecuted, Petitioner disputes

Respondent's assertion that there was overwhelming evidence implicating him in the shootings.

(*Id*. at 65-66.) Petitioner reiterates that no scientific evidence implicated him and that the only

evidence implicating him–his own coerced confession and Dorothy's self-serving, inconsistent,

state-compensated rendition of Petitioner's confession to her–is unreliable. Further, the state

appellate court's conclusion in postconviction that the prosecutor possessed race-neutral reasons

for the charging decision, according to Petitioner, is contrary to and an unreasonable application

of United States Supreme Court precedent, is not supported by the record, and deserves no

deference by this Court under 28 U.S.C. § 2254(d). This is so, Petitioner argues, because it was

Detective Knabel, rather than the prosecutor, who made the charging decision in Petitioner's

case.

The first two sub-parts of Petitioner's claim rely on statistics to prove Petitioner's

assertion that law enforcement officers focused their investigation and prosecution on him, and

treated him differently than Dorothy Jackson, solely because Petitioner was Hispanic, Jackson

was white, and/or the victims were not minorities. The problem with Petitioner's argument is

twofold. First, the sample size upon which Petitioner relies is too small to have any statistical

significance. *See, e.g., United States v. Taylor*, 583 F. Supp. 2d 923, 929-930 (E.D. Tenn. 2008)

("This is the first and only death penalty case prosecuted in this district. With a sample size of

one, the Court cannot compare this prosecution to others."); *Jefferson v. Terry*, 490 F. Supp. 2d

1261, 1340-41 (N.D. Ga. 2007) (stating that sample size of 32 cases analyzed for whether capital

punishment was imposed disproportionately upon minorities was "unlikely" to yield "statistically

meaningful findings"), *rev'd in part on other grounds, Jefferson v. Hall*, 570 F.3d 1283 (11th Cir.

2009).

   Second, the Sixth Circuit has rejected this argument. By way of reminder, in *McCleskey*

*v. Kemp*, 481 U.S. 279, 294-95 (1987), the Supreme Court held that statistics showing

discriminatory effect in a state's administration of the death penalty do not, without more,

constitute proof of discriminatory intent. Interpreting *McCleskey*, the Sixth Circuit in *McQueen*

*v. Scroggy*, 99 F.3d 1302, 1333 (6th Cir. 1996), held that the statistical evidence offered by the

petitioner was similar to the statistical evidence at issue in *McCleskey* and was insufficient to

establish a claim of discriminatory intent. Subsequently, in *Coleman v. Mitchell*, 268 F.3d 417,

441-42 (6th Cir. 2001), the Sixth Circuit rejected a claimed equal protection violation based on

statistics showing that African Americans constituted 9% of the population in Ohio but 49% of

the population on Ohio's death row. More recently, in *Smith v. Mitchell*, 348 F.3d 177, 211-12

(6th Cir. 2004), the Sixth Circuit rejected a claimed equal protection violation based on statistics

showing that although African Americans constituted only 20% of Hamilton County's

population, 62% of the death sentences from Hamilton County were imposed on African

Americans. Because the Sixth Circuit has rejected the statistically based argument presented by

Petitioner herein, the Court cannot find that the Ohio court of appeals' decision that statistics

167

alone are insufficient to establish a claim that racism resulted in the investigation, prosecution, and sentencing of Petitioner contravened or unreasonably applied clearly established Supreme Court precedent.

Petitioner suggests that he does not rely on statistics alone to establish discriminatory intent in *his* claim. Petitioner asserts that the pervasive use by the law enforcement officers investigating the shootings of racial slurs and other racially offensive remarks concerning Petitioner's Hispanic ethnicity, along with the statistics that he offers, demonstrate that Butler County officials acted with discriminatory purpose when they focused their investigation on, selectively prosecuted, and secured a death sentence for Petitioner. Petitioner reasons that his girlfriend Dorothy Jackson, who was white, knew as many if not more of the details surrounding the shootings and gave suspiciously inconsistent accounts to the police, but nevertheless was neither capitally charged nor seriously considered by law enforcement officers as a suspect in the shootings. This evidence, even considered with the statistical evidence Petitioner offers, still falls short of establishing discriminatory intent. To be clear, the use of racial slurs and other racially offensive remarks by law enforcement officers who investigated the shootings as evidenced in the habeas depositions before this Court was unfortunate, unseemly, and reflected poorly on those officers as public servants and as individuals. Their uttering those remarks does not, however, establish or create inference that the officers acted with discriminatory intent in investigating and capitally prosecuting Petitioner.

Although Petitioner argues otherwise, this Court is of the view that the record reflects bona fide race neutral reasons for Butler County's investigation and capital prosecution of Petitioner and not Dorothy Jackson. First, the initial approach of Petitioner by Detective Knabel

was prompted not by Petitioner's race, ethnicity, or other arbitrary reason–but by the fact that Petitioner had been observed discarding items in a business dumpster, among which Knabel and business owner Gary Hoertt found a letter whose author claimed to have committed a drive-by shooting in Los Angeles. Second, when Petitioner and Dorothy Jackson were initially detained, it was for the race-neutral reason that it appeared that Petitioner and Jackson, who was a juvenile, were about to depart for Los Angeles without the permission of Jackson's mother. Later that evening, once police discovered the four bodies of Jackson's family members shot to death in their home, Jackson pointed to Petitioner, recounting his confession to her earlier that morning, and Petitioner pointed to himself in both his confession to officers during an interrogation preceded by his waiver of his *Miranda* rights and a letter that he subsequently wrote to his mother which was obtained by police. At that time, both Jackson and Petitioner consistently and steadfastly denied that anyone but Petitioner was responsible for the four shootings. It is difficult to conceive of a more race-neutral reason for police to target their investigation and subsequent capital prosecution on Petitioner. The subsequent discovery of evidence during these habeas proceedings purporting to suggest that Jackson may have known more about (or even had a role in) the shootings than she admitted before or during Petitioner's trial does not change the facts and circumstances as they appeared at the time and that informed the decision to investigate and capitally prosecute Petitioner. And those facts and circumstances constitute race-neutral explanations for why Butler County treated Petitioner and Jackson differently.

Sub-part (C) of Petitioner's argument contends that Petitioner was denied a representative jury from a fair cross-section of the community. Asserting that all minorities, not just Hispanics, are under represented on Butler County juries, Petitioner argues that he can satisfy the three

factors for establishing a prima facie violation of the fair cross-section requirement, to wit: (1) that the group alleged to have been excluded was a distinctive group in the community; (2) that the representation of this group in the pool from which juries were selected was not fair and reasonable in relation to the number of persons from the group within the community; and (3) that the under representation is due to systematic exclusion of the group in the jury selection process. Petitioner's claim is without merit and the state courts' decision rejecting the claim did not contravene clearly established Supreme Court precedent.

The Supreme Court has held that there is "no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population." *Taylor v. Louisiana*, 419 U.S. 522, 538 (1975). In so holding, the Supreme Court cautioned that "jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *Id*. To prevail on a claimed fair cross-section violation, the petitioner must show that under-representation of a distinctive group resulted from systematic exclusion. *Id*. at 527. In *United States v. Odeneal*, 517 F.3d 406, 411-12 (6th Cir. 2008), the Sixth Circuit rejected the defendants' challenge to the use of voter registration lists, noting that absent evidence that African-Americans were systematically excluded from those lists, under-representation of African-Americans in a venire made up from voter registration lists does not establish a fair cross-section violation. *See also Moore v. Mitchell*, No. 1:00-cv-023, 2007 WL 4754340, at *64 (S.D. Ohio Feb. 15, 2007) ("Potential jurors are selected from voter registration lists and the use of voter rolls as opposed to driver's license lists does not create a representative cross-section claim."); *Davie v. Mitchell*, 291 F. Supp. 2d 573, 590 (N.D. Ohio 2003).

170

The Court is mindful that recently, in *Smith v. Berghuis*, 543 F.3d 326 (6th Cir. 2008), the Sixth Circuit found a fair cross-section violation stemming from the under-representation of African Americans in Kent County venire panels in Michigan. That case is distinguishable from the instant case, however, because the inference of systematic exclusion resulting in under-representation of African-Americans stemmed from the use of "non-random factors"–such as problems with child care and transportation– in excusing those called for jury service from the driver's license and state identification card lists. In fact, the Sixth Circuit itself distinguished differences in rates of voter registration from the non-random factors for excusal from jury service at issue in *Smith*. *Id*. at 341 n.4. In short, whatever disparity might exist between the percentage of minorities in Butler County and the percentage of minorities represented in Butler County venires drawn from voter registration lists, Petitioner has offered no evidence establishing or suggesting that minorities are systematically excluded from Butler County jury venires. For that reason, sub-part (C) of Petitioner's claim fails.

Accordingly, the Court concludes that the state courts' decision rejecting Petitioner's claim in postconviction did not contravene or unreasonably apply clearly established Supreme Court precedent or rely on an unreasonable determination of the facts. Petitioner's seventeenth ground for relief is **DENIED**.

> **Eighteenth Ground for Relief: The seizure of letters written by Petitioner while he was incarcerated without a legitimate penal interest deprived Petitioner of his rights as guaranteed by the First, Fourth, and Fourteenth Amendments.**

In his eighteenth ground for relief, Petitioner challenges the seizure by law enforcement officers (and subsequent introduction at trial) of three letters that Petitioner wrote while

171

incarcerated at the Butler County jail awaiting trial. (Petition, Doc. # 6, at ¶¶ 230-236.)
Petitioner explains that on January 17, 1991, he gave to Detectives Knabel and Jeffery three
letters that he had written and asked Detective Knabel to mail because Petitioner did not have
envelopes or stamps. Rather than mail the letters immediately, Petitioner explains, Detective
Knabel contacted the prosecutor's office, which advised him to read and copy Petitioner's letters.
Petitioner states that the letters inculpated him and were introduced against him at his trial.
Petitioner argues that his Fourth Amendment rights were violated because the Supreme Court has
held that prisoners enjoy a reasonable expectation of privacy, albeit of a diminished scope, and
that jail officials may monitor inmate correspondence or conduct warrantless searches only if a
justifiable purpose of imprisonment or prison security warrants those actions. Petitioner argues
that there was no legitimate justification for the seizure of his letters, especially in light of the
fact that the intrusion occurred when he was a pretrial detainee and "cloaked with the
presumption of innocence." (*Id*. at ¶ 233.) Thus, Petitioner reasons, the trial court erred when it
allowed the letters to be introduced at trial and admitted into evidence. Petitioner also argues
that the seizure violated his rights under the First Amendment. Petitioner concludes by arguing
that "[t]he admission of this tainted evidence into trial requires a reversal of Loza's conviction
and sentences of death." (*Id*. at ¶ 236.)

Petitioner focuses upon the importance, when analyzing the constitutionality of seizures
of prisoner mail, of distinguishing between convicted prisoners and pretrial detainees because the
latter enjoy a presumption of innocence and may not be punished or stripped of their
constitutional rights until proven guilty. Petitioner acknowledges, however, that the Supreme
Court has rejected this distinction. (*Id*. at 110 (citing *Bell v. Wolfish*, 441 U.S. 520 (1979)).)

172

Petitioner acknowledges that the inquiry now requires reviewing courts to determine whether the purpose of the restriction or intrusion is to punish the detainee or is " 'reasonably related to a legitimate governmental objective.' " (*Id.* (quoting *Bell*, 441 U.S. at 539).) Applying the *Bell* reasoning that any restriction or intrusion must be necessary to maintain security and cannot be arbitrary or purposeless to his own case, Petitioner argues that the seizure of his outgoing letters was unconstitutional because it was not reasonable related to a legitimate government interest. Petitioner argues that his attempt to mail three letters to a friend detained in another facility posed no risks.

Respondent argues that this Court should deny Petitioner's claim on the merits. (Doc. # 67, at 76-77.) After reciting the Ohio Supreme Court's decision rejecting Petitioner's claim on direct appeal, Respondent asserts that *Stone v. Powell*, 428 U.S. 465 (1976) precludes this Court from even entertaining Petitioner's claimed Fourth Amendment violation. Concerning the merits of Petitioner's claim, Respondent argues that state prison system had a legitimate interest in examining Petitioner's correspondence that was reasonably related to legitimate penological interests: namely, protecting a person who was a material witness and relative of the four victims.

Petitioner challenges several aspects of Respondent's argument, noting first that the decision to read, seize, and use Petitioner's outgoing mail was made not by those charged with ensuring prison safety but by those charged with prosecuting Petitioner. (Doc. # 70, at 67-71.) Quoting *Turner v. Safley*, 482 U.S. 78, 89-91 (1986), Petitioner reasons that the seizure of his outgoing mail was wholly unrelated to any legitimate penological interest. Petitioner notes that there existed no valid rational connection between Detective Knabel's actions at the instruction of the prosecutor and a penological interest, that the decision to read and copy the letters was not

173

a neutral one, and that any legitimate penological interest could have been protected by simply turning the letters over to prison officials for the sole purpose of determining whether they contained any threats.

The Ohio Supreme Court rejected Petitioner's claim on direct appeal as follows:

Appellant in his sixteenth proposition of law challenges the constitutionality of the actions of the police in seizing and copying letters that appellant wrote from jail and admitting the letters into evidence against him absent special justification. Appellant asserts that the letters were the product of an illegal search and seizure and were admitted in violation of his Fourth Amendment rights, and that the seizure, reproduction and admission of the letters violated his First Amendment rights. Appellant's arguments are without merit.

Appellant sets forth a two-part test found in *Procunier v. Martinez* (1973), 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224, which pertains to the censorship of inmate correspondence. A more appropriate test is set forth in *Turner v. Safley* (1986), 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64, which holds that prison regulations on correspondence are upheld if "reasonably related" to legitimate penological interests.

Warren County prison officials had a legitimate security interest in Loza's correspondence. Loza was writing to Dorothy Jackson, an inmate at the juvenile detention center at the time and a key witness in the state's case against him. Jackson had already expressed her fear of appellant and mortification over what he had done to her family. The state had an important interest in ensuring that appellant was not threatening or intimidating Jackson.

Furthermore, the letters were voluntarily written and no threat or coercion was used to obtain them–appellant handed the unsealed letters to Knable and asked him to mail them. The letters came into the possession of the officials under an established practice, which was reasonably designed to promote discipline. Under these conditions, there was not an unreasonable search and seizure in violation of appellant's constitutional rights or an infringement on appellant's First Amendment rights. *Stroud v. United States* (1919), 251 U.S. 15, 21, 40 S.Ct. 50, 64 L.Ed. 103. Appellant's sixteenth proposition of law is rejected.

(*Loza*, 71 Ohio St. 3d at 77; App. Vol. III, at 1242-43.)

Petitioner asserts that the Ohio Supreme Court did not identify or apply the controlling federal standard, to wit: *Turner v. Safley*. (Doc. # 70, at 70-71.) That being so, Petitioner reasons, the AEDPA standard of review does not constrict this Court's determination of the merits of Petitioner's claim. Petitioner argues in the alternative that the Ohio Supreme Court's decision unreasonably applied *Turner v. Safley* by focusing on the actions of Butler County officials charged with prosecuting Petitioner rather than Warren County prison officials charged with protecting Dorothy Jackson. Finally, Petitioner also disputes Respondent's assertion that *Stone v. Powell* erects a blanket prohibition against consideration by federal habeas corpus courts of claimed Fourth Amendment violations.

For the reasons discussed more fully in denying Petitioner's twelfth and fourteenth grounds for relief, this Court concludes that review of Petitioner's eighteenth ground for relief is barred by *Stone v. Powell*. Ohio, by providing for the filing of a pretrial motion to suppress and the opportunity to take a direct appeal from any ruling denying a motion to suppress, has in place a state procedural mechanism that presents the opportunity for full and fair litigation of a Fourth Amendment claim. *Riley v. Gray*, 674 F.2d at 526; *see also Harding v. Russell*, 156 F. App'x at 745; *Seymour v. Walker*, 224 F.3d 542, 553 (6th Cir. 2000). Further, this Court is not persuaded that Petitioner's presentation of his Fourth Amendment claim was frustrated by any failure of Ohio's procedural mechanism.

Alternatively, this Court is of the view that Petitioner's claim–including both the First Amendment and Fourth Amendment components–is without merit. Case law certainly supports Petitioner's position that prisoners do not forfeit all constitutional rights by virtue of their confinement. *See, e.g., Bell v. Wolfish*, 441 U.S. 520, 545 (1979); *Turner v. Safley*, 482 U.S. 78,

175

84 (1987); *Flagner v. Wilkinson*, 241 F.3d 475, 481 (6th Cir. 2001). In the instant case, however, this Court agrees with the Ohio Supreme Court that there existed a legitimate penalogical interest for seizing and reading the three letters that Petitioner wrote. Regardless of whether it was Butler County jail officials, Warren County jail officials, or Detective Knabel who read and copied Petitioner's outgoing letters, Petitioner was attempting to contact a material witness and relative of the four victims. And detectives had reason to believe that Petitioner would seek to do so. Further, notwithstanding Petitioner's claimed inability to find envelopes and stamps for his letters, it is nonetheless difficult to say that he had a reasonable expectation of privacy regarding three unsealed letters that he handed over to a law enforcement officer, even if Petitioner did not technically give that officer consent to read the letters. Finally, the Court is not persuaded that the seizure of Petitioner's outgoing letters violated his First Amendment rights sufficient to warrant habeas corpus relief. *See, e.g., Busby v. Dretke*, 359 F.3d 708, 721-22 (5th Cir. 2004). Thus, the record does not support Petitioner's claimed First or Fourth Amendment violations.

For the foregoing reasons, Petitioner's eighteenth ground for relief is **DENIED** primarily pursuant to *Stone v. Powell* and alternatively as without merit.

> **Twentieth Ground for Relief: The trial court erred by allowing the admission of irrelevant and inflammatory materials that impacted on the culpability and penalty phases in deprivation of Petitioner's rights as guaranteed by the Sixth, Eighth, and Fourteenth Amendments.**[10]

In his twentieth ground for relief, Petitioner argues that his constitutional rights to a fair trial and sentencing hearing were violated by the admission of evidence of unproven criminal acts that he was alleged to have committed and that were unconnected and irrelevant to the

---

[10]     In its June 11, 2002 *Opinion and Order*, the Court denied Petitioner's nineteenth ground for relief as procedurally defaulted. (Doc. # 56, at 49-57.)

176

aggravated murder charges for which Petitioner was tried. (Petition, Doc. # 6, at ¶¶ 246-257 [except paragraph 252, concerning Petitioner's alleged assault of a man in California, which is barred by procedural default].) "Among these adduced acts," Petitioner explains, "were Loza's supposed involvement in a drive-by shooting in California, his juvenile arrests, his activities in a gang in California, and his participation in the assault of a man in California." (*Id*. at ¶ 247.) Petitioner argues that the other act evidence was particularly prejudicial and that its introduction at trial was in violation of Ohio R. Evid. 404(B).

In his memorandum in support, Petitioner provides additional citations in support of his argument that the admission of prejudicial other acts evidence in his case requires reversal of his convictions and death sentences. (Doc. # 62, at 117-121.) In addition to reiterating the evidence of unproven criminal acts allegedly committed by Petitioner that the State presented at trial, Petitioner adds an allegation that the prosecutor knowingly presented false evidence suggesting that Petitioner was involved not only in a drive-by shooting but also heavily involved in gang activities. (*Id*. at 118 n.38.) Petitioner notes cases in which courts have recognized the particular prejudice that a defendant might suffer from allegations of being linked to a gang. Petitioner goes on to point out that the Sixth Circuit has recognized prosecutorial misconduct when a prosecutor dwells on an accused's bad character. (*Id*. at 120.) Finally, Petitioner asserts that the trial court's admonition to the jury to ignore the prejudicial other acts evidence did not cure the error.

Respondent asserts that Petitioner's twentieth ground for relief is not actionable in federal habeas corpus. (Doc. # 67, at 78-80.) Specifically, Respondent argues that it was not error to admit Petitioner's confession, during which his alleged involvement in a drive-by shooting was

177

discussed, that any prejudice that Petitioner suffered by the admission of evidence of other criminal acts was remedied by the trial court's curative instruction, and that Petitioner accordingly cannot demonstrate that he was denied a fundamentally fair trial sufficient to warrant habeas corpus relief. Respondent notes that the Ohio Supreme Court rejected Petitioner's claim on direct appeal.

In his reply, Petitioner states that he "rests on his briefing as contained in the Petitioner's merit brief." (Doc. # 70, at 71.)

As Respondent notes, the Ohio Supreme Court considered Petitioner's claim on the merits and rejected it as follows:

> In his thirteenth proposition of law, appellant challenges the introduction of evidence relating to his alleged involvement in the following unrelated criminal acts: a drive-by shooting in California, his juvenile arrest, gang-related activities, and participation in the assault of a man in California.
>
> Generally, evidence of the bad character of a witness is inadmissible. Evid.R. 404(B) provides:
>
> "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. See, also, R.C. 2945.59.
>
> Appellant failed to object to much of the evidence, which waives all but plain error. *State v. Landrum* (1990), 53 Ohio St.3d 107, 111, 559 N.E.2d 710, 717. "The failure to object has been held to constitute a waiver of the error and to preclude its consideration upon appeal, for, absent an objection, the trial judge is denied an opportunity to give corrective instructions as to the error." *State v. Wade* (1978), 53 Ohio St.2d 182, 188, 7 O.O.3d 362, 365, 373 N.E.2d 1244, 1248. Concerning the items to which Loza did object, the trial judge gave a curative instruction to the jury that it was to disregard the statements relating to the drive-by shooting, the juvenile arrest and gang involvement. A jury is presumed to follow the instructions given to it by the trial judge. *State v. Henderson, supra* 39 Ohio St.3d at 33, 528 N.E.2d at 1246, citing *Parker v.*

*Randolph* (1979), 442 U.S. 62, 99 S.Ct. 2132, 60 L.Ed.2d 713. Furthermore, evidence admitted at trial refuted the appellant's involvement in the drive-by shooting. Appellant denied any involvement in the drive-by shooting in his confession, and Knable testified that he did not find any connection between Loza and the any drive-by shootings in Los Angeles.

In light of the other overwhelming evidence, we find that this testimony did not contribute to appellant's conviction. Therefore, appellant's thirteenth proposition of law is overruled.

(*Loza*, 71 Ohio St. 3d at 74-75; App. Vol. III, at 1240-41.)

As noted above, Petitioner complains of three acts of uncharged criminal activity that were introduced during his trial: (1) his alleged involvement in a drive-by shooting in California; (2) his alleged involvement in gang activity; and (3) his juvenile arrest for automobile theft. Those acts were introduced through the playing of Petitioner's videotaped confession during Detective Knabel's testimony (App. Vol. V, at 2769), through the introduction of and reference to a series of letters that Petitioner had written while incarcerated awaiting trial, introduced as State's Exhibit 18 (App. Vol. V, at 2777), and during the testimony of Detective Duvelius (App. Vol. V, at 2870-71). After the videotaped confession was made, the trial court of its own volition admonished the jury to disregard the reference that had been made to Petitioner's juvenile record:

THE COURT: Ladies and gentlemen, during the course of this tape, reference was made to a juvenile offense which the Defendant referred to. You are to disregard, put out of your minds as if you had never heard that; that is, you are to disregard any reference to juvenile offenses allegedly or purportedly committed by this Defendant. To disregard that, you must treat that as if you had never heard it.

(App. Vol. V, at 2774.) Later, Detective Duvelius made reference during his testimony on direct examination to material that had been found indicating that there may have been a shooting in the

State of California, at which point defense counsel approached the bench and requested a mistrial. (*Id*. at 2869.) After expressing its displeasure that the prosecution had failed to direct its witness not to mention such matters, the trial court proceeded to give another curative instruction: "Ladies and gentlemen, you will disregard the statement of the witness respecting any occurrences in California." (*Id*. at 2871.)

It is well settled that federal habeas corpus review of state court evidentiary rulings is extremely limited. *See, e.g., Waters v. Kassulke*, 916 F.2d 329, 335 (6th Cir. 1990). In order for a state court evidentiary ruling to rise to the level of a constitutional violation, it must appear that the ruling violated a bedrock principle of justice sufficient to deprive the defendant of a fundamentally fair trial. *Bey v. Bagley*, 500 F.3d 514, 519 (6th Cir. 2007); *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000); *Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348, 1354 (6th Cir. 1993). Federal habeas corpus review of state court evidentiary rulings is further conscripted by the AEDPA's standard of review. In addition to satisfying the stringent standard set forth above, the petitioner must demonstrate that the state courts' decision finding no error in the state court evidentiary ruling contravened or unreasonably applied clearly established Supreme Court precedent. *Bey*, 500 F.3d at 521-22. It is that much more difficult for the petitioner to satisfy these stringent burdens when, as here, the trial court gave a curative instruction cautioning the jury to disregard any improper reference to prior bad acts on the part of the defendant. *See, e.g., Doan v. Haviland*, No. 1:00CV727, 2004 WL 5258155, at * 46-47 (S.D. Ohio Dec. 20, 2004).

In the instant case, the Ohio Supreme Court rejected Petitioner's claim, relying on the curative instruction that the trial court gave and the presumption that jurors will follow a trial court's instructions, the fact that evidence was presented refuting Petitioner's involvement in a

drive-by shooting in California–namely, Petitioner's own denial, as well as Detective Knabel's

testimony that he found no evidence linking Petitioner to a drive-by shooting in California–and

the other overwhelming evidence of Petitioner's guilt. Having reviewed the transcript, this Court

cannot disagree with, much less find unreasonable, the Ohio Supreme Court's reasoning. The

references to uncharged criminal or bad acts, however inappropriate under Ohio R. Evid. 404(B),

were fairly isolated relative to the other evidence presented against Petitioner. The trial court

gave a forceful, unambiguous instruction directing the jury to disregard that evidence. In

Petitioner's videotaped confession, when detectives asked him about the alleged drive-by

shooting referenced in the letter that they had found in Gary Hoertt's business dumpster,

Petitioner denied any involvement or knowledge of the shooting and Detective Knabel admitted

during his trial testimony that he had looked into the matter and had never found any evidence

linking Petitioner to a drive-by shooting. (App. Vol. V, at 2795-96.) In light of the foregoing,

the Court cannot find that Petitioner's twentieth ground for relief warrants habeas corpus relief

because the Court cannot find that the Ohio Supreme Court's decision rejecting this claim

contravened or unreasonably applied controlling Supreme Court precedent. For the foregoing

reasons, Petitioner's twentieth ground for relief is **DENIED**.

> **Twenty-First Ground for Relief: The trial court erred by allowing the
> admission of irrelevant and inflammatory gruesome materials that impacted
> on the culpability and penalty phases in deprivation of Petitioner's rights as
> guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United
> States Constitution.**

In his twenty-first ground for relief, Petitioner asserts that the admission of certain

inflammatory materials–photographs of the victims and a videotape of the crime scene–tainted

his convictions and sentences and requires habeas corpus relief. (Petition, Doc. # 6, at ¶¶ 258-

181

262.) In his memorandum in support, Petitioner expressly withdraws this claim. (Doc. # 62, at 121-22.) Accordingly, Petitioner's twenty-first ground for relief is **DENIED**.

> **Twenty-Second Ground for Relief: The trial court erred in replaying the entire videotape statement during the jury's deliberations without first inquiring of the jury why the statement needed to be replayed and instructing the jury not to overemphasize the statement thereby depriving Petitioner of his rights as guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

Petitioner argues in his twenty-second ground for relief that it was error for the trial court to allow the jury to reply Petitioner's videotaped confession during guilt phase deliberations without inquiring as to why the jury felt it was necessary. (Petition, Doc. # 6, at ¶¶ 263-280.) In his memorandum in support, Petitioner expressly withdraws this claim. (Doc. # 62, at 122.) Accordingly, Petitioner's twenty-second ground for relief is **DENIED**.

> **Twenty-Third Ground for Relief: Petitioner was denied his right to the effective assistance of counsel as guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

>> **1. Failure to object to the opinion testimony of questioned document examiner Stephen Greene.**

>> **2. Failure to object to all irrelevant and unproven other criminal acts admitted against Petitioner.**

>> **3. Failure to object to all gruesome photographs.**

>> **4. Failure to object to juror Nevaline Halcomb serving on Loza's jury.**

>> **5. Failure to object to letters written by Loza being admitted into evidence.**

>> **6. Failure to request a *voir dire* of juror Zecher.**

>> **7. Failure to object to definition of reasonable doubt used in the trial court's instructions.**

**8. Failure to object to the improper standard used by the trial court in overruling the motion to suppress.**

**9. Failure to object to the insufficient factual findings made by the trial court on the motion to suppress.**

**10. Failure to object to the trial court's reference to punishment at the guilt phase.**

**11. Failure to object to the trial court's failure to instruct on one of the offenses in Ohio Rev. Code Ann. Section 2929.04(A)(3) specification.**

**12. Failure to object to the issue of future dangerousness introduced at the penalty phase.**

**13. Failure to object to the admission of statements by Loza during custodial interrogation without Loza having first been warned pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966).**

**14. Failure to move for acquittal on the basis of insufficient scientific evidence, Dorothy Jackson's legally insufficient testimony, Loza's lack of detailed information about the crimes, and because Loza's affirmative defense to the child stealing death specification was met.**

**15. Failure to object to the prosecutorial misconduct at the penalty phase.**

In his twenty-third ground for relief, Petitioner summarily raises fifteen instances of ineffective assistance of trial counsel for the failure to make certain objections. (Petition, Doc. # 6, at ¶¶ 281-285.) In his memorandum in support, Petitioner pares down the list of counsel's errors from the fifteen above to the nine below:

**1. Failed to object to all irrelevant and unproven other criminal acts admitted against Petitioner, see Twentieth Ground for Relief.**

**2. Failed to object to jur[or] Nevaline Halcomb serving on Petitioner's jury; see Fifteenth Ground for Relief.**

183

3. Failed to object to letters written by Petitioner, State's Exhibit 18-E, being admitted into evidence, see Eighteenth Ground for Relief.

4. Failed to request a voir dire of juror Zecher, see Sixteenth Ground for Relief.

5. Failed to object to definition of reasonable doubt used in the trial court's instructions, see Eleventh Ground for Relief.

6. Failed to object to the issue of future dangerousness introduced at the penalty phase see Twenty-Fifth Ground for Relief.

7. Failed to object to the admission of statements by Petitioner during custodial interrogation without Petitioner having first been warned pursuant to Miranda v. Arizona, 384 U.S. 436 (1966), see Thirteenth Ground for Relief.

8. Failed to move for acquittal on the basis of insufficient scientific evidence, Dorothy Jackson's legally insufficient testimony, Petitioner's lack of detailed information about the crimes and because Petitioner's affirmative defense to the child stealing death specification was met.

9. Failed to object to prosecutorial misconduct at the penalty phase, see Twenty-Sixth Ground for Relief.

(Doc. # 62, at 122-23.)

In her return of writ, Respondent argues that Petitioner's claim is meritless. (Doc. # 67, at 45-50.) Noting that the Ohio Supreme Court rejected Petitioner's claim on direct appeal, Respondent asserts that Petitioner can satisfy neither the deficient performance nor the prejudice components of *Strickland v. Washington*. Respondent states that trial counsel is not required to interpose futile objections to every possible issue that subsequent counsel might raise. Respondent further asserts as to Petitioner's case that even assuming the trial court would have sustained any of the omitted objections set forth above, it would have had no effect on the

outcome of Petitioner's trial.  Respondent goes on to address each sub-part set forth above,

pointing out why none is meritorious.

In his reply, Petitioner notes that the allegations of ineffective assistance that he raises

relate to habeas corpus grounds that he also raises and states that he incorporates the briefing on

those grounds and rests on his briefing as contained in his previous pleadings.  (Doc. # 70, at 72.)

As Respondent notes, Petitioner raised these ineffectiveness assistance allegations on

direct appeal.  The Ohio Supreme Court rejected them as follows:

> In proposition twenty-seven, appellant claims that he was denied effective
> assistance of counsel.
>
> A reversal based upon a claim of ineffective assistance of counsel requires
> the defendant to show, first, that counsel's performance was deficient and, second,
> that the deficient performance prejudiced his defense so as to deprive him of a fair
> trial. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064,
> 80 L.Ed.2d 674, 693.  The proper standard for judging attorney performance is
> whether the attorney provided reasonably effective assistance, considering all the
> circumstances.  When a convicted defendant complains of the ineffectiveness of
> counsel's assistance, the defendant must show that counsel's representation fell
> below an objective standard of reasonableness.  *Id*. at 687-688, 104 S.Ct. at 2064,
> 80 L.Ed.2d at 693.  The ultimate focus must be on the fundamental fairness of the
> proceeding that is being challenged.  *Id*. at 696, 104 S.Ct. at 2069, 80 L.Ed.2d at
> 699.  If it is easier to dispose of an ineffectiveness claim on the ground of lack of
> sufficient prejudice, that course should be followed.  *Id*. at 697, 104 S.Ct. at 2069,
> 80 L.Ed.2d at 699.  With regard to the required showing of prejudice, the proper
> standard requires the defendant to show that there is a reasonable probability that,
> but for counsel's unprofessional errors, the result of the proceeding would have
> been different.  *Id*. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698.
>
> Even though defense counsel did not raise at trial the issues in
> propositions of law three, seven through nine, eleven through eighteen, twenty and
> twenty-one, twenty-eighth, and thirty-one, defense counsel's performance did not
> fall below an objective standard of reasonableness.  Furthermore, Loza does not
> demonstrate that there is a reasonable probability that, but for the alleged errors,
> the result of the proceeding would have been different.  Appellant's ineffective
> assistance of counsel claim is overruled.

(*Loza*, 71 Ohio St. 3d at 83-84; App. Vol. III, at 1246-47.)

This Court's inquiry is limited to whether the result of the Ohio Supreme Court's decision contravened or unreasonably applied clearly established United States Supreme Court precedent. Scrutiny of defense counsel's performance must be "highly deferential." *Id*. at 689. With respect to the first prong of the *Strickland* test, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. To establish the second prong of the *Strickland* test, prejudice, a petitioner must demonstrate that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. *Id*. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. Because Petitioner must satisfy both prongs of the *Strickland* test to demonstrate ineffective assistance of counsel, should the court determine that Petitioner has failed to satisfy one prong, it need not consider the other. *Id*. at 697.

The Court is not persuaded that the Ohio Supreme Court's decision rejecting Petitioner's ineffective assistance claims ran afoul of United States Supreme Court precedent. With the exception of sub-parts three, this Court has squarely considered and rejected either the claimed instances of trial counsel ineffectiveness themselves or the underlying errors forming the basis of the claimed instances of trial counsel ineffectiveness. For the reasons that follow, therefore, Petitioner has not demonstrated that his trial counsel performed deficiently and to his prejudice and this Court is not persuaded that the Ohio Supreme Court's decision violated the strictures of the AEDPA.

186

In the first sub-part, Petitioner challenges the failure of his trial counsel to object to all irrelevant and unproven other criminal acts admitted against Petitioner. In addressing Petitioner's twentieth ground for relief, this Court found no constitutional error in the (errant) introduction of evidence concerning Petitioner's alleged involvement in a drive-by shooting in California, Petitioner's alleged involvement in gang activity, or Petitioner's juvenile arrest for automobile theft. Accordingly, Petitioner cannot show that his trial attorneys performed deficiently and to his prejudice in connection with the introduction of that evidence. As to evidence of Petitioner's alleged assault of a man in California, this Court concluded in its June 11, 2002 *Opinion and Order* that that claim was indeed waived due to counsel's failure to object. In so holding, however, the Court expressly considered and rejected trial counsel ineffectiveness as cause and prejudice to excuse the default. (Doc. # 56, at 59-61.) Thus, the first sub-part of Petitioner's twenty-third ground for relief is without merit.

In the second sub-part, Petitioner challenges the failure of his trial counsel to object to juror Nevaline Halcomb serving on Petitioner's jury. In addressing Petitioner's fifteenth ground for relief, however, this Court found no error because the individual voir dire of Halcomb, read in its entirety, does not support a finding that Halcomb misunderstood the jury's role in the sentencing process. That being so, Petitioner cannot demonstrate either deficient performance or prejudice in connection with Nevaline Halcomb serving on the jury. The second sub-part of Petitioner's twenty-third ground for relief is without merit.

In the third sub-part, Petitioner challenges the failure of his trial counsel to object to the admission of letters written by Petitioner from prison and seized, read, and copied by the State. Petitioner challenged the admission of those letter in his eighteenth ground for relief. Although

187

the Court rejected that claim primarily because of the limits that *Stone v. Powell* places upon

habeas corpus review of claimed Fourth Amendment violations, the Court also remarked that it

was of the view that there was a legitimate penalogical interest for Detective Knabel seizing

Petitioner's letters and that Petitioner could not have had a reasonable expectation of privacy

when he handed the unsealed letters to Detective Knabel. The Court is not persuaded, therefore,

that Petitioner can demonstrate deficient performance or prejudice stemming from counsel's

failure to block admission of the letters. The third sub-part of Petitioner's twenty-third ground

for relief is without merit.

In the fourth sub-part, Petitioner challenges the failure of his trial counsel to request a

voir dire of juror Zecher. Petitioner challenged the failure of the trial court and trial counsel to

voir dire juror Martha Zecher about her ability to be impartial in his sixteenth ground for relief.

After jury selection but before the trial commenced, Zecher passed a note to the trial court's

bailiff indicating that her husband was displeased about her selection and wanted her to be

excused. The Court found no error because there was no evidence at any time during or after the

trial from Zecher or any juror who served with her that Ms. Zecher's service was distracted, that

her impartiality was compromised, or that her verdict was improperly influenced. In view of that

determination, Petitioner cannot demonstrate deficient performance or prejudice stemming from

the failure of trial counsel to request a voir dire of Zecher. The fourth sub-part of Petitioner's

twenty-third ground for relief is without merit.

In the fifth sub-part, Petitioner challenges the failure of his trial counsel to object to the

trial court giving Ohio's statutorily defined "reasonable doubt" instruction. Petitioner challenged

the instruction in his eleventh ground for relief. The Court rejected his claim on the basis that it

was foreclosed by Sixth Circuit precedent and that Ohio's "reasonable doubt" instruction did not appear to run afoul of any United States Supreme Court decision. That being so, Petitioner cannot demonstrate that counsel performed deficiently or to Petitioner's prejudice in failing to object to an instruction that is defined by state statute and has been repeatedly approved by the Sixth Circuit. The fifth sub-part of Petitioner's twenty-third ground for relief is without merit.

In the sixth sub-part, Petitioner challenges the failure of his trial counsel to object to the issue of Petitioner's future dangerousness being introduced during the penalty phase. Petitioner challenges the admission of evidence of future dangerousness in his twenty-fifth ground for relief below. As the Court explains more fully below, the record contains no evidence that the Ohio Supreme Court (or for that matter the trial court in its separate sentencing opinion or the intermediate appellate court during its independent review) relied upon or even considered Petitioner's future dangerousness or lack of remorse in its independent reweighing of the aggravating circumstances and mitigating factors. That being so, Petitioner cannot demonstrate deficient performance or prejudice from the failure of his trial counsel to object to the issue. The sixth sub-part of Petitioner's twenty-third ground for relief is without merit.

In the seventh sub-part, Petitioner challenges the failure of his counsel to object to the admission of un-*Mirandized* statements made by Petitioner during an alleged custodial interrogation. Petitioner challenged the admission of those statements in his thirteenth ground for relief, arguing specifically that Detective Knabel violated Petitioner's Fifth and Fourteenth Amendment rights by questioning Petitioner in the back of Knabel's cruiser without first advising Petitioner of his *Miranda* rights. The Court rejected that claim, concluding that Detective Knabel's detention of Petitioner was a *Terry*-type stop, supported by reasonable

189

suspicion that criminal activity was afoot, and that Detective Knabel proceeded to ask no more than routine booking questions that did not require *Miranda* warnings. Thus, Petitioner cannot demonstrate deficient performance or prejudice in connection with the failure of trial counsel to object to the admission of the statements that Petitioner made to Detective Knabel. The seventh sub-part of Petitioner's twenty-third ground for relief is without merit.

In the eighth sub-part, Petitioner challenges the failure of his trial counsel to move for acquittal on the basis of insufficient scientific evidence, Dorothy Jackson's legally insufficient testimony, Petitioner's lack of detailed information about the crimes, and Petitioner's affirmative defense to the child stealing death specification. In addressing the sufficiency of the evidence challenge set forth in Petitioner's sixth ground for relief, this Court considered and rejected each of Petitioner's arguments. That being so, the Court cannot find that counsel performed deficiently and to Petitioner's prejudice in failing to make an objection on which, in this Court's view, counsel had virtually no chance of prevailing. The eighth sub-part of Petitioner's twenty-third ground for relief is without merit.

Finally, in the ninth sub-part, Petitioner challenges the failure of his trial counsel to object to penalty phase prosecutorial misconduct. Petitioner challenged that prosecutorial misconduct in his twenty-sixth ground for relief, which this Court in its June 11, 2002 *Opinion and Order* found to be procedurally defaulted due to counsel's failure to object. In so finding, this Court expressly considered and rejected Petitioner's claim that trial counsel were ineffective sufficient to excuse the procedural default. (Doc. # 56, at 63-67.) The Court having already considered and rejected this claim of trial counsel ineffectiveness, the ninth sub-part of Petitioner's twenty-third ground for relief is without merit.

For the foregoing reasons, Petitioner's twenty-third ground for relief is **DENIED**.

**Twenty-Fourth Ground for Relief: The presentation by the State of materially false evidence deprived Petitioner of his rights as guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

Petitioner argues in his twenty-fourth ground for relief that it was Dorothy Jackson who confessed to Petitioner that she had committed the murders and that Jackson testified falsely when she testified that Petitioner had confessed to the murders. (Petition, Doc. # 6, at ¶¶ 286-288.) Thus, Petitioner emphasizes, he stands convicted and sentenced to death on the basis of materially false testimony in violation of his rights to a fundamentally fair trial and reliable sentencing determination, to be free from cruel and unusual punishment, and to due process.

In his memorandum in support, Petitioner continues to argue that the prosecution's use of false testimony requires that Petitioner be given a new trial. (Doc. # 62, at 123-127.) Petitioner claims that the prosecution was actually in possession of a report substantiating his claim that it was Dorothy Jackson who committed the murders and testified falsely that Petitioner had confessed to the murders. Petitioner thus argues that the prosecution allowed false testimony to go uncorrected in postconviction and may even have committed a *Brady* violation. Petitioner also submits that the prosecution relied heavily on Jackson's testimony, despite being in possession of mental health evaluations documenting Jackson's evasiveness in response to questions about the murders and marginal cooperation in response to test stimuli. Those evaluations, Petitioner notes, reveal that Jackson was borderline mentally retarded and possessed personality features indicating lack of respect for social standards, a propensity for conflicts with social systems around her and the criminal justice system, and insincere feelings of guilt and

191

remorse. Petitioner emphasizes that he averred in his postconviction affidavit that it was Jackson who had confessed to him that she had committed the murders, that independent evidence exists corroborating her culpability, and that significant evidence exists to undermine the veracity of his confession. Asserting that Jackson was not believable, that any reasonable prosecutor would have known as much, and that the prosecutors in this case perpetuated a fraud on the courts when they obtained actual knowledge of Jackson's dishonesty, Petitioner urges this Court to award him a new trial or alternatively to require a new post-conviction proceeding.

Relying on the state courts' rejection of Petitioner's claim in postconviction, Respondent raises a number of arguments against Petitioner's claim. (Doc. # 67, at 81-85.) Concerning Exhibit E–an April 1, 1992 report by social worker Janet Dickens stating that Dorothy Jackson's foster mother told Dickens that the foster mother's grandson David told the foster mother that Jackson told David that she (Jackson) had killed her mother–respondent argues that the statement in Exhibit E is triple hearsay, inherently unreliable, and almost certainly inadmissible. Respondent also asserts that the exhibit cannot implicate *Brady* because it is dated more than five months after Petitioner's October 1991 trial. "Furthermore," Respondent notes, "both prosecutors when asked about the social worker's report stated during depositions that they had never seen the social worker's report." (*Id.* at 82.) Respondent goes on to argue that the state courts' dismissal of Petitioner's false evidence claim is supported by federal law and is not based upon an unreasonable determination of the facts in light of the evidence presented, namely because the exhibit upon which Petitioner relies does not set forth operative facts demonstrating that Jackson testified falsely. To the extent that the exhibit attempts to raise a claim of actual innocence, Respondent argues that claims of actual innocence are not actionable constitutional

192

deprivations. Regarding Petitioner's argument that Jackson's statements and testimony were always replete with inconsistencies, thereby indicating her untruthfulness, Respondent argues that the only inconsistent statement cited by Petitioner concerns whether it was Jackson or Petitioner who threw the slipper used to muffle the gunshots on to the roof of the bus station. (Jackson testified before the grand jury that she had thrown the slipper on to the roof and testified thereafter that it was Petitioner who had thrown the slipper on to the roof.) Respondent offers as possible explanations for Jackson's inconsistent statements concerning the slipper that Jackson's memory of the events may have changed and that Jackson was under great stress. Respondent also notes that defense counsel had had significant opportunities to cross-examine Jackson about the inconsistency. Respondent goes on to assert that the record contains numerous examples of Jackson making consistent statements through the proceedings. Finally, Respondent questions not only the relevance of Jackson's psychological evaluations (Rule 7 motion exhibits C and D) but also the appropriateness of this Court even considering them.

Petitioner presented the essence of this claim to the state courts in postconviction, albeit as two distinct claims. In the eighth claim for relief of his postconviction action, Petitioner alleged:

> Petitioner Loza's convictions and/or sentences are void or voidable because Mr. Loza is actually innocent of the crime of aggravated murder in the deaths of Georgia Davis, Cheryl Senteno, Gary Mullins and Jerri Luanna Jackson. Exhibits 14 and 15. Although Mr. Loza sought to protect Dorothy Jackson at trial, letters which Mr. Loza wrote to Ms. Jackson shortly thereafter show that he acknowledged her involvement in the murders. Exhibit 15. These letters also provide evidence of Loza's motivation for confessing. Furthermore, Jose's confession was the result of coercion. Exhibits 1 and 9.

(App. Vol. III, at 1426.) In the twelfth claim for relief in his postconviction action, Petitioner

alleged:

> Petitioner Loza's convictions and/or sentences are void or voidable because the State of Ohio used inaccurate and/or false testimony to convict Petitioner Loza and sentence him to death. Witness Dorothy Jackson testified at trial that Mr. Loza confessed to her that he killed her family. Evidence dehors the record shows that it was Jackson who confessed to Loza that she committed the murders on January 16, 1991. Exhibits 14 and 15.

(*Id.* at 1431.)

The last state court to issue a reasoned decision addressing Petitioner's claims, the state

appellate court, rejected the claims as follows:

> In his fifth assignment of error, Loza contends that the trial court erred by denying relief where the prosecutor used false evidence to obtain his conviction. In particular, Loza claims that Jackson falsely testified that Loza confessed to her that he killed Jackson's family. In support of his claim, Loza submitted his own affidavit where he denied committing the murders. In addition, Loza submitted copies of several letters that he wrote to Jackson after his trial and conviction. In the letters, Loza indicates that he did not commit the murders.
>
> Failure of a prosecutor to correct testimony, which he knows to be false, denies a criminal defendant due process of law. Moore v. Illinois (1972), 408 U.S. 798, 92 S.Ct. 2562; Napue v. Illinois (1959), 360 U.S. 264, 79 S.Ct. 1173. Loza's affidavit and letters are conclusory and self-serving materials that do not set forth operative facts which demonstrate that Jackson testified falsely. Further, Loza has provided absolutely no evidence that the prosecution knowingly used false evidence to obtain his conviction. Therefore, since Loza failed to submit evidentiary materials setting forth sufficient operative facts to demonstrate substantive grounds for relief, the trial court properly dismissed this claim for relief without a hearing. See Jackson, 64 Ohio St.2d at 110. Accordingly, Loza's fifth assignment of error is overruled.

> \* \* \*

> In his seventh assignment of error, Loza contends that the trial court erred by dismissing his petition because he submitted evidence of "actual innocence." Loza's evidence of "actual innocence" consists of the affidavit and letters that were discussed with respect to his fifth assignment of error. Loza cites Herrera v.

Collins (1993), 506 U.S. 390, 113 S.Ct. 853, in support of his contention that evidence of "actual innocence" is a constitutional claim that entitles him to postconviction relief.

In Herrera, a majority of Supreme Court Justices, in separately filed opinions both concurring in and dissenting from the Court's decision, indicated that the execution of an innocent person would constitute a violation of rights conferred by the Eighth and Fourteenth Amendments. Herrera, 506 U.S. at 419, 429-436, 113 S.Ct. at 870, 875-878 (O'Connor, J., concurring, joined by Kennedy, J.; White, J., concurring; Blackmun, J., dissenting, joined by Stevens and Souter, JJ.). However, the Supreme Court held that a petitioner was not entitled to federal habeas corpus relief because "a claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional clam considered on the merits." Herrera at 506 U.S. at 404, 113 S.Ct. at 862.

In State v. Campbell (Jan. 8, 1997), Hamilton App. No. C-950746, unreported, the First District Court of Appeals interpreted the Supreme Court's holding in Herrera and held that a claim of "actual innocence" based on newly discovered evidence does not constitute a substantive ground for postconviction relief. The First District reasoned that a petitioner was not entitled to postconviction relief unless he showed a violation of rights that were constitutional in dimension, which occurred at the time that the petitioner was tried and convicted. Campbell at 6, citing Powell, 90 Ohio App.3d at 264. The First District then concluded that the petitioner was not entitled to postconviction relief because actual innocence "does not, standing alone, demonstrate a constitutional violation in the proceedings that actually resulted in the conviction." Campbell at 8.

We agree with the reasoning of the First District and find that Loza's claim of "actual innocence" does not constitute a substantive ground for postconviction relief. Additionally, we note that Loza's self-serving affidavit and letters are conclusory and do not set forth any operative facts that demonstrate his "actual innocence." Accordingly, the trial court properly dismissed ths claim for relief without a hearing and Loza's seventh assignment of error is overruled.

(App. Vol. IV, at 2006-2008.)

In his reply brief, Petitioner states that:

[i]n assessing this claim, it is important for this Court to consider four significant facts that frame the issue:

1. Petitioner was described as the "wetback from California" by the lead detective; thus race was a significant factor in the investigation and prosecution of Petitioner;

2. The trial prosecutor testified in his deposition that he had never heard of the United States Supreme Court decisions of Napue and Gigglio; (Powers Deposition p. 56);

3. Both Powers and Eichel identified the Butler County Prosecutor's received date stamp (dated June 2, 1992) of Dorothy's admission; (Powers Deposition p. 48); (Eichel Deposition p. 33);

4. Powers volunteered in his deposition that he "didn't know if [his case theory (premised upon Dorothy and Jose)] was true or it wasn't true." (Eichel Deposition p. 33).

(Doc. # 70, at 72-73.) Petitioner argues that Respondent ignored the admissions made by the Butler County prosecutors that Dorothy Jackson's purported confession was exculpatory to Petitioner and that the prosecutors' admissions bind Respondent.

Petitioner goes on to assert, concerning Respondent's argument that claims of actual innocence are not actionable in habeas corpus, "that a majority of the Supreme Court Justices recognize the claim." (*Id*. (citing *Herrera v. Collins*, 506 U.S. 390, 419 (1993)).) Petitioner further argues that the state courts did not adjudicate the "actual innocence" component of Petitioner's claim on the merits and that as a result, this Court must review the claim de novo. Regarding Respondent's challenge to the relevance of psychological evaluations of Dorothy Jackson, Petitioner asserts that it is "ridiculous" as a matter of common psychological practice to dismiss the evaluations simply because they post-dated the trial. Petitioner also asserts that the evaluations are relevant because they "document that Dorothy had significant intellectual and psychological shortcomings – which provides a profile for an individual capable of killing." (*Id*. at 77.)

196

Petitioner concludes by arguing that it is error to rely on the state appellate court's

decision rejecting the "false evidence" component of Petitioner's claim in view of the fact that

"the Butler County Prosecutor's Office manipulated the entirety of the post-conviction

proceedings by misrepresenting the contents of the prosecutor's file." (*Id.*) Petitioner argues that

because the state courts relied on the prosecution's misrepresentation that no new evidence

existed, when the habeas corpus depositions reveal that the prosecutor's office in June 1992

received the social worker report documenting Jackson's purported confession, the state courts'

decisions deserve no deference. Petitioner posits that "[i]f the trial prosecutor entertains doubts

about the theory he presented at trial, and possessed those doubts at the time of trial while

remaining silent, and presented the questionable theory without disclosing those doubts to

defense counsel, the prosecutor violated the Constitution and Petitioner's conviction cannot

stand." (*Id.* at 78.)

The Sixth Circuit has recognized that habeas corpus relief may be warranted where the

State obtains a criminal conviction through the knowing use of perjured testimony or materially

false evidence. *See, e.g., Rosencrantz v. Lafler*, 568 F.3d 577, 583-84 (6th Cir. 2009); *Carter v.

Mitchell*, 443 F.3d 517, 535 (6th Cir. 2006); *Byrd v. Collins*, 209 F.3d 486, 517-18 (6th Cir. 2000).

In the instant case, however, this Court has carefully reviewed the materials to which Petitioner

points and finds within them no credible evidence establishing Petitioner's claim that the

prosecution used materially false evidence to secure Petitioner's convictions and death sentences.

The photocopied letters that Petitioner wrote to Dorothy Jackson from prison lack specific details

implicating Jackson rather than Petitioner for the murders of Jackson's family members. To the

extent that the letters contained cryptic passages suggesting that Jackson was responsible for

197

some or all of the shootings–App. Vol. III, at 1551, 1558, 1562-63, 1569, 1570–those passages are inherently unreliable. They are vague, self-serving, unsworn, and tainted by possible ulterior motives, such as a desire on Petitioner's part to intimidate Jackson or to make Jackson feel grateful to and/or sorry for Petitioner. Similarly, Jackson's alleged admission that she was the one who killed her mother is comes in the form of a single triple hearsay sentence in a social services report. It tests the limits of credulity to suggest that Jackson's alleged admission is more reliable than Petitioner's videotaped, *Mirandized* confession.

To the extent that Petitioner points to psychological evaluations of Dorothy Jackson as evidence that her insincere expressions of remorse, impulsiveness, and inability to conform to rules and social norms reflect the profile of someone capable of killing her family and letting Petitioner take the blame, the Court notes that that is Petitioner's conclusion, not that of any of the evaluators. The psychological evaluations contain no reported admissions by Jackson or conclusions on the part of the evaluators that Jackson may have been responsible for or possessed knowledge in advance of some or all of the shootings.

Finally, the depositions of prosecutors Noah Powers and Daniel Eichel establish that neither recalled having knowledge before or during Petitioner's trial of the social services report containing Jackson's triple hearsay admission to having killed her mother or any other evidence suggesting that Jackson had been responsible for any of the shootings. Powers, when asked whether he had received a report that Dorothy Jackson had made an admission that she had killed her mother, answered "[t]o the best of my recollection, no." (Powers Deposition, at 47.) Powers cautioned, "[t]hat's not to say we didn't receive it. I just don't have any recall about this." (*Id.* at 48.) Powers also averred that had he received the report, he would have disclosed it to

Petitioner's defense counsel. (*Id.* at 49.) Not even Powers' concession that he harbored doubts about whether Jackson had been involved in planning or carrying out the shootings and that he regarded her as "stupid" constitutes evidence that he knowingly used false evidence. (*Id.* at 50.) Assistant Prosecutor Daniel Eichel also denied having ever seen the social services report containing Jackson's admission. (Eichel Deposition, at 33-34.) Even if the depositions supported Petitioner's assertion that the prosecution was careless in investigating Jackson and/or relying upon her as the key witness against Petitioner–a finding this Court is not making–the depositions do not establish that the prosecution knowingly presented or allowed to go uncorrected materially false evidence in securing Petitioner's convictions and death sentences.

For the foregoing reasons, the Court is not persuaded that the state courts' decision rejecting Petitioner's actual innocence/false evidence claims contravened or unreasonably applied clearly established Supreme Court precedent or involved unreasonable factual determinations, the Court cannot find that Petitioner's claim warrants habeas corpus relief. Petitioner's twenty-fourth ground for relief is **DENIED**.

> **Twenty-Fifth Ground for Relief: The jury considered the non-statutory aggravating circumstance of future dangerousness thereby depriving Petitioner of his rights as guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

Petitioner argues that his jury was exposed to prejudicial information at the penalty phase concerning his potential to commit future crimes. (Petition, Doc. # 6, at ¶¶ 289-294.) Petitioner reasons that this error invalidates his death sentences because future dangerousness is not a statutory aggravating circumstance and the constitutional validity of Ohio's capital sentencing scheme is predicated on the guidance of the sentencer's discretion to impose death through the

use of statutory aggravating circumstances. Petitioner argues that, "[w]hen, as here, a non-statutory aggravating factor is introduced which exceeds those limitations, the sentencer's discretion is not properly guided and the risk of arbitrary imposition of the death sentence returns." (Doc. # 6, at ¶ 293.)

Petitioner asserts that there were several instances during the mitigation phase when the jury was exposed to allegations of Petitioner's future dangerousness. Petitioner points to the State's cross-examination of psychologist Dr. Roger Fisher, during which the prosecution asked whether Petitioner would "do it again given the same circumstances," and Dr. Fisher answered, "I am afraid he would." (Doc. # 6, at ¶ 290 (quoting P.T. p. 53).) Petitioner also points to the conclusion of the mitigation phase, when during the replaying, at the prosecution's request, of Petitioner's videotaped confession, detectives asked Petitioner, "You turn all of this around, would you do it again," and Petitioner eventually answered "it [would] still come out to the same thing." (*Id*. (quoting Con.T.p. 118).) Petitioner goes on to note that the prosecution reminded the jury of the previous suggestions of Petitioner's future dangerousness in summarizing the testimony of Dr. Fisher, stating "He told you that the Defendant had no regrets over these deaths, that he would do it again." (*Id*. at ¶ 291 (quoting P.T.p. 123).)

In his memorandum in support, Petitioner adds that the Ohio Supreme Court, in rejecting his claim on direct appeal, failed to consider any federal authority. (Doc. # 62, at 127-129.) Petitioner also asserts that the Ohio Supreme Court was not able to cite to any portion of the record supporting its conclusion that the comments in question were not related to non-statutory aggravating circumstances, but rather related to Petitioner's history, character, and background. Petitioner contends that the Ohio Supreme Court erred in focusing on what the prosecutor had

intended, instead of on what a reasonable juror would have extrapolated from the prosecution's questions and arguments.

In her return of writ (Doc. # 67, at 85-86), Respondent characterizes Petitioner's claim as complaining "that the mitigating factors under Ohio law improperly includes the history, character, and background of the accused." (*Id*. at 85.) Respondent also asserts that because Petitioner's only allegation of a constitutional violation is that the sentencer's discretion was not properly guided, thereby creating a risk of arbitrary imposition of the death penalty, Petitioner's claim must be rejected because "Ohio has complied with the United States Supreme Court precedent in limiting aggravating circumstances, and permitting sentencers to consider the defendant's character, record, and background." (*Id*. at 86 (citing *Lockett v. Ohio*, 438 U.S. 586 (1978); and *Eddings v. Oklahoma*, 455 U.S. 104 (1982)).) Thus, Respondent reasons, the Ohio Supreme Court's decision rejecting Petitioner's claim did not contravene clearly established United States Supreme Court precedent or rely on an unreasonable determination of the facts based on the evidence presented during the state court proceedings, requiring this Court to deny Petitioner's claim as meritless.

In his reply, Petitioner assails Respondent for mischaracterizing Petitioner's claim as one challenging the fact that Ohio law permits consideration of an accused's history, character, and background. (Doc. # 70, at 78-79.) Rather, Petitioner asserts, his claim challenges the prosecution's introduction of a non-statutory aggravating circumstance–namely, Petitioner's future dangerousness. Petitioner argues that the Ohio Supreme Court's decision rejecting this claim failed to correctly identify and apply the controlling legal principle governing Petitioner's alleged error, instead rejecting Petitioner's claim on the basis of the assumption that the

201

prosecutor did not intend the evidence or argument to be construed as a non-statutory aggravating circumstance. Petitioner argues that because of the Ohio Supreme Court's error in this regard, § 2254(d)(1) does not require this Court to defer to the Ohio Supreme Court's decision. Petitioner also argues that the Ohio Supreme Court's decision relied on an unreasonable determination of the facts in violation of § 2254(d)(2) because "[n]owhere in the state court record does it suggest what the prosecutor's subjective intent [was]." (Doc. # 70, at 79.) Petitioner concludes by arguing that his jury considered Petitioner's future dangerousness and lack of remorse, that the error had a substantial and injurious effect on Petitioner's sentence, and that habeas corpus relief should be granted.

The Ohio Supreme Court rejected Petitioner's claim on direct appeal as follows:

> In proposition of law twenty-four, appellant argues that the trial court erred by allowing the prosecutor to inject Loza's future dangerousness into the sentencing proceedings.

> During the sentencing phase, the prosecution asked defense psychologist Dr. Fisher if Loza regretted the offense and if Loza would do it again under the same circumstances. Fisher responded that Loza did not express any regrets over the deaths and that he would commit the offenses again under the same circumstances. The prosecutor also referred to the lack of remorse Loza displayed in his videotaped confession.

> Our review of the record indicates that these comments were not to be interpreted as non-statutory aggravating circumstances, but rather, were related to Loza's "history, character, and background" as specified in R.C. 2929.04(B). The trial court instructed the jury on the statutory aggravating circumstances and mitigating factors only. Appellant's contention is without merit.

(*Loza*, 71 Ohio St. 3d at 81-82; App. Vol. III, at 1245.)

The Court need not address whether or to what extent the Ohio Supreme Court failed to consider or apply clearly established United States Supreme Court precedent or relied on an

unreasonable determination of the facts. To the extent that Petitioner is arguing that the prosecution's presentation of and/or the sentencer's consideration of his future dangerousness and lack of remorse was unconstitutional because those factors were not enumerated statutory aggravating circumstances, his claim is definitively foreclosed by Sixth Circuit precedent. In *Smith v. Mitchell*, 348 F.3d 177, 209-210 (6th Cir. 2004), the Sixth Circuit rejected a claim that the trial court had improperly construed the nature and circumstances of the offense as non-statutory aggravating circumstances, noting, "the Supreme Court has also held that consideration of a non-statutory aggravating circumstance, even if contrary to state law, does not violate the Constitution." The Sixth Circuit reiterated that holding in *Slagle v. Bagley*, 457 F.3d 501, 521 (6th Cir. 2007); *see also Durr v. Mitchell*, 487 F.3d 423, 442 (6th Cir. 2007).

To the extent that Petitioner is arguing that the sentencer's consideration of his future dangerousness and lack of remorse, beyond being an improper because those issues constituted a non-statutory aggravating circumstance, was so prejudicial as to render his death sentence unreliable, his claim falls short because of the Ohio Supreme Court's independent determination of the appropriateness of Petitioner's death sentences. The record contains no evidence that the Ohio Supreme Court relied upon or even considered Petitioner's future dangerousness or lack of remorse in its independent reweighing of the aggravating circumstances and mitigating factors.[11] *See, e.g., White v. Mitchell*, 431 F.3d 517, 535 (6th Cir. 2006) ("even if the trial court did improperly consider future dangerousness, the Ohio Supreme Court undertook an independent

---

[11]    For that matter, there is no evidence that either the trial court in its separate written sentencing opinion or the intermediate appellate court during its independent reweighing relied upon or even considered Petitioner's future dangerousness in concluding that the death penalty was appropriate for him.

203

reweighing of the aggravating and mitigating factors without considering future dangerousness and still concluded that a death sentence was properly imposed upon White"); *Fox v. Coyle*, 271 F.3d 658, 667 (6th Cir. 2002) ("no constitutional claim is stated where a state's highest court either concludes that no extra-statutory factors were considered at the trial level ... or independently reweighs the aggravating and mitigating circumstances without reference to the extra-statutory factor improperly relied upon by the lower state courts...."); *see also Slagle*, 457 F.3d at 521.

For the foregoing reasons, this Court cannot find that the result of the Ohio Supreme Court's decision rejecting Petitioner's claim ran afoul of clearly established United States Supreme Court precedent. That being so, Petitioner's twenty-fifth ground for relief is **DENIED**.

**Twenty-Seventh Ground for Relief: The trial court erroneously failed to give effect to presented mitigating evidence thereby Petitioner of his rights as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution.[12]**

Petitioner takes aim at the following portion of the trial court's separate sentencing opinion, discussing the mitigation evidence that Petitioner had presented:

[A] tragic childhood involving the abandonment of the family by defendant's father and being raised with his three siblings by his mother and grandmother, the surreptitious entry into this country to be supported by his mother's meager earnings as a domestic servant, the handicaps of language, ethnic rejection and poverty, the defendant was pictured as a loving brother, deeply attached to and supportive of his family.

(Petition, Doc. # 6, at ¶ 312 (quoting Tr.Ct.Op. at 5).) Petitioner complains specifically that at the conclusion of that list of mitigating factors, the trial court found the evidence to be "of little

_____

[12]    In its June 11, 2002 *Opinion and Order*, the Court denied Petitioner's twenty-sixth ground for relief as procedurally defaulted. (Doc. # 56, at 61-67.)

relevance to the appropriateness of the death penalty." (*Id.* at ¶ 313.) Petitioner reasons that the trial court confused its duty under O.R.C. § 2929.03(D) to consider the testimony and evidence presented during mitigation with a reviewing court's duty under O.R.C. § 2929.05(A) to determine the appropriateness of the death sentence. In so doing, Petitioner argues, the trial court failed to properly consider and give effect to relevant mitigating evidence in violation of Petitioner's rights under the Eighth and Fourteenth Amendments. (*Id.* at ¶¶ 311-316.) Petitioner asserts that the trial court's error removed from its consideration relevant mitigation evidence, in essence precluding the individualized consideration to which Petitioner was entitled under the Eighth and Fourteenth Amendments.

In his memorandum in support, Petitioner explains in more detail the string of United States Supreme Court's decisions spelling out the Eighth Amendment requirement that the sentencer in a capital case be permitted to consider and give effect to relevant mitigating evidence. (Doc. # 62, at 130-134.) Petitioner points out that, according to the United States Supreme Court, " 'the Constitution limits a State's ability to narrow a sentencer's discretion to consider relevant evidence that might cause it to **decline** to impose the death sentence.' " (Doc. # 62, at 130-31 (quoting *McCleskey v. Kemp*, 481 U.S. 279, 304 (1987) (emphasis added)).)[13] Petitioner emphasizes that it is not enough to simply allow a defendant to present mitigation; rather, the sentencer must be able to consider and give effect to that mitigation.

Petitioner goes on to argue that the Ohio Supreme Court's decision rejecting his claim on direct appeal cannot survive scrutiny under the AEDPA. (Doc. # 62, at 133.) Petitioner contends

---

[13]     Petitioner also cites and discusses in support of this principle *Gregg v. Georgia*, 428 U.S. 153, 188 (1976); *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976); *Lockett v. Ohio*, 438 U.S. 586, 607-608 (1978); and *Eddings v. Oklahoma*, 455 U.S. 104, 113 (1982).

that the Ohio Supreme Court rejected his claim by finding that the trial court had performed a weighing analysis of aggravation against mitigation with which the Ohio Supreme Court agreed. That analysis, Petitioner insists, ignored his argument not that no weighing took place, but that the weighing excluded consideration of mitigating evidence due to the trial court's finding that the evidence was not relevant.

Respondent argues that Petitioner's claim is without merit because the trial court did not fail in its duty imposed by the Eighth and Fourteenth Amendments to consider and give effect to relevant mitigating evidence. (Doc. # 67, at 87-88.) Respondent replies that, under Ohio law, the weight to be given to mitigation evidence is left to the sentencer's discretion. According to Respondent, the trial court in Petitioner's case did not fail to consider the mitigation evidence to which Petitioner points, but rather, gave that evidence less weight than that demanded by Loza. Respondent goes on to argue that even assuming the trial court had rejected the mitigation evidence entirely, no error ensued because the Ohio Supreme Court, through its independent review, cured any alleged error. "The Supreme Court of Ohio's independent review," according to Respondent, "was not contrary to United States Supreme Court precedent nor an unreasonable determination of the facts in light of the evidence presented." (*Id.* at 88.)

In response, Petitioner claims that he has not contested that no weighing took place; rather, he contests that the weighing that did take place excluded the consideration of mitigating evidence due to the trial court's ruling that the evidence was not relevant. (Doc. # 70, at 80-83.) Petitioner argues, as he did in his memorandum in support, that his "case is materially indistinguishable from Eddings, in that both involved the failure of state courts to consider mitigation due to a relevancy ruling." (*Id.* at 80.) Petitioner adds that the failure of the Ohio

206

Supreme Court to consider United States Supreme Court authority removes from this Court's

consideration of his claim any barrier imposed by the AEDPA's § 2254(d) standard of review.

Moreover, according to Petitioner, "the Ohio Supreme Court's failure to give effect to the plain

language of the trial court's opinion is unreasonable pursuant to 28 U.S.C. § 2254(d)(2)." (*Id.* at

81.) Petitioner points out that the trial court treated every other mitigating factor that Petitioner

offered differently than it treated the mitigating factor at issue in this claim. Thus, Petitioner

argues, it was an unreasonable determination of the facts for the Ohio Supreme Court to conclude

that the trial court did consider the mitigation evidence at issue. Concerning Respondent's

argument that any error was cured by the Ohio Supreme Court's independent review, Petitioner

counters that the United States Supreme Court has never advocated nor approved of reweighing

of mitigation by an appellate court when the mitigation was never considered by the sentencer in

the first place.

Section 2929.03(F) of the Ohio Revised Code provides in relevant part that the trial court

in a capital case:

> [W]hen it imposes sentence of death, shall state in a separate opinion its specific
> findings as to the existence of any of the mitigating factors set forth in division
> (B) of section 2929.04 of the Revised Code, the existence of any other mitigating
> factors, the aggravating circumstances the offender was found guilty of
> committing, and the reasons why the aggravating circumstances was found guilty
> of committing were sufficient to outweigh the mitigating factors.***

O.R.C. § 2929.03(F). Concerning the mitigation evidence that Petitioner had presented, the trial

court stated the following in its O.R.C. § 2929.03(F) opinion:

> At the hearing on mitigation, the defendant presented the testimony of his
> mother and two sisters, and a psychologist, Roger Fisher, Ph. D. The defendant
> made no statement.

R.C. Section 2929.04(B) requires the court to consider in mitigation certain factors which the court will now address insofar as the same are pertinent to this case. The mitigating factors are applicable to each of Counts Two, Three and Four.

"Whether the victim of the offense induced or facilitated it." R.C. Section 2929.04(B)(1). The evidence showed that the decedents, who were the mother and siblings of defendant's sixteen-year-old girlfriend, Dorothy Jackson, verbally and physically abused Dorothy because of her pregnancy by and relationship with the defendant. [Fn. 1. The principle antagonist in this regard was Georgia Davis, Dorothy Jackson's mother. With regard to Georgia Davis' killing, the jury found that the aggravating circumstances did not outweigh the mitigating factors beyond a reasonable doubt.] The defendant was enamored of Dorothy and looked forward to the birth of the child. This mitigating factor exists in this case.

"Whether it is unlikely that the offense would have been committed but for the fact that the defendant was under duress, coercion, or strong provocation." R.C. Section 2929.04(B)(2). The evidence was that the defendant, with his background, felt compelled to take drastic action to resolve the animosities which were directed at his girlfriend by her family. This mitigating factor exists to a minimal extent.

"The youth of the defendant." R.C. Section 2929.04(B). The defendant was born June 19, 1972, in Guadalajara, Mexico. He was eighteen years old when he killed his girlfriend's family. This mitigating factor exists in this case.

"The offender's lack of a significant history of prior criminal convictions and delinquency adjudications." R.C. Section 2929.04(B)(5). While there was evidence that the defendant had some connection with a street gang in Los Angeles, his only prior involvement with the criminal justice system was a juvenile theft of property from an automobile. This mitigating factor is also present in this case.

"Any other factors which are relevant to the issue of whether the defendant should be sentenced to death." R.C. Section 2929.04(B)(7). Despite a tragic childhood involving the abandonment of the family by defendant's father and being raised with his three siblings by his mother and grandmother, the surreptitious entry into this country to be supported by his mother's meager earnings as a domestic servant, the handicaps of language, ethnic rejection and poverty, the defendant was pictured as a loving son and brother, deeply attached to and supportive of his family. This is a mitigating factor, but of little relevance with respect to the appropriateness of the death penalty.

This court retains no residual doubt as to the defendant's guilt of the four aggravated murders or the specifications of which the defendant was convicted.

The court has considered, and weighed against the aggravating circumstances proved beyond a reasonable doubt, the nature and circumstances of the offense, the history, character and background of the defendant as revealed by the evidence, all the mitigating factors set forth above, and the arguments of counsel, insofar as the same pertain to each of the counts of the indictment for which the jury recommended the death penalty, i.e., Counts Two, Three and Four. For each of those counts, the court finds that the entirety of the mitigating factors falls short of creating any reasonable doubt that the aggravating circumstances outweigh those mitigating factors. With respect to Counts Two, Three and Four of the indictment, and each of them, it is the conclusion of this court that the aggravating circumstances of which the defendant was found guilty of committing outweigh all the mitigating factors advanced by the defendant, beyond a reasonable doubt.

On November 12, 1991, this court imposed the sentence of death on the defendant, Jose Trinidad Loza, as to each of Counts Two, Three and Four of the indictment in this case.

(App. Vol. I, at 12-15.)

On direct appeal, Petitioner argued as he does herein that the trial court discounted

Petitioner's O.R.C. § 2929.04(B)(7) mitigation evidence on the basis that the evidence was not

relevant to the appropriateness of the death penalty. (App. Vol. II, at 853-855.) The Ohio

Supreme Court rejected Petitioner's claim as follows:

The trial court did not discount the mitigating evidence presented by appellant; it determined that the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt. The weight to be given mitigating factors is left to a sentencing authority's sound judgment. *State v. Mills*, 62 Ohio St.3d at 376, 582 N.E.2d at 988. As noted below, we agree with the trial court's assessment on this issue.

(*Loza*, 71 Ohio St. 3d at 83; App. Vol. III, at 1246.)

In *Lockett v. Ohio*, 438 U.S. 586, 604 (1978), a plurality of the Supreme Court held that

the Eighth and Fourteenth Amendments require that the sentencer not be precluded from

209

considering as a mitigating factor any aspect of the defendant's character or record and any of the circumstances of the offense. *See also Eddings v. Oklahoma*, 455 U.S. at 113-14 (holding that sentencing judge's refusal, as a matter of law, to consider mitigating evidence concerning family history and upbringing violated the defendant's constitutional rights). *Lockett* and its progeny prevent a State, through statutes or judicial instruction, from precluding the sentencer from hearing, considering, or giving effect to relevant mitigating evidence. *See, e.g., Johnson v. Texas*, 509 U.S. 350, 359 (1993) (holding that instruction on future dangerousness did not preclude consideration of the defendant's youth); *see also Saffle v. Parks*, 494 U.S. 484, 489 (1990) (holding that "antisympathy" instruction did not preclude sentencer from giving effect to relevant mitigating evidence).

Ohio law is clear that the decision of how much weight, if any, to assign evidence that the defendant presents in mitigation is for the sentencer to decide. *See, e.g. State v. Steffen*, 31 Ohio St. 3d 111, paragraph two of the syllabus (1987) ("The fact that an item of evidence is admissible under R.C. 2929.04(B)(7) does not automatically mean that it must be given any weight"); *see also State v. Holloway*, 38 Ohio St. 3d 239, 241 (1988) ("When found not mitigating, a factor may be given little or no weight against the aggravating circumstances" (citations omitted)). That the jury or trial court may decide how much weight to assign mitigating evidence does not offend *Lockett* and its progeny because "those cases and others in that decisional line do not bar a State from guiding the sentencer's consideration of mitigating evidence." *Johnson v. Texas*, 509 U.S. at 362.

Petitioner construes the trial court's statement that the O.R.C. § 2929.04(B)(7) evidence at issue was "of little relevance with respect to the appropriateness of the death penalty" as

210

meaning that the trial court refused to consider that evidence at all. This Court believes that a more reasonable reading of the trial court's decision as a whole is, as the Ohio Supreme Court suggested and Respondent herein argues, that the trial court considered but gave little weight to the § 2929.04(B)(7) mitigating factors in determining that the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt. Petitioner points out that the trial court treated the § 2929.04(B)(7) "catch-all" mitigation evidence differently than it treated the other categories of mitigation evidence.

For the foregoing reasons, the Court is not persuaded that Petitioner has demonstrated that the trial court refused to consider or give effect to Petitioner's § 2929.04(B)(7) "catch-all" mitigation evidence in violation of Petitioner's Eighth and Fourteenth Amendment rights. Thus, the Court cannot find that the result of the Ohio Supreme Court's decision rejecting Petitioner's claim contravened United States Supreme Court authority or relied on an unreasonable determination of the facts. Petitioner's twenty-seventh ground for relief is **DENIED**.

> **Twenty-Eighth Ground for Relief: The death sentences are inappropriate and thereby deprive Petitioner of his rights as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution.**

(Petition, Doc. # 6, at ¶¶ 317-336.) In his memorandum in support, Petitioner expressly withdraws this claim. (Doc. # 62, at 134.) Accordingly, Petitioner's twenty-eighth ground for relief is **DENIED** and is not certified for appeal.

> **Twenty-Ninth Ground for Relief: The appellate court failed to conduct the direct appellate review appropriately and thereby deprived Petitioner of his rights as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution.**

(Petition, Doc. # 6, at ¶¶ 337-340.)  In his memorandum in support, Petitioner expressly withdraws this claim.  (Doc. # 62, at 134.)  Accordingly, Petitioner's twenty-ninth ground for relief is **DENIED**.

> **Thirtieth Ground for Relief: The proportionality review conducted in Ohio deprives Petitioner of his rights as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution.**

Section 2929.03(G) of the Ohio Revised Code creates a statutorily mandated duty upon state appellate courts to reivew each death sentence imposed to determine whether the sentence is excessive or disproportionate to death sentences imposed in similar cases.  Petitioner argues that Ohio's proportionality review is meaningless and incapable of guarding against the arbitrary and capricious imposition of capital punishment, pointing to the information gathering system as flawed.  (Petition, Doc. # 6, at ¶¶ 341-346.)  Petitioner asserts that trial courts presiding over capital cases consistently file separate sentencing decisions only when they impose death, not when they impose life.  "The result," Petitioner explains, "has been an information tracking system that contains only death verdicts."  (*Id.* at ¶ 342.)  Petitioner reasons that "[b]asing a proportionality decision on a data bank containing only death verdicts can result in one conclusion, that all death verdicts are proportional."  (*Id.*)

In his memorandum in support, Petitioner adds that although the United States Supreme Court has suggested that the Constitution does not mandate proportionality review, *Gregg v. Georgia*, 428 U.S. 153, 198 (1976), and its progeny *Walton v. Arizona*, 497 U.S. 636, 655 (1990), nonetheless stand for the proposition that meaningful appellate review, undertaken in good faith, is a factor to consider in determining the constitutionality of any capital punishment scheme.  (Doc. # 62, at 135-142.)  Moreover, Petitioner argues, due process is violated when a

212

State creates a liberty interest, such as the placement of substantive limitations on the exercise of official discretion, and then fails to enforce those limitations. The Supreme Court has held, Petitioner argues, that the Due Process Clause protects state criminal defendants from the arbitrary deprivation of life and liberty. Petitioner asserts that the Sixth Circuit, too, has consistently recognized that a sentencer's failure to abide by statute may violate due process. (Doc. # 62, at 139 (citing *Fox v. Coyle*, 271 F.3d 658, 665-66 (6th Cir. 2001), and *Howard v. Grinage*, 82 F.3d 1343, 1349-1350 (6th Cir. 1996)).) In his own case, Petitioner notes that the Ohio Supreme Court provided no analysis whatsoever, only "a string cite," in finding that his sentence was proportionate. (Doc. # 62, at 140.)

In her return of writ, Respondent notes that the Ohio Supreme Court rejected Petitioner's claim on direct appeal and argues that the "short answer to [Petitioner's] argument is that no proportionality review is constitutionally required." (Doc. # 67, at 89.) Respondent also asserts that because proportionality is not constitutionally required, states such as Ohio enjoy considerable latitude in defining the pool of cases to be used for comparison. Ohio has defined its pool of cases in a rational manner, Respondent argues, meaning that no constitutional provision is implicated in Petitioner's claimed error.

In his reply, Petitioner begins by asserting that the Ohio Supreme Court, in rejecting his claim in a summary fashion and with no reference to controlling federal law, did not adjudicate Petitioner's claim on the merits sufficient to trigger the applicability of the AEDPA's § 2254(d) standard of review. (Doc. # 70, at 83-84.) Petitioner goes on to assert that Respondent failed to respond to any of Petitioner's arguments as to why, even in the face of Supreme Court law suggesting that the Constitution does not require proportionality review, the flawed manner in

213

which Ohio courts conduct statutorily required proportionality review nonetheless runs afoul of the United States Constitution.

Petitioner's arguments fall short of establishing that he is entitled to habeas corpus relief on this claim. The Sixth Circuit has consistently rejected this claim, not only generally on the ground that the Constitution does not require proportionality review, but also as to each argument raised by Petitioner herein. *See, e.g., Smith v. Mitchell*, 567 F.3d 246, 260-61 (6th Cir. 2009); *Getsy v. Mitchell*, 495 F.3d 295, 306 (6th Cir. 2007); *Williams v. Bagley*, 380 F.3d 932, 961-63 (6th Cir. 2004). For these reasons, Petitioner cannot show that the result of the Ohio Supreme Court's decision rejecting his claim on direct appeal violated any Supreme Court authority. Petitioner's thirtieth ground for relief is **DENIED**.

> **Thirty-First Ground for Relief**: **Executing an individual via the electric chair offends contemporary standards of decency in violation of Petitioner's rights as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution.**

(Petition, Doc. # 6, at ¶¶ 347-350.) In his memorandum in support, Petitioner acknowledges that since the filing of his habeas corpus petition, Ohio has changed its method of execution eliminating use of the electric chair. Accordingly, Petitioner expressly withdraws this claim. (Doc. 62, at 142-43.) Petitioner's thirty-first ground for relief is **DENIED**.

> **Thirty-Second Ground for Relief**: **The Ohio Death Penalty statute on its face and as applied deprives Petitioner of his rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

(Petition, Doc. # 6, at ¶¶ 351-374.) In his memorandum in support, Petitioner notes that "[w]here appropriate, Petitioner's counsel have included arguments related to a facial or as applied challenge to Ohio's statute in Petitioner's other habeas grounds." (Doc. # 62, at 143.)

214

Petitioner accordingly expressly withdraws this claim and this Court **DENIES** his thirty-second ground for relief.

> **Thirty-Fourth Ground for Relief: The cumulative effect of errors visited upon Petitioner's proceedings have deprived Petitioner of his rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.**[14]

(Petition, Doc. # 6, at ¶¶ 382-383.) Beyond adding some case citations, Petitioner does not expand upon this summary argument in his memorandum in support or reply. (Doc. # 62, at 144; Doc. # 70, at 84.) In her return of writ, Respondent argues that many of Petitioner's claims are barred by procedural default and that the claims properly before this Court did not rise to the level of an error of constitutional magnitude having a substantial and injurious effect or influence on the jury's verdict. (Doc. # 67, at 91.)

Petitioner's claim is foreclosed by Sixth Circuit precedent that clearly establishes as to cases governed by the AEDPA that "[t]he Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief." *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002), *amended on other grounds*, 307 F.3d 459 (6th Cir. 2002), *cert. denied*, 538 U.S. 947 (2003); *see also Gillard v. Mitchell*, 445 F.3d 883, 898 (6th Cir. 2006) (holding that Supreme Court has never held that distinct claims can accumulate to grant habeas relief); *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005) (same). In light of the foregoing, this Court cannot find that the Ohio courts' decisions rejecting Petitioner's cumulative-effect-of-the-errors claims was

---

[14]     In its June 11, 2002 *Opinion and Order*, the Court denied Petitioner's thirty-third ground for relief as procedurally defaulted. (Doc. # 56, at 67-71.)

contrary to or involved an unreasonable application of clearly established federal law.[15] Even

assuming that Petitioner's claim was not precluded by Sixth Circuit precedent, this Court is not

of the view that it warrants habeas corpus relief because this Court has not found any errors to

accumulate. *See Getsy v. Mitchell*, 495 F.3d 295, 317 (6th Cir. 2007) (holding that cumulative-

error claim failed "because there simply are no errors to accumulate" (citing *Baze v. Parker*, 371

F.3d 310, 330 (6th Cir. 2004)).

Accordingly, Petitioner's thirty-fourth ground for relief is **DENIED**.

## IV. Conclusion

For the foregoing reasons, the Court **DENIES** Petitioner's habeas corpus claims,

**DISMISSES** this action, and **DIRECTS** the Clerk to enter judgment dismissing this action.

**IT IS SO ORDERED.**

3-31-2010

**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT JUDGE**

---

[15]    This Court is mindful that the Sixth Circuit granted relief on a cumulative-error claim in *DePew v. Anderson*, 311 F.3d 742, 751 (6th Cir. 2003), but that case was not governed by the AEDPA.

216